**UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| HYUNG SEOK KOH and EUNSOOK KOH, | ) | |
| | ) | |
| Plaintiffs, | ) | No. 11-cv-02605 |
| | ) | |
| v. | ) | |
| | ) | Judge Edmond E. Chang |
| M. GRAF, et al., | ) | |
| | ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

Plaintiffs Hyung Seok and Eunsook Koh brought this suit against Northbrook police officers Graf, Ustich, Wernick, Eisen, Johnson, Dunham, Meents, Celia, and other unknown officers, as well as Wheeling police officer Sung Phil Kim (when referred to all together, the Defendant Officers), alleging violations of their civil rights under 42 U.S.C. § 1983.[1] R. 40, First Am. Compl. The Kohs also name the Villages of Northbrook and Wheeling as defendants. *Id.* The Northbrook officers and the Village of Northbrook have moved to dismiss under Federal Rule of Civil Procedure 12(b)(6) [R. 48], as have Officer Kim and the Village of Wheeling [R. 51]. For the reasons below, the motions are granted in part and denied in part.

## I. Background

In evaluating this motion to dismiss, the Court accepts as true the complaint's factual allegations and draws reasonable inferences in Plaintiffs' favor. *Ashcroft v. al-Kidd*, — U.S. —, 131 S. Ct. 2074, 2079 (2011). At around 3:30 a.m. on April 16, 2009,

---

[1]The Court has subject matter jurisdiction under 28 U.S.C. § 1331 over the § 1983 claims, and supplemental jurisdiction over the state-law claims.

Eunsook Koh discovered her son, Paul Koh, lying in a pool of his own blood in their family home. First Am. Compl. ¶ 12. Paul had been a troubled young man; before his death, he had reported to family members and others that he had begun hearing voices and had become increasingly erratic. *Id.* ¶ 10. Sometime that night, Paul committed suicide. *Id.* ¶ 11. Upon discovering her son's body, Eunsook immediately woke her husband, Hyung Seok Koh, who hysterically called 911. *Id.* ¶ 13.

About fifteen minutes later, Northbrook police officers Eisen, Johnson, Meents, and Celia arrived at the Koh family home and found Paul Koh lying in the foyer. *Id.* ¶ 14. At the time, there was no valid reason to suspect that either of the Kohs were responsible for Paul's death. *Id.* ¶ 15. Mr. Koh, who was shorter, older, and weighed significantly less than Paul, had no wounds, cuts, bruises, or abrasions on his body. *Id.* ¶¶ 17-18. Nor was there any other sign of trauma anywhere on Mr. Koh. *Id.* ¶ 17. And there was no significant amount of visible blood on Mr. Koh's body, no bloody clothing (other than Paul's) recovered from the Kohs' home, and no evidence to suggest that any blood had been cleaned up in any way. *Id.* ¶ 19. Yet the Northbrook officers, who did not conduct any interviews with neighbors, friends of the victim, or anyone else, immediately decided that Mr. Koh had stabbed Paul to death. *Id.* ¶¶ 16, 20. Because of this suspicion, Officer Johnson refused the Kohs' pleas to allow them to follow Paul's body to the hospital. *Id.* ¶ 21. Instead, Northbook police officers (including Johnson, Meents, and Celia) immediately detained the Kohs and then took them to the Northbrook police station and placed them under arrest. *Id.* ¶ 22. The Kohs were each confined in a room, alone, for a long period of time, and Eunsook Koh was detained for

about 32 hours in total and strip-searched without justification under the authorization of Defendant Wernick (the Watch Supervisor of the Northbrook Police Department). *Id.* ¶¶ 23-24.

Meanwhile, at about 7:30 a.m. that same morning, Hyung Seok Koh was subjected to the first of three videotaped interrogations. *Id.* ¶ 25. Mr. Koh, who emigrated from South Korea, does not speak English very well and had significant difficulties understanding the police officers' questions and expressing himself accurately. *Id.* ¶¶ 8, 26. But rather than supply Mr. Koh with a proper interpreter, the Northbrook Police Department provided Mr. Koh with interpretation "assistance" from Officer Kim, a Wheeling police officer of Korean descent. *Id.* ¶ 27. By Officer Kim's own admission, he was not fluent in Korean. *Id.* And Officer Kim's job was not to serve merely as a passive translator, but as an additional interrogating police officer. *Id.* ¶ 28.

These interrogations, the Kohs allege, were unduly coercive and confrontational. Throughout the lengthy interrogations, Mr. Koh was in shock and grieving at the loss of his son. *Id.* ¶ 29. Mr. Koh, moreover, was a diabetic with numerous medical conditions, including high blood pressure, and had no access to any of his medications and did not eat or drink properly. *Id.* He was also sleep deprived. *Id.* Knowing that Mr. Koh was in a vulnerable condition, the complaint[2] alleges that the Defendant Officers repeatedly yelled at him, lied to him, manipulated him, and repeatedly accused him

---

[2] For convenience's sake, all references to "the complaint" in this opinion are actually references to the First Amended Complaint.

of his son's murder. *Id.* ¶¶ 29-30. Without having conducted any meaningful investigation, and lacking physical evidence of any kind suggesting that Paul Koh had even been murdered at all, Detective Graf fabricated a motive for the killing and repeatedly badgered Mr. Koh to adopt Graf's explanation as true. *Id.* ¶¶ 31-32. During the interrogations, the Defendant Officers physically and mentally intimidated Mr. Koh by unjustified physical touching and the presence of an armed police officer in the room. *Id.* ¶ 34. And at no point was he free to leave the station, or was allowed to consult with his family, friends, or pastor despite his repeated requests to do so. *Id.* ¶ 33. Indeed, after a number of hours of interrogation, Detective Graf learned that the Kohs had a lawyer in the police station who was trying to reach them. *Id.* ¶ 37. The attorney was not allowed into the interrogation room to speak to Mr. Koh within a reasonable period of time. *Id.* ¶ 38. Instead, Detective Graf urged Mr. Koh to "hurry up" and confess "right now . . . let's be done, fast." *Id.* (ellipses in amended complaint). Eventually, the Kohs' attorney got access to the interrogation room and ended the interrogation. *Id.* ¶ 39.

The Kohs allege that as a result of this coercive interrogation, Mr. Koh made statements that the Defendant Officers believed were self-incriminating. *Id.* ¶ 36. And at the conclusion of the interrogation, the Defendant Officers fabricated a statement and falsely attributed it to Mr. Koh, and told prosecutors from the Cook County State's Attorney's Office about the statement. *Id.* ¶ 40. The Defendant Officers (including Defendants Wernick, Eisen, and Dunham, who allegedly turned a blind eye to all of this alleged misconduct) also withheld exculpatory evidence. *Id.* ¶¶ 41-42. As a result

4

of the alleged misconduct, Assistant State's Attorneys used Mr. Koh's custodial statements, plus Detective Graf's allegedly false grand jury testimony, to charge Mr. Koh with Paul's murder. *Id.* ¶¶ 36, 40-41. Mr. Koh's bond was set prohibitively high, and he spent more than three years in Cook County Jail awaiting trial. *Id.* ¶ 43. At Cook County Jail, he endured harsh and brutal conditions, which were compounded by his age, medical issues, and English difficulties. *Id.* ¶ 44. Finally, in December 2012, Mr. Koh went on trial for his son's murder, where the only evidence implicating him were his custodial statements. *Id.* ¶ 45. At the conclusion of the three-week trial, he was acquitted after less than two hours of deliberation. *Id.* ¶¶ 45-46.

As a result of this alleged police misconduct, the Kohs bring several constitutional and state-law claims in their First Amended Complaint. In Count One, the Kohs allege that the Defendant Officers arrested them without probable cause (or, in Officer Kim's case, allegedly extended Mr. Koh's unlawful detention) in violation of the Fourth Amendment. *Id.* ¶¶ 47-51. They also contend that the Defendant Officers improperly subjected Mr. Koh to physical and psychological abuse and subjected Mrs. Koh to an unnecessary strip search. *Id.* ¶ 49. In Count Two, the Kohs allege that the Defendant Officers deprived Mr. Koh of his Sixth Amendment right to counsel. *Id.* ¶¶ 52-55. In Count Three, the Kohs allege that the Defendant Officers violated Mr. Koh's Fifth and Fourteenth Amendment due process rights, including the right to avoid self-incrimination. *Id.* ¶¶ 56-59. Count Four alleges that the Defendant Officers failed to intervene to prevent these constitutional violations, *id.* ¶¶ 60-64, Count Five alleges that the Defendant Officers were acting pursuant to Northbrook's policy and practice

5

(pursuant to *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658 (1978)), *id.* ¶¶ 65-67, and Count Six alleges that the Defendant Officers conspired to violate the Kohs' civil rights, *id.* ¶¶ 68-72. Those are the Kohs' federal constitutional claims.

The Kohs also bring several Illinois state-law claims. Count Seven alleges that the Defendant Officers committed malicious prosecution by fabricating evidence, withholding exculpatory information, and subjecting Mr. Koh to criminal proceedings without probable cause. *Id.* ¶¶ 73-77. Count Eight alleges that the Defendant Officers intentionally inflicted emotional distress upon the Kohs. *Id.* ¶¶ 78-82. Count Nine alleges loss of consortium on behalf of both of the Kohs. *Id.* ¶¶ 83-86. Finally, Counts Ten and Eleven allege *respondeat superior* and indemnification against the Villages of Northbrook and Wheeling for these state-law torts. *Id.* ¶¶ 87-95.

In response to the First Amended Complaint, all Defendants have moved to dismiss most of these claims pursuant to Federal Rule of Civil Procedure 12(b)(6). R. 48; R. 51.

## II. Standard of Review

Under Federal Rule of Civil Procedure 8(a)(2), a complaint generally need only include "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). This short and plain statement must "give the defendant fair notice of what the claim is and the grounds upon which it rests." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal quotation marks and citation omitted). The Seventh Circuit has explained that this rule "reflects a liberal notice pleading regime, which is intended to 'focus litigation on the merits of a claim' rather

6

than on technicalities that might keep plaintiffs out of court." *Brooks v. Ross*, 578 F.3d 574, 580 (7th Cir. 2009) (quoting *Swierkiewicz v. Sorema N.A.*, 534 U.S. 506, 514 (2002)).

"A motion under Rule 12(b)(6) challenges the sufficiency of the complaint to state a claim upon which relief may be granted." *Hallinan v. Fraternal Order of Police Chicago Lodge No. 7*, 570 F.3d 811, 820 (7th Cir. 2009). "[A] complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). These allegations "must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. The allegations that are entitled to the assumption of truth are those that are factual, rather than mere legal conclusions. *Iqbal*, 556 U.S. at 678-79.

## III. Analysis

### A. Northbrook's Motion to Dismiss

The Village of Northbrook and the Northbrook officers move to dismiss most of the claims against them. The Court addresses each argument in turn.

### 1. Group Pleading

At the outset, Northbrook argues that the complaint should be dismissed because the Kohs fail to give each individual Northbrook officer fair notice of the conduct on which each individual officer's liability is allegedly based. R. 48, Northbrook Mot. Dismiss at 4. For example, rather than name specific officers in paragraph 30 of the First Amended Complaint, the Kohs allege, "While Plaintiff Hyung Seok Koh was

7

in this unduly vulnerable condition, the *Defendant Officers* repeatedly yelled at him, lied to him, manipulated him, and repeatedly accused him wrongfully of his son's murder." First Am. Compl. ¶ 30 (emphasis added). Northbrook complains that the Kohs continually use "Defendant Officers" throughout their complaint rather than specify which officer did what, and argues that this practice of group pleading violates Rule 8(a). Northbrook Mot. Dismiss at 5.

In this case, the group pleading in the Kohs' complaint is permissible. Rule 8(a) is not so rigid that it requires a plaintiff, without the benefit of discovery, to connect every single alleged instance of misconduct in the complaint to every single specific officer. Such a pleading standard would effectively allow police officers to violate constitutional rights with abandon as long as they ensured they could not be individually identified, even if liability for acting in concert (or for aiding and abetting each other) would otherwise apply. *Wilson v. City of Chicago*, No. 09-C-2477, 2009 WL 3242300, at *2 (N.D. Ill. Oct. 7, 2009) ("Two police officers arrest a person, and after handcuffing him and placing him on the ground, one officer kicks the arrestee in the head. It would be patently unfair and illogical to force such a person to identify which of the two officers committed the act before taking discovery."). Rather, the key is to generally name the "persons responsible for the problem." *Burks v. Raemisch*, 555 F.3d 592, 594 (7th Cir. 2009). And that is what the Kohs did here. The Kohs allege that three individual officers—Johnson, Meents, and Celia—arrested the Kohs and took them to the Northbrook police station without probable cause. First Am. Compl. ¶ 22. Although the complaint generally alleges that the "Defendant Officers repeatedly

8

yelled at him [Mr. Koh], lied to him, manipulated him, and repeatedly accused him wrongfully of his son's murder" during Mr. Koh's interrogation, *id.* ¶ 30, it names Detective Graf in particular as the lead interrogating officer, *see, e.g.*, *id.* ¶¶ 31-32. The complaint, moreover, specifically names Defendants Wernick, Eisen, and Dunham as defendants who knew about this alleged misconduct (and authorized the unjustified strip search of Mrs. Koh, in the case of Defendant Wernick), yet allowed it to happen. *Id.* ¶¶ 24, 42. And the complaint also alleges that the Defendant Officers all acted jointly in this misconduct and in misconduct that presumably occurred outside of the Kohs' presence—when they could never have known which officer(s) were responsible—including communicating an allegedly false statement to prosecutors and withholding exculpatory evidence. *See, e.g.*, *id.* ¶¶ 40-41. Read sensibly and as a whole, these allegations are sufficient to place the Defendant Officers on notice of the claims against them. *See Engel v. Buchan*, 710 F.3d 698, 710 (7th Cir. 2013) ("But reading the allegations sensibly and as a whole, there is no genuine uncertainty regarding who is responsible for what. Wherever the complaint mentions specific misconduct in Engel's investigation and prosecution . . . there can be no doubt that it refers to Buchan and Quid, the two law-enforcement officers involved in the case. And they are accused of acting jointly.").

To be sure, group pleading is not an ideal practice, especially where it would seem possible to name a particular defendant, or at least a subset of defendants, as committing or participating in certain conduct. By not tying every individual officer to a specific instance of alleged misconduct, the Kohs might have prevented each officer,

or at least some of the officers, from raising the defense of qualified immunity now (more on this below) before being subjected to "the burdens of broad-reaching discovery." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). There is no readily apparent reason why, for example, the Kohs have only named one officer who was present during the interrogation of Mr. Koh (Detective Graf). *See, e.g.*, First Am. Compl. ¶¶ 31-32, 37-38. Nor is group pleading an effective vehicle for obtaining specific admissions from defendants. But a suboptimal practice is not an impermissible practice. Indeed, the Defendant Officers can take solace in the fact that they may answer the complaint in the way it is pled and may admit or deny each allegation of group action as just that—as a group. The Court might also entertain an early motion for summary judgment on the basis of qualified immunity, once discovery has begun and more specifics have been tied down (and after the Kohs have had a reasonable chance to do so in discovery). And of course the Kohs must eventually tie particular officers to particular injuries to survive summary judgment (if there are motions for summary judgment), unless there are joint liability theories that apply. *See, e.g.*, *Grieveson v. Anderson*, 538 F.3d 763, 777-78 (7th Cir. 2008). But at this early stage, the Kohs' complaint gives Defendants sufficient notice of the claims against them.[3]

---

[3]Northbrook also contends that incorporating the previous paragraphs by reference, which each numbered count does, is impermissible "shotgun" pleading. Northbrook Mot. Dismiss at 4-5. But the Kohs' complaint is different from the complaint in the case that Northbrook cites, *CustomGuide v. CareerBuilder, LLC*, 813 F. Supp. 2d 990 (N.D. Ill. 2011). The complaint in that case appeared to allege a theory of common law misappropriation that was undisputedly preempted by federal copyright law. *Id.* at 1001. When the plaintiff argued that its misappropriation count should survive under a *different* theory because it incorporated different facts by reference, the court there declined to consider the incorporated facts because it was impossible to tell which facts supported which misappropriation theory. *Id.* at 1001-02.

## 2. Fifth Amendment

Second, Northbrook moves to dismiss the Kohs' Fifth Amendment claim, asserting that Mr. Koh was not denied counsel in violation of the Fifth Amendment. Northbrook Mot. Dismiss at 7-9. But as the Kohs argue in their response, their Fifth Amendment claim is not based on a denial of counsel, but on a coerced confession that was used against him in criminal proceedings, including at his trial. R. 61 at 11. Although Northbrook complains that it has no way of knowing which factual allegations support the Fifth Amendment claim because the claim incorporates the preceding paragraphs by reference, R. 63 at 7, plaintiffs need only plead factual allegations that support a plausible claim to relief and are not required to string those allegations together into legal theories. *Del Marcelle v. Brown Cnty. Corp.*, 680 F.3d 887, 909 (7th Cir. 2012) (en banc) (per curiam). Thus, the question is whether the factual allegations in the Kohs' complaint plausibly allege that Mr. Koh's confession was coerced in violation of the Fifth Amendment.

The complaint does. The voluntariness of a confession "is a question of fact to be determined from the totality of all the circumstances." *Schneckloth v. Bustamonte*, 412 U.S. 218, 227 (1973). And the totality of the factual allegations surrounding Mr. Koh's interrogation, if assumed to be true and all reasonable inferences from them are drawn in the Kohs' favor, does plausibly allege that his confession was the product of coercion.

---

Here, in contrast, Northbrook does not contend that each count is based on conflicting theories or facts, or even that the counts are mutually exclusive. The complaint is thus sufficiently clear to put Northbrook on notice of the alleged claims despite the incorporations by reference.

11

The Kohs allege that the Defendant Officers knew that Mr. Koh was sleep-deprived, did not eat or drink properly, and could not access medications for diabetes and high blood pressure. First Am. Compl. ¶ 29. And they knew that Mr. Koh was not fluent in English and the police officer assigned to translate for him was not fluent in Korean. *Id.* ¶ 27. Yet despite knowing all of this (or because they knew all of this), the Defendant Officers repeatedly yelled at him, lied to him, manipulated him, badgered him, and wrongfully accused him of his son's murder to make him confess. *Id.* ¶¶ 30-32. They physically intimidated him by putting their hands on him. *Id.* ¶ 34. One of the officers openly wore a gun in the room. *Id.* Mr. Koh was never free to leave the station or speak to family and friends, *id.* ¶ 33, and when his attorney came to the station looking for him, the pace of the badgering only increased as the police tried to wrangle a confession out of him before his attorney could interrupt. *Id.* ¶ 38. And on top of all this, the police officer that Northbrook assigned to translate for Mr. Koh was not just a passive translator, but helped interrogate him too. *Id.* ¶ 28. All of these factors contributed to the coercive atmosphere of the interrogation room, which confused Mr. Koh and caused him to make self-incriminating statements to the police. *Id.* ¶¶ 35-36. Read together, these allegations plausibly allege that Mr. Koh's "will was overborne at the time he confessed." *Reck v. Pate*, 367 U.S. 433, 440 (1961) (citations omitted); *see also, e.g., Arizona v. Fulminante*, 499 U.S. 279, 287 (1991) ("Our cases have made clear that a finding of coercion need not depend upon actual violence by a government agent; a credible threat is sufficient.") (footnote omitted); *Andersen v. Thieret*, 903 F.2d 526, 530 (7th Cir. 1990) ("Food, sleep, and water deprivation and a mentally coercive

interrogation would also have caused the state courts to conclude that [a] confession was involuntary." (citations omitted)); *cf. United States v. Nguyen*, 155 F.3d 1219, 1222 (10th Cir. 1998) (holding that a custodial statement was given voluntarily in part because the defendant "was comfortable with the English language, was intelligent, and was capable of understanding his statement when it was reduced to writing"); *United States ex rel. McMillen v. Briley*, 2002 WL 69488, at *8 (N.D. Ill. Jan. 18, 2002) ("[T]he record does not indicate that the state either promised medication or therapy as a reward for confessing, or withheld it to coerce a confession."). Accordingly, the Kohs' complaint plausibly pleads a Fifth Amendment violation.[4]

### 3. Intentional Infliction of Emotional Distress

Third, Northbrook moves to dismiss the intentional infliction of emotional distress claim, arguing that it is time-barred. Northbrook Mot. Dismiss at 12. The parties agree that this claim is governed by a one-year statute of limitations, *see Williams v. Lampe*, 399 F.3d 867, 870 (7th Cir. 2005) (citation omitted), so the only question is when the year started. Northbrook asserts that the Kohs' cause of action accrued (that is, the one-year clock began ticking) on the date of Mr. Koh's interrogation, Northbrook Mot. Dismiss at 12, but the Kohs contend that it accrued on the date of Mr. Koh's acquittal in his criminal trial. R. 61 at 13. In support of that accrual date, the Kohs cite *Feltmeier v. Feltmeier*, where the Illinois Supreme Court

---

[4]In its reply brief, Northbrook asks the Court to strike paragraphs 37-39 as immaterial to the Kohs' Fifth Amendment claim. R. 63 at 7-8. Although those allegations do not independently support a claim, they are part of the totality of circumstances surrounding the Kohs' Fifth Amendment coerced confession claim and will not be stricken.

held that an intentional infliction of emotional distress claim based on an ongoing campaign of abuse, all by the same actor and of a similar nature, accrues once the last act occurred. 798 N.E.2d 75, 87-88 (Ill. 2003). According to the Kohs, their intentional infliction of emotional distress claim is based on the entirety of Defendants' alleged misconduct (beginning with the Kohs' unlawful seizure and continuing through Mr. Koh's criminal court proceedings), so their claim accrued on the date that Mr. Koh was acquitted. R. 61 at 12-13.

The problem for the Kohs is that *Brooks v. Ross*, which neither party discusses, rejected *Feltmeier*'s continuing-tort theory for intentional infliction of emotional distress claims arising out of malicious prosecutions. 578 F.3d 574, 579 (7th Cir. 2009). In *Brooks*, Brooks "became convinced that he was the victim of a conspiracy to prosecute him," and sued a variety of defendants—"all of whom played a role in the actions against [him]"—for a variety of claims. *Id.* at 577. When the defendants argued that Brooks's intentional infliction of emotional distress claim was time-barred, he cited the continuing-tort rule in *Feltmeier* (although not to *Feltmeier* directly) and argued that "*his entire prosecution* constitutes a continuing tort." *Id.* at 579 (emphasis added). The Seventh Circuit rejected this argument, reasoning that a pattern of continuing *torts* is different from a continuing *injury* that flows from a single overt act. *Id.* (citing *Feltmeier*, 798 N.E.2d at 85). Accordingly, the Seventh Circuit held that "[t]he single overt act here is Brooks's indictment, even if the damages that Brooks suffered may have continued throughout his trial," and that Brooks's intentional infliction of emotional distress claim was time-barred because the claim accrued on the

14

date of his indictment. *Id.* This holding defeats the Kohs' argument that their claim accrues on the date of Mr. Koh's acquittal. Mr. Koh may have continued to suffer injury from the Defendant Officers' actions throughout his incarceration and up until he was acquitted at trial, but *Brooks* makes clear that Mr. Koh suffered a continuing injury that flowed from his indictment rather than a continuing pattern of tortious activity that ended with his acquittal.

To be fair, it appears that only two of the cases from this District that were decided after *Brooks* discuss *Brooks*. One of those cases, *Starks v. City of Waukegan*, similarly concluded that *Brooks* holds that an intentional infliction of emotional distress claim arising out of a malicious prosecution claim accrues upon indictment. 2013 WL 2243089, at *16-17 (N.D. Ill. May 21, 2013). There, although Starks argued that his intentional infliction of emotional distress claim was based on facts underlying his malicious prosecution claim (specifically, that several dentists refused to acknowledge that their reports linking Starks to the bite mark on the victim were flawed), the court applied *Brooks* to reject that argument. *Id.* It therefore dismissed Starks's claim as time-barred. *Id.* at *17. Thus, *Starks* also supports this Court's conclusion.

As for the other Northern District case, which the Kohs do cite to, it distinguishes *Brooks* on the grounds that "the court failed to consider if and how the plaintiffs' IIED claims were intertwined with their malicious prosecution claims." *Hobbs v. Cappelluti*, 899 F. Supp. 2d 738, 763 n.16 (N.D. Ill. 2012) (citation omitted). But that is not a basis to set aside the plain holding of *Brooks*. And the Seventh

15

Circuit, more importantly, *did* understand that Brooks's intentional infliction of emotional distress claim arose out of his malicious prosecution claim. *See Brooks*, 578 F.3d at 579 ("Brooks believes that his *entire prosecution* constitutes a continuing tort." (emphasis added)); *see also* Brief of Appellant, *Brooks v. Ross*, 578 F.3d 574 (7th Cir. 2009) (No. 08-4286), 2009 WL 908608 (arguing that defendants intentionally inflicted emotional distress upon Brooks by causing him to be wrongfully and unlawfully arrested, imprisoned, and prosecuted). *Hobbs*, then, does not offer a compelling reason why *Brooks* does not control here.

Accordingly, the Kohs' emotional-distress claim accrued on the date of Mr. Koh's indictment and not the date of his acquittal. Although that date is not set out in the complaint, the complaint does allege that Mr. Koh was charged before he spent more than three years in Cook County Jail. First Am. Compl. ¶ 43. And he was acquitted following this incarceration in December 2012. *Id.* ¶¶ 45-46. So the record shows that Mr. Koh was indicted in 2009, three years before his trial began. His initial complaint bringing the intentional infliction of emotional distress claim was not filed until April 18, 2011, *see* R. 1, which is more than one year after 2009. Accordingly, the Kohs' intentional infliction of emotional distress claim is time-barred, and is dismissed with prejudice.[5]

---

[5]Practically speaking, because this claim mirrors the malicious prosecution claim (which Northbrook does not move to dismiss), its dismissal seems to have little or no practical impact on the case, especially because the Kohs presumably will seek emotional-distress damages for the alleged malicious prosecution.

**4. Other Claims**

Finally, Northbrook has moved to dismiss several other claims without objection from the Kohs. Those claims include the Kohs' Sixth Amendment claim (Count Two), the Kohs' *Monell* claim against the Village of Northbrook (Count Five), and Mr. Koh's state-law loss of consortium claim (Count Nine). R. 61 at 14. In light of this agreement, Count Two is dismissed with prejudice in its entirety, and Count Nine is dismissed with prejudice as to Mr. Koh only. Count Five, the *Monell* claim, is dismissed without prejudice (but also without pre-approval to re-file an amended *Monell* claim); if the Kohs wish to amend that claim, they must bring a separate motion for leave to amend the complaint. The Kohs' state-law *respondeat superior* and indemnification claims (Counts Ten and Eleven) are also dismissed with prejudice to the extent that they are based on the Kohs' intentional infliction of emotional distress claim or Mr. Koh's loss of consortium claim. Likewise, the Kohs' failure to intervene claim (Count Four) and conspiracy claim (Count Six) are dismissed with prejudice to the extent that they are based on the now-dismissed Sixth Amendment claim.

**B. Wheeling's Motion to Dismiss**

The Village of Wheeling and Officer Kim separately move to dismiss, asserting arguments that overlap with those in Northbrook's motion as well as independent grounds for dismissal. The Court tackles the independent grounds first.

**1. The State-Court Transcripts and Interrogation Video**

As a threshold matter, Wheeling urges the Court to consider two exhibits that were not attached to the Kohs' complaint in considering its motion to dismiss: (1)

transcripts from Mr. Koh's pretrial hearings in state criminal court, and (2) a video recording of Mr. Koh's interrogation at the Northbrook police station. *See* R. 51-1-9, Wheeling Exh. A; R. 51-10, Wheeling Exh. B. Generally, in deciding a motion to dismiss, courts cannot consider evidence outside the pleadings; considering that type of evidence requires converting the motion to a motion for summary judgment under Rule 56. *See, e.g.*, *Tierney v. Vahle*, 304 F.3d 734, 738 (7th Cir. 2002). There are some exceptions, however, and Wheeling attempts to invoke them by arguing that (a) the Court may take judicial notice of the facts contained in the transcripts and (b) the video depicts the interrogation that is central to the plaintiff's claims. R. 51, Wheeling Mot. Dismiss at 5-6.

It is true that, as a general principle, courts may take judicial notice of matters of public record without converting a motion to dismiss into a motion for summary judgment. *Gen. Elec. Capital Corp. v. Lease Resolution Corp.*, 128 F.3d 1074, 1080 (7th Cir. 1997) (citations omitted). But that is a "narrow exception" that applies only to "*undisputed fact[s]* in the public record." *Id.* at 1080, 1081 (emphasis added); *see also* Fed. R. Evid. 201(b)(2) ("The court may judicially notice a fact that is not subject to reasonable dispute because it can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."). Indeed, the cases that Wheeling cites took judicial notice of *un*disputed facts. *See Ennenga v. Starns*, 677 F.3d 766, 773-74 (7th Cir. 2012) (taking judicial notice of the *date* on which an estate entered probate to calculate timeliness under a statute of limitations); *Henson v. CSC Credit Servs.*, 29 F.3d 280, 285 (7th Cir. 1994) (taking judicial notice that no money judgment *was*

18

*entered* in the Indiana state court's Record of Judgment and Orders). And here, just the sheer volume of Mr. Koh's pretrial hearing transcripts alone—thousands of pages' worth—suffices to demonstrate the extent to which the Cook County State's Attorneys Office and Mr. Koh's defense counsel litigated and disputed the facts that Wheeling asks judicial notice of. Indeed, Wheeling has not actually presented an argument that the Kohs are precluded from relitigating the coerciveness of Mr. Koh's interrogation or the lawfulness of their detention. *See Cameron v. Patterson*, 2012 WL 1204638, at *3-4 (N.D. Ill. Apr. 10, 2012) (reviewing state-court criminal transcripts for issue-preclusion purposes). Yet without arguing issue preclusion, Wheeling essentially asks the Court to accept the disputed findings of the state court despite the requirement that, when evaluating a dismissal motion, the Court must assume the truth of the factual allegations in the Koh's complaint. The state-court transcripts will not be considered in deciding this motion.

The interrogation video presents a closer issue. Wheeling contends that the Court may consider the video without converting its motion to a motion for summary judgment because the video is referred to by the Kohs' complaint and is central to their claim. *See* R. 65 at 2. In support, Wheeling cites *Brownmark Films, LLC v. Comedy Partners*, where the Seventh Circuit held that the district court correctly considered two videos in deciding a motion to dismiss. 682 F.3d 687, 690 (7th Cir. 2012). But *Brownmark Films* was a *copyright infringement* case about the videos themselves where the defendant raised an affirmative defense of fair use; the two videos were thus "the only two pieces of evidence needed to decide the question of fair use in this case."

19

*Id.* In other words, the videos in *Brownmark Films* were truly "central to the claim": the dispute was over the videos themselves, and formed the premise of the copyright infringement claim. (That is why courts usually apply this incorporation-by-reference doctrine to contracts in breach of contract cases. *See Tierney*, 304 F.3d at 738; *Levenstein v. Salafsky*, 164 F.3d 345, 347 (7th Cir. 1998).) But here, the Kohs' claims center around an interrogation that just so happens to have been filmed; they could have brought this § 1983 case if the interrogation video had never existed in the first place. *Brownmark Films* thus does not lend much support to Wheeling's position.

A better case for Wheeling is *Scott v. Harris*, 550 U.S. 372 (2007). There, Harris sued Officer Scott, under § 1983, for excessive force resulting in an unreasonable seizure after Scott rammed Harris's car during a high-speed chase. *Id.* at 375-76. At the summary-judgment stage, Scott asserted qualified immunity, which the Supreme Court held that he was entitled to. *Id.* at 376, 386. In so holding, the Supreme Court viewed a videotape of the high-speed chase and found that the video showed that the chase placed police officers and innocent bystanders in serious danger. *See id.* at 379-80. The Supreme Court viewed the other facts in the light most favorable to the nonmovant (Harris), but reasoned that the video so clearly contradicted Harris's version of the events that there was no *genuine* issue of material fact. *See id.* at 380. Although *Scott* was decided at the summary-judgment stage and not the motion-to-dismiss stage, much of the discussion of the video in *Scott* focused on how badly the video "utterly discredited" Harris's version of the events. *See id.* at 380-81. Presumably, the chase video utterly discredited the way that the chase was pled in Harris's

complaint as well. Thus, it is likely that the Supreme Court would likewise have considered the video had they heard the case at the motion-to-dismiss stage. And the Seventh Circuit has been willing to view videos that contradict a complaint's allegations when hearing appeals from dismissals of cases, albeit videos that were attached to the complaint as exhibits. *See, e.g.*, *Bogie v. Rosenberg*, 705 F.3d 603, 608-09, 610-12 (7th Cir. 2013). Thus, *Scott* suggests that this Court may view the interrogation video to determine if, as Wheeling believes it does, the video contradicts the way Mr. Koh's interrogation is pled in the Kohs' complaint.

Several other factors also support this conclusion. Whether police coerce a confession in violation of the Fifth Amendment depends, again, on the totality of the circumstances of the interrogation. *See Fulminante*, 499 U.S. at 285-86. And the type of coercion that the Kohs allege—including shouting, badgering, nonconsensual touching, and displaying a gun, *see* First Am. Compl. ¶¶ 30-34—are outward manifestations of coercion that a video might (though not always) capture. And although there can be physical limitations with video footage that "show[] only one perspective on a scene" so that "additional perspectives, such as eyewitness testimony or photographs or films from different angles or different times, [are necessary to] reveal additional facts that would change the legal analysis," *Bogie*, 705 F.3d at 611, this video captures the entire interrogation (or at least large chunks of the interrogation) from a fixed perspective. More importantly, Officer Kim is either present on screen or can be heard off-screen during the entirety of the tape. The video is

21

therefore relevant and helpful when assessing whether it contradicts the Kohs' factual allegations about Officer Kim's involvement in Mr. Koh's interrogation.

For all of those reasons, the Court will consider the interrogation video in conjunction with the Kohs' complaint in deciding Wheeling's motion to dismiss. But in doing so, it still views the video in the light most favorable to the Kohs, who are the nonmovants. *See Bogie*, 705 F.3d at 609 ("When an exhibit contradicts the allegations in the complaint, ruling against the non-moving party on a motion to dismiss is consistent with our obligation to review all facts in the light most favorable to the non-moving party."). And after viewing the video in that light, as discussed below, the video does not actually contradict the Kohs' complaint and does not require dismissal of the Kohs' constitutional claims.

## 2. Qualified Immunity on the Fifth Amendment Claim

The bulk of Wheeling's motion to dismiss contends that Officer Kim acted solely as a translator during the confession, and as a translator (or even as an interrogator) he is entitled to qualified immunity for any Fifth Amendment violations that may have occurred during Mr. Koh's interrogation. *See* Wheeling Mot. Dismiss at 8-13. Wheeling's first argument, that Officer Kim acted only as a passive translator, is rejected at this stage of the case. The Kohs' complaint specifically alleges that Officer Kim was not merely a passive translator, but was acting as an interrogating police officer during all or most of the interrogation. First Am. Compl. ¶ 28. Nor does the video contradict this factual allegation that Officer Kim was more than a mere pass-through. Viewing the video in the light in the most favorable to the Kohs, it appears

22

that there are numerous instances where Officer Kim spontaneously decided to pose his own questions to Mr. Koh, in Korean, rather than simply translating the questions asked by the Northbrook police officers. *See, e.g.*, Wheeling Exh. B, Suspect Interview 1 at 35:23; Suspect Interview 2 at 45:08; Suspect Interview 3 at 3:54, 5:36, 10:24, 12:26, 13:38. Officer Kim even continued to question Mr. Koh after the lead interrogator momentarily left the room. *See* Wheeling Exh. B, Suspect Interview 3 at 18:28. So even though the video shows that the Northbrook police officers took the lead in the interrogation, the video suggests that Officer Kim also actively participated at multiple points in the interrogation. The video therefore supports, rather than contradicts, the complaint's plausible allegations that Officer Kim was also an interrogator.

And as an interrogator, Officer Kim is not entitled to qualified immunity at this stage in the case.[6] Qualified immunity protects government officials "from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow*, 457 U.S. at 818 (citations omitted). So the first step in the qualified-immunity analysis is determining whether the Kohs have plausibly alleged the violation of Mr. Koh's Fifth Amendment rights. *Sornberger v. City of Knoxville*, 434 F.3d 1006, 1013 (7th Cir. 2006)

---

[6]Contrary to what the Kohs contend, there is no hard-and-fast rule saying that considering a defense of qualified immunity is premature at this stage in the case. *See Kitzman-Kelley ex rel. Kitzman-Kelley v. Warner*, 203 F.3d 454, 457 (7th Cir. 2000) (citing Supreme Court precedent describing the appropriate methodology for deciding a motion to dismiss when qualified immunity is raised as a defense). Indeed, one of the main purposes of qualified immunity is to shield officials from the "burdens of broad-reaching discovery." *See Harlow*, 457 U.S. at 817-18. So dismissing an official from the case before discovery even starts is not necessarily a premature application of qualified immunity, but instead might fulfill the defense's purpose.

(citations omitted). As discussed above regarding Northbrook's motion to dismiss, the Kohs have: again, they allege that the Defendant Officers yelled at, badgered, and manipulated Mr. Koh, lied to him, physically intimidated him, touched him without justification, and displayed a gun in the interrogation room, all while knowing that he was not fluent in English and operating without food, medicine, and sleep. *See* First Am. Compl. ¶¶ 28-38. Nor are these allegations belied by the video, when viewed in the light most favorable to the Kohs. *See, e.g.*, Wheeling Exh. B, Suspect Interview 2 at 59:30, 1:02:31, 1:09:43 (showing an officer's yelling at Mr. Koh); Suspect Interview 2 at 55:14, 57:53, 59:36, 1:01:04, 1:09:16 (showing an officer's repeatedly touching Mr. Koh while questioning him); Suspect Interview 3 at 18:19 (showing a gun visible on an officer's hip). What's more, the Kohs have also plausibly pled that *Officer Kim* specifically contributed to this Fifth Amendment violation by acting in concert with the other Defendant Officers to interrogate Mr. Koh and conspiring to falsely arrest Mr. Koh and coerce his confession. *See* First Am. Compl. ¶¶ 28, 69-72. In essence, the Kohs allege that even though Officer Kim may not have been the "bad cop" in the interrogation, he is still liable for being the "good cop" whose role was nonetheless part and parcel of the coercion. Thus, the Kohs have plausibly pled that Officer Kim is liable, under a joint-action theory, for violating Mr. Koh's constitutional rights.

The next step, then, is to determine whether Mr. Koh's Fifth Amendment right to avoid self-incrimination was so clearly established at the time of the alleged violation that a reasonable officer would know that his actions were unconstitutional. *Sornberger*, 434 F.3d at 1013 (citations omitted). In determining whether a

24

constitutional right was clearly established, the analysis "must be undertaken in light of the specific context of the case, not as a broad general proposition." *Saucier v. Katz*, 533 U.S. 194, 201 (2001). In other words, this inquiry requires the Court to assess "whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Purtell v. Mason*, 527 F.3d 615, 621 (7th Cir. 2008) (quoting *Saucier*, 533 U.S. at 202) (internal quotation mark omitted). Applying these principles to the situation that presented itself on April 16, 2009 (the interrogation date)—and after accepting the Kohs' factual allegations as true, which again are not contradicted by the video—it is plausible that a reasonable officer conducting Mr. Koh's interrogation would have known that he was violating the Fifth Amendment by berating, lying to, and physically intimidating a detainee who did not understand English and had not eaten, slept, or taken necessary medication. Indeed, the cases cited above suggesting that such an interrogation plausibly violates the Fifth Amendment were all decided before 2009. *See, e.g.*, *Fulminante*, 499 U.S. at 279, 287; *Nguyen*, 155 F.3d at 1219, 1222-23; *Andersen*, 903 F.2d at 526, 530; *Briley*, 2002 WL 69488, at \*1, \*8. And if it is plausible that the officers in charge of Mr. Koh's interrogation would have known that they were violating Mr. Koh's clearly established constitutional rights, then it is certainly plausible that Officer Kim, who is alleged to have jointly acted and conspired with those officers during that interrogation, shared the knowledge of the underlying facts that torpedoes qualified immunity. *See, e.g.*, *Hampton v. Hanrahan*, 600 F.2d 600, 635 (7th Cir. 1979) ("If plaintiffs prove their case against the defendants, the doctrine of qualified immunity will not thwart recovery of

25

damages. . . . Plaintiffs have presented evidence which could suggest that the defendants both *as part of a conspiracy* and individually violated, among others, their clearly established First, Fourth, and Fourteenth Amendment rights." (emphasis added) (footnotes omitted)), *rev'd on other grounds*, 446 U.S. 754, 759 (1980). Accordingly, at this stage,[7] Officer Kim is not entitled to qualified immunity, so the Kohs' Fifth Amendment claim against Officer Kim survives.

### 3. Failure to Intervene

Wheeling also asserts that the Kohs' failure-to-intervene claim should be dismissed as to their false-arrest claim and Mr. Koh's coerced-confession claim. A police officer is liable under § 1983 for failing to intervene to prevent other police officers from infringing the constitutional rights of others if (1) that officer had reason to know that any constitutional violation has been committed by a law enforcement official, and (2) that officer had a realistic opportunity to intervene to prevent the harm from occurring. *Abdullahi v. City of Madison*, 423 F.3d 763, 774 (7th Cir. 2005) (citing *Yang v. Hardin*, 37 F.3d 282, 285 (7th Cir. 1994)). Wheeling argues that the Kohs fail to adequately plead that Officer Kim had any knowledge that the Northbrook police department was engaging in unconstitutional misconduct. Wheeling Mot. Dismiss at 7-8. But again, the complaint alleges that Officer Kim was not acting merely as a

---

[7]The Court notes that it might be appropriate to consider an early summary judgment motion from Officer Kim, perhaps even in the middle of discovery, reasserting the shield of qualified immunity. The denial of Officer Kim's motion, at this time, does not preclude him from reasserting the defense if discovery has uncovered facts disproving the complaint's factual allegations. But the video itself, standing alone, is not enough to contradict the Kohs' complaint, and not enough to support a finding of qualified immunity now.

passive translator or intermediary between the Northbrook interrogating officers and Mr. Koh, but was acting as an interrogating police officer and contributed to the coercion of Mr. Koh. First Am. Compl. ¶¶ 27-28. It further alleges that the Defendant Officers—including Officer Kim—acted in concert with each other and conspired to falsely arrest Mr. Koh and coerce his confession. *See id.* ¶¶ 69-72. These allegations of joint action, if assumed to be true, not only plausibly plead that Officer Koh knew about the unconstitutional misconduct, but also actively engaged in it. And as discussed above, the Kohs' allegations that Mr. Koh's confession was coerced are not belied by the video, which also supports the plausible inference that Officer Kim knew that the Northbrook police officers were violating Mr. Koh's constitutional rights.

The video shows, moreover, that Officer Kim was present throughout the entirety of the interrogation. *See generally* Wheeling Exh. B (showing Officer Kim on-screen or slightly off-screen for the entirety of the interrogation). Officer Kim's continual presence again supports the plausible inference that he had a realistic opportunity to intervene in the interrogation. *Cf. Yang*, 37 F.3d at 285 ("At a minimum Officer Hardin could have called for a backup, called for help, or at least cautioned Officer Brown to stop. In fact, Officer Hardin should have arrested Officer Brown."). And Wheeling has cited no case to support its argument that Officer Kim, a Wheeling police officer, had no authority to intervene at the Northbrook police station, especially where Officer Kim was invited to the interrogation and could have sought out Northbrook police supervisors (at least that must be assumed at this stage of the case).

27

Accordingly, the complaint and video do plausibly plead that Officer Kim failed to intervene to prevent the violation of Mr. Koh's constitutional rights.

### 4. Malicious Prosecution

Next, Wheeling moves to dismiss the malicious-prosecution claim against Officer Kim, arguing that the Kohs have not plausibly pled that Officer Kim was personally involved in that misconduct. *See* Wheeling Mot. Dismiss at 13-14. But as discussed above in relation to Northbrook's motion, the Kohs' group pleading, while not ideal, suffices to put Officer Kim on notice that the Kohs allege that *all* of the Officer Defendants—Officer Kim included—coerced a confession, made false statements to prosecutors, and withheld exculpatory information. *See, e.g.*, First Am. Compl. ¶¶ 40-41. Accordingly, the claim survives. But like the Northbrook officers, Officer Kim is free to admit or deny the Kohs' group allegations as they are pled.

### 5. Other Claims

Finally, Wheeling moves to dismiss several other claims, asserting arguments that overlap with portions of Northbrook's motion to dismiss. Like Northbrook's motion, Wheeling's motion is granted with prejudice as to the Kohs' intentional infliction of emotional distress claim (Count Eight), their Sixth Amendment claim (Count Two), and Mr. Koh's state-law loss of consortium claim (Count Nine). And to the extent that the Kohs' state-law *respondeat superior* and indemnification claims (Counts Ten and Eleven) and their failure to intervene and conspiracy claims (Counts Four and Six) are based on now-dismissed state-law torts or constitutional claims, they too are dismissed with prejudice.

28

## IV. Conclusion

For the reasons discussed above, Defendants' motions to dismiss [R. 48; R. 51] are granted in part and denied in part. On or before October 21, 2013, Defendants shall file an answer to the First Amended Complaint.

ENTERED:

_____s/Edmond E. Chang_____
Honorable Edmond E. Chang
United States District Judge

DATE: September 24, 2013