**IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

| | | |
|---|---|---|
| HYUNG SEOK KOH and | ) | |
| EUNSOOK KOH, | ) | Case No. 11 C 2605 |
| | ) | |
| Plaintiffs, | ) | Hon. Edmond E. Chang, |
| | ) | District Judge |
| v. | ) | |
| | ) | |
| Detective M. GRAF, et al., | ) | JURY TRIAL DEMANDED |
| | ) | |
| Defendants. | ) | |

**PLAINTIFFS' CONSOLIDATED RESPONSE IN
OPPOSITION TO DEFENDANTS' SUMMARY JUDGMENT MOTIONS**

Arthur Loevy
Jon Loevy
Elizabeth Mazur
Steven Art
**LOEVY & LOEVY**
312 N. May St., Ste. 100
Chicago, IL 60607
jon@loevy.com

## TABLE OF CONTENTS

Page

**TABLE OF AUTHORITIES** ................................................................................. iv

**INTRODUCTION** ..............................................................................................1

**STATEMENT OF FACTS** ................................................................................2

   A. The Kohs. ...................................................................................................2

   B. Paul Koh's Suicide ....................................................................................3

   C. Police Arrest the Kohs ...............................................................................3

   D. Defendants Hold the Kohs *Incommunicado* At the Station .....................4

   E. Because of the Kohs' Language Barriers, Kim Is Called Into the
      Investigation… .........................................................................................6

   F. Evidence at the Scene Showed Paul's Death Was a Suicide… ..............7

   G. Defendants Prepare to Interrogate Mr. Koh… .........................................7

   H. Defendants' First Interrogation of Mr. Koh… ...........................................8

   I. Defendants Hold Mr. Koh *Incommunicado* Again… ...............................10

   J. Mrs. Koh is Interviewed .............................................................................11

   K. Defendants Interrogate Mr. Koh A Second Time ......................................11

       1. Preparations for the Second Interrogation… ...............................11

       2. Defendants' Improper Use of the Reid Technique… ...................12

       3. Mr. Koh's Extremely Compromised State… ...............................12

       4. Mr. Koh's Clear Signs of Confusion and Distress… ...................13

       5. Defendants' Illegal Interrogation Tactics… .................................13

       6. Kim's Role in the Interrogation… ...............................................15

       7. Mr. Koh's Involuntary, Inculpatory Statements… .......................16

   L. Mr. Koh's Attorney Arrives and, After Being Blocked by the Defendants,
      Finally Stops the Interrogation… ..............................................................17

   M. Graf and Kim Prepare False Police Reports… ........................................18

   N. The Autopsy of Paul Koh… .....................................................................19

   O. State Prosecutors Approve Charges Against Mr. Koh Without Seeing Mr.
      Koh's Videotaped Interrogation… ...........................................................19

   P. Graf Fabricates More Evidence To Support The Prosecution… .............20

   Q. Mr. Koh's Prosecution… .........................................................................22

i

**ARGUMENT** ................................................................................................................23

A. A Jury Must Decide Plaintiffs' Fourth Amendment Claims ...............................23

    1.   Legal Framework Governing Plaintiffs' Fourth Amendment
        Claims .......................................................................................................24

    2.   Under Clearly Established Law, Plaintiffs Were Arrested Long
        Before 1 p.m. on April 16, When Mr. Koh's Interrogation Ended .....27

        a.   Plaintiffs Were Arrested At Their Home ....................................28

        b.   Plaintiffs Were Certainly Under Arrest When They Were
            Held *Incommunicado* At the NPD Between 4 a.m. and 7:30
            a.m. .............................................................................................29

        c.   At Latest, Plaintiffs Were Under Arrest Between 7:30 a.m.
            and 1 p.m., When They Were Interrogated ...............................30

    3.   There Was Never Probable Cause to Believe Plaintiffs Killed Paul ...................31

        a.   Defendants Did Not Have Arguable Probable Cause to
            Believe That Any Crime Had Been Committed .........................32

        b.   Defendants Did Not Have Arguable Probable Cause to
            Believe That Mr. Koh Killed Paul .............................................34

            i.   Statements Extracted During Mr. Koh's
                Interrogation Did Not Establish Probable Cause to
                Arrest Mr. Koh for Murder .............................................35

            ii.   Other Evidence Did Not Establish Probable Cause to
                 Arrest Mr. Koh for Murder .............................................36

        c.   Defendants Also Did Not Have Arguable Probable Cause
            To Believe That Mrs. Koh Committed Any Crime .....................38

B. A Jury Must Decide Mr. Koh's Fifth And Fourteenth Amendment Claims
That Defendants Violated Mr. Koh's Right to be Free of Compulsory Self-
Incrimination ................................................................................................39

    1.   It was Established Long Before 2009 That Police Cannot Compel
        Involuntary Statements From An Accused For Use in Criminal
        Proceedings ..............................................................................................40

    2.   Whether Mr. Koh's Confession Was Voluntary Is A Fact-Bound
        Determination Based on the Totality of Circumstances .......................40

    3.   Construing the Record in Plaintiff's Favor, Defendants'
        Misconduct Plainly Violated Established Law .....................................43

    4.   The Record Supports This Court's Prior Decision, Reached on
        Motions To Dismiss, That the Interrogation Video Supports A Fact
        Dispute About Whether Mr. Koh's Statements Were Voluntary .........46

    5.   Defendants' Arguments for Summary Judgment on Plaintiff's
        Coerced Confession Claims Lack Merit ...............................................47

C. A Jury Must Decide Mr. Koh's Substantive Due Process Claim..........................................49

D. A Jury Must Decide Mr. Koh's Due Process Claims Regarding Fabrication
   of Evidence ...................................................................................................................50

    1. Defendants Forfeited Any Argument for Judgment on This Claim .......................50

    2. Legal Framework Governing Plaintiffs' Due Process Fabrication
   Claims .............................................................................................................50

    3. Defendants' Fabrication of False Evidence Relating to Mr. Koh's
   Statements .......................................................................................................51

    4. Defendants' Fabrication of False Evidence Relating to Other
   Witnesses ........................................................................................................52

    5. The Use of Fabricated Evidence to Deprive Mr. Koh of His Liberty ...................53

E. A Jury Must Decide Plaintiffs' *Monell Claims* .................................................................53

    1. Northbrook Is Liable for Its Express Policy That Caused the
   Violation of Plaintiffs' Constitutional Rights ......................................................54

    2. Northbrook Is Liable For the Actions of Wernick, Its Final
   Policymaker, Regarding Arrests and Interrogations .............................................56

        a. Northbrook Has Not Shifted The Summary Judgment
   Burden On the Identity of Its Final Policymaker for
   Arrests and Interrogations ........................................................................56

        b. The Record Links Wernick to Plaintiffs' Constitutional
   Violations ...............................................................................................57

F. A Jury Must Decide Mr. Koh's Malicious Prosecution Claim.............................................59

    1. Defendants Commenced and Continued A Criminal Proceeding...........................59

    2. Defendants Lacked Probable Cause.....................................................................62

        a. Evidence Gathered Between the End of Mr. Koh's
   Interrogation and the Filing of Charges Did not Establish
   Probable Cause ........................................................................................63

        b. The Indictment Does Not Establish Probable Cause ................................64

    3. Defendants Acted with Malice.............................................................................64

G. A Jury Must Decide The Conspiracy Claims Against Kim ..................................................66

H. A Jury Must Decide The Failure-to-Intervene Claim Against Kim......................................68

I. A Jury Must Decide the Conspiracy and Failure-to-Intervene Claims
   Against the Northbrook Defendants....................................................................................69

J. A Jury Must Decide The Derivative Claims .......................................................................70

**CONCLUSION** ........................................................................................................................70

iii

# TABLE OF AUTHORITIES

Page

*Abdullahi v. City of Madison*, 423 F.3d 763 (7th Cir. 2005) .........................................................32

*Alexander v. United States*, 721 F.3d 418 (7th Cir. 2013) .............................................................57

*Aleman v. Village of Hanover Park*, 662 F.3d 897 (7th Cir. 2011) .........................................32, 64

*Alexander v. United States*, 721 F.3d 418 (7th Cir. 2013) .............................................................26

*Ali v. Village of Tinley Park*, 79 F. Supp. 3d 772 (N.D. Ill. 2015) ...............................................69

*Allen v. Berger*, 784 N.E.2d 367 (Ill. App. Ct. 2002) ...................................................................61

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986) ..................................................................23

*Arizona v. Fulminante*, 499 U.S. 279 (1991) ................................................................................46

*Bank of Illinois v. Allied Signal Safety Restraint Sys.*, 75 F.3d 1162 (7th Cir. 1996) ..................32

*Beauchamp v. City of Noblesville*, 320 F.3d 733 (7th Cir. 2003) ..................................................26

*Beck v. Ohio*, 379 U.S. 89 (1964) ..................................................................................................25

*BeVier v. Hucal*, 806 F.2d 123 (7th Cir. 1986)..............................................................................26

*Bianchi v. McQueen*, 2016 WL 1213270 (7th Cir. Mar. 29, 2015) ...............................................53

*Bielanski v. County of Kane*, 550 F.3d 632 (7th Cir. 2008)...........................................................50

*Blackburn v. Alabama*, 361 U.S. 199 (1960)..................................................................................41

*Boyle v. Torres*, 756 F. Supp. 2d 983 (N.D. Ill. Dec. 21, 2010) ...................................................60

*Bram v. United States*, 168 U.S. 532 (1897)..................................................................................40

*Bridewell v. Eberle*, 730 F.3d 672 (7th Cir. 2013) ........................................................................23

*Brinegar v. United States*, 338 U.S. 160 (1949) ............................................................................31

*Brown v. Mississippi*, 297 U.S. 278 (1936) .............................................................................40, 52

*Byrd v. Brishke*, 466 F.2d 6 (7th Cir. 1972)..................................................................................69

*Calhoun v. Ramsey*, 408 F.3d 375 (7th Cir. 2005) ........................................................................54

iv

## TABLE OF AUTHORITIES (cont.)

Page

*Carbaugh v. Peat*, 189 N.E.2d 14, 19-20 (Ill. App. Ct. 1963)......................................................64

*Carmichael v. Village of Palatine*, 605 F.3d 451(7th Cir. 2010).............................................50, 56

*Cartwright v. City of Chicago*, 450 Fed. App'x 539 (7th Cir. 2011) ............................................25

*Chatman v. City of Chicago*, 2015 WL 1090965 (N.D. Ill. Mar. 10, 2015)................................69

*Chavez v. Martinez*, 538 U.S. 760 (2003).......................................................................................49

*Chelios v. Heavener*, 520 F.3d 678 (7th Cir. 2008)................................................................25, 62

*City of St. Louis v. Praprotnik*, 485 U.S. 112 (1988)....................................................................57

*Costello v. Grundon*, 651 F.3d 614 (7th Cir. 2011).......................................................................50

*Culombe v. Connecticut*, 367 U.S. 568 (1961) ..............................................................................42

*Currie v. Chhabra*, 728 F.3d 626 (7th Cir. 2013).........................................................................27

*Dennis v. Sparks*, 449 U.S. 24 (1980)............................................................................................48

*Dominguez v. Hendley*, 545 F.3d 585 (7th Cir. 2008) ...................................................................52

*Driebel v. City of Milwaukee*, 298 F.3d 622 (7th Cir. 2002) .........................................................24

*Dunaway v. New York*, 442 U.S. 200 (1979) ..................................................................................30

*Duran v. Town of Cicero*, 2005 WL 2563023 (N.D. Ill. Oct. 7, 2005) ........................................69

*Edwards v. Arizona*, 451 U.S. 477 (1981) ...............................................................................42, 45

*Etherly v. Davis*, 619 F.3d 654 (7th Cir. 2010)..............................................................................40

*Fields v. Wharrie*, 740 F.3d 1107 (7th Cir. 2014) ...........................................................48, 51, 53

*Fox v. Hayes*, 600 F.3d 819 (7th Cir. 2010) .............................................................................25, 26

*Franks v. Delaware*, 438 U.S. 154 (1978).....................................................................................26

*Freeman v. Brown*, 2012 WL 3777074 (N.D. Ill. Aug. 29, 2012).................................................60

**TABLE OF AUTHORITIES (cont.)**

Page

*Freides v. Sani-Mode Mfg. Co.*, 211 N.E.2d 286 (Ill. 1965) ........................................64

*Gardenhire v. Schubert*, 205 F.3d 303 (6th Cir. 2000)..................................................28

*Green v. Butler*, 420 F.3d 689 (7th Cir. 2005)...............................................................27

*Hall v. Bates*, 508 F.3d 854 (7th Cir. 2007).................................................................29

*Halsey v. Pfeiffer*, 750 F.3d 273 (3d Cir. 2014)...........................................................41

*Hammond v. Kunard*, 148 F.3d 692 (7th Cir. 1998).......................................................31

*Hampton v. Hanrahan*, 600 F.2d 600 (7th Cir. 1979) ...................................................67

*Harris v. City of Chicago*, 2015 WL 5445012 (N.D. Ill. Sept. 15, 2015) ....................69

*Hayes v. Florida*, 470 U.S. 811 (1985).......................................................................27

*Haynes v. Washington*, 373 U.S. 503 (1963)...............................................................42

*Hill v. City of Chicago*, 2009 WL 174994 (N.D. Ill. Jan. 26, 2009).........................41, 47

*Hope v. Pelzer*, 536 U.S. 730 (2002) .........................................................................26

*Hunter v. Bryant*, 502 U.S. 224 (1991).................................................................24, 27, 31

*Jimenez v. City of Chicago*, 830 F. Supp. 2d 432 (N.D. Ill. 2011) ...............................64

*Jones v. City of Chicago*, 856 F.2d 985 (7th Cir. 1988) ....................................26, 51, 64

*Julian v. Hanna*, 732 F.3d 842 (7th Cir. 2013)............................................................53

*Kerr v. City of Chicago*, 424 F.2d 1134 (7th Cir. 1970).................................................41

*Kincaid v. Ames Dep't Stores*, 670 N.E.2d 1103 (Ill. 1996)..........................................62

*Kirchner v. Thomas*, 2014 WL 6790754 (N.D. Ill. Dec. 2, 2014) ..................................29

*Koh v. Graf*, 2013 WL 5348326 (N.D. Ill. Sep. 24, 2013) ...........................................46

*Kujawski v. Bd of Comm. of Bartholomew*, 183 F.3d 734 (7th Cir. 1999) ....................57

*Lawson v. Veruchi*, 637 F.3d 699 (7th Cir. 2011)........................................................26

vi

## TABLE OF AUTHORITIES (cont.)

Page

*Logan v. Caterpillar*, 246 F.3d 912 (7th Cir. 2011) ....................................................57

*Lynumn v. Illinois*, 372 U.S. 528 (1963)....................................................41

*Mack v. First Sec. Bank of Chicago*, 511 N.E.2d 714, 719 (Ill. App. Ct. 1987) ..........................65

*Malley v. Briggs*, 475 U.S. 335 (1986) ..........................................24, 25, 48

*Malloy v. Hogan*, 378 U.S. 1 (1964)..........................................40

*Maxwell v. City of Indianapolis*, 998 F.2d 431 (7th Cir. 1993)..............................24, 25

*McMillen v. Briley*, 2002 WL 69488 (N.D. Ill. Jan. 18, 2002)..........................................46

*Miller v. Fenton*, 474 U.S. 104 (1985)..........................................40

*Monell v. Department of Social Services*, 436 U.S. 658 (1978) ..........................................53

*Mooney v. Holohan*, 294 U.S. 1033 (1935) ..........................................51

*Napue v. Illinois*, 360 U.S. 264 (1959) ..........................................51

*Narducci v. Moore*, 572 F.3d 313 (7th Cir. 2009) ..........................................27

*Nelson v. City of Chicago*, 810 F.3d 1061 (7th Cir. 2016) ..........................................32

*Newsome v. McCabe*, 319 F.3d 301 (7th Cir. 2003)..........................................51

*Olson v. Tyler*, 771 F.2d 277 (7th Cir. 1985)..........................................26, 62

*Padilla v. City of Chicago*, 2013 WL 1208567 (N.D. Ill. Mar. 26, 2013)....................................60

*Pembaur v. City of Cinncinati*, 475 U.S. 469 (1986)..........................................56

*Perez v. Thorntons*, 731 F.3d 699 (7th Cir. 2013) ..........................................23

*Phelan v. Village of Lyons*, 531 F.3d 484 (7th Cir.2008) ..........................................26

*Proffitt v. Ridgway*, 279 F.3d 503 (7th Cir. 2002) ..........................................66

*Pyle v. Kansas*, 317 U.S. 213 (1942) ..........................................51, 52

*Redwood v. Dobson*, 476 F.3d 462 (7th Cir. 2007) ..........................................66

## TABLE OF AUTHORITIES (cont.)

Page

*Rehberg v. Paulk*, 132 S. Ct. 1497 (2012) ...................................................................52

*Richardson v. City of Indianapolis*, 658 F.2d 494 (7th Cir. 1981) ...............................66

*Rivera v. Lake County*, 974 F. Supp. 2d 1179 (N.D. Ill. 2013) ....................................69

*Rochin v. California*, 342 U.S. 165 (1952) ...................................................................49

*Rogers v. Richmond*, 365 U.S. 534 (1961) ...................................................................41

*Saunders-El v. Rohde*, 778 F.3d 556 (7th Cir. 2015) ...................................................51

*Schneckloth v. Bustamonte*, 412 U.S. 218 (1973) ..................................................40, 42

*Serino v. Hensley*, 735 F.3d 588 (7th Cir. 2013) ..........................................................53

*Simon v. Northwestern University*, 2016 WL 1237666
    (N.D. Ill. Mar. 29, 2016) .........................................................................60, 65

*Smith v. Duckworth*, 856 F.2d 909 (7th Cir. 1988) .......................................................42

*Smith v. Illinois*, 469 U.S. 91 (1984) ...........................................................................42

*Sornberger v. City of Knoxville*, 434 F.3d 1006 (7th Cir. 2006) ............................ *passim*

*Spano v. New York*, 360 U.S. 315 (1959) ......................................................................41

*Starks v. City of Waukegan*, 946 F. Supp. 2d 780 (7th Cir. 2013) ..........................41, 60

*Steidl v. Fermon*, 494 F.3d 623 (7th Cir. 2007) ...........................................................48

*Sublett v. John Wiley & Sons, Inc.*, 463 F.3d 731 (7th Cir. 2006) .................................50

*Turner v. City of Chicago*, 2013 WL 4052607 (N.D. Ill. 2013) ....................................59

*United States v. Askew-Bell*, 2007 WL 1035156 (N.D. Ill. Apr. 2, 2007) .....................29

*United States v. Ienco*, 182 F.3d 517 (7th Cir. 1999) ...................................................28

*United States v. Nguyen*, 155 F.3d 1219 (10th Cir. 1998) ............................................46

*United States v. Stadfeld*, 689 F.3d 705 (7th Cir. 2012) ..............................................41

*United States v. Useni*, 516 F.3d 634 (7th Cir. 2008).....................................................70

*United States v. Verdugo-Urquidez*, 494 U.S. 295 (1990)..........................................40

*Valentino v. Village of S. Chicago Heights*, 575 F.3d 664 (7th Cir. 2009) ..........................50, 56

*Vodak v. City of Chicago*, 639 F.3d 738 (7th Cir. 2011) ........................................56, 57

*Wallace v. City of Zion*, 2011 WL 3205495 (N.D. Ill. July 28, 2011)..........................................60

*Weidner v. Thieret*, 866 F.2d 958 (7th Cir. 1989).........................................................42

*Wells v. City of Chicago*, 896 F. Supp. 2d 725 (N.D. Ill. 2012) ...................................29

*Whitlock v. Brueggemann*, 682 F.3d 567 (7th Cir. 2012) .......................................48, 51

*Whren v. United States*, 517 U.S. 806 (1996)...............................................................25

*Wilkins v. May*, 872 F.2d 190 (7th Cir. 1989)...............................................................50

*Williams v. City of Chicago*, 733 F.3d 749 (7th Cir. 2013) .........................25, 36, 62, 65

*Wilson v. Lawrence County*, 260 F.3d 946 (8th Cir. 2001) .........................................41

*Yang v. Hardin*, 37 F.3d 282 (7th Cir. 1994)...............................................................68

## INTRODUCTION

Plaintiffs Hyung Seok Koh and Eunsook Koh awoke in the middle of the night on April 16, 2009, to a parent's worst nightmare: their eldest child and only son Paul had committed suicide and was lying lifeless in the foyer of their home. But the nightmare did not end there. Instead, without any evidence to suggest Paul had been murdered—let alone by his parents—Defendants arrested both Plaintiffs, unlawfully interrogated Mr. Koh, and fabricated false evidence, all in an effort to prosecute Mr. Koh for killing his son. Mrs. Koh, too, was arrested for something she had not done. Accused of a crime that had not even occurred, Mr. Koh spent almost four years in Cook County Jail awaiting trial. On December 17, 2012, after just two hours of deliberation, a jury acquitted Mr. Koh of the false charges.

At summary judgment, Plaintiffs and Defendants present stories, diametrically opposed to one another, about how these gross injustices occurred. On the one hand, Defendants contend that because they conducted, in their own view, a thorough investigation, and because they had no one to tell them that what they were doing was wrong, there are institutional reasons to grant them good faith immunity from Plaintiffs' constitutional claims and summary judgment on other claims. Contrary to this view, Plaintiffs have assembled a summary judgment record that demonstrates that Defendants—without any basis at all in evidence and without any reason— arrested the Kohs at their home shortly after they discovered Paul dead, decided immediately that Mr. Koh had murdered his son, and then set about generating false evidence, including coerced, incriminating statements, to implicate, detain, and prosecute Mr. Koh for murder. Underlying these conflicting accounts are monumental factual disputes—about the cause of Paul's death, about evidence at the scene and what it showed, about the circumstances of Mr. Koh's interrogation, about the states of mind of both Defendants and the Kohs, and about whether false

inculpatory evidence was fabricated, among many other material subjects. As the literally hundreds of pages of combined briefing suggest, there are many fundamental disagreements about what occurred, and those factual disputes must be resolved by a jury.

The law governing Plaintiffs' claims was firmly established long before the misconduct at issue. Supreme Court and Seventh Circuit precedents exist that are on all fours with every constitutional issue in this case, such that Defendants' assertions about the uniqueness of this case and their claims of immunity are nonstarters. The factual record, viewed in Plaintiffs' favor, reveals unambiguous violations of Plaintiffs' clearly established rights under the Fourth, Fifth, and Fourteenth Amendments. There is no basis to grant any Defendant immunity.

After seven years spent fighting against the striking injustice caused by Defendants' misconduct, it is finally time for Mr. and Mrs. Koh's day in court. As explained below, Defendants have not moved for summary judgment on all of Plaintiffs' claims, and so a trial in this case will happen no matter how the Court resolves Defendants' motions. With respect to Plaintiffs' *Monell* theories and Mr. Koh's claim of malicious prosecution, Defendants have no claim of immunity and no arguable basis to keep those claims from the jury. Finally, with respect to the remainder of Plaintiffs' constitutional claims, firmly established law and fundamental factual disputes preclude summary judgment. This Court should deny Defendants' motions.

## STATEMENT OF FACTS

### A. THE KOHS

The Kohs are first-generation Korean-Americans. Until the events at issue in this case, they lived the American Dream. They worked hard, established successful businesses, and settled with their family in a quiet community, sending their children to school and surrounding themselves with family and friends.

**B.      PAUL KOH'S SUICIDE**

In early 2009, the Kohs' only son Paul was a struggling 22-year old, who battled depression, as well as serious mental health and substance abuse problems. Living at home with his parents, Paul slept most of the time, and sometimes behaved erratically—for example, showing up on his neighbor's porch completely naked and talking incoherently, and walking down the street without clothes on. He reported suicidal thoughts to his sister and pastor. Despite persistent efforts to address these issues by Paul's family, his religious community, and Paul himself, Paul ultimately succumbed. In the early morning hours of April 16, 2009, while Mr. and Mrs. Koh were asleep in their bedroom, Paul stabbed himself to death. PSF ¶¶ 1, 66.

Around 3:45 a.m. that morning, Mrs. Koh woke up and used the restroom. *Id.* ¶ 2. On her way to the bathroom, she noticed lights on elsewhere in the house, went to investigate, and found her son's bloody body in the foyer of the home. *Id.* Mrs. Koh's screams woke Mr. Koh, who ran downstairs and found the horrific sight. *Id.* Mr. Koh rushed to the kitchen, grabbed the cordless phone, and frantically called 911. *Id.* ¶ 3. The Kohs dressed, so that they could attempt to save Paul's life by rushing him to the hospital. *Id.* Like most parents, the Kohs refused to accept that their son might be dead, despite appearances, in part because Paul's body still seemed warm to Mrs. Koh. When it looked to the Kohs as though the police were not responding quickly enough, Mr. Koh called 911 again. *Id.*

**C.      POLICE ARREST THE KOHS**

Defendants Meents, Celia, Johnson, and Eisen arrived at the Koh home a short time later. RNBSF ¶ 3. The officers found Mrs. Koh kneeling over her son in the foyer, hugging him and sobbing. RNBSF ¶ 4. Mr. Koh was frantic and screaming "someone help my son!" PSF ¶ 4. The

officers immediately yelled at Mrs. Koh, told her to leave the house, took her to the front yard, and pushed her down to the ground. RNBSF ¶ 8.

Mr. Koh attempted to get in his car in the driveway. RNBSF ¶ 7. In shock and disbelief, Mr. Koh thought everyone was preparing to rush Paul to the hospital. PSF ¶ 4. One of the officers stopped Mr. Koh near his car, took him to the yard, and pushed him to the ground next to Mrs. Koh. RNBSF ¶ 11. The Kohs were told to shut up and not to move. RNBSF ¶ 11. Johnson stood over the Kohs in the front yard for at least 15 minutes. PSF ¶ 5. The Kohs continually begged police to take them to the hospital with Paul. PSF ¶ 4.

Eisen instead directed Johnson to take the Kohs to the Northbrook Police Department (NPD). RNBSF ¶ 22. Johnson complied. *Id.* Before being taken away, Mr. Koh asked Meents if he could talk to Paul and asked to get his cell phone so that he could call his pastor and family members, but Meents said no. RNBSF ¶13. Mr. Koh, who suffered from diabetes, high blood pressure, and an ammonia level disorder, also asked if he could get his medications, but Johnson refused to let him. RNBSF ¶15. Mr. Koh still was holding the cordless home phone he had used to call 911, and so he tried to call his daughter Helen (there was no answer), and he called a close friend from church, Sang Jo Choi. RNBSF ¶14. The Kohs were taken to Johnson's squad car and were ordered to get inside. RNBSF ¶16. At no point after police arrived at the Kohs' home did the Kohs feel they were free to leave. PSF ¶6.

## D.    DEFENDANTS HOLD THE KOHS *INCOMMUNICADO* AT THE STATION

Between approximately 4 and 7:30 a.m., the Kohs were held in non-public areas of the police station, where they sat and waited, in the constant presence of either Johnson or Ochab. RNBSF ¶ 44. After just 5 minutes together, the Kohs were separated—they did not talk to each other, and they never huddled together with their heads under a blanket speaking Korean. *Id.*

Around the time he arrived at the station, Mr. Koh learned that a chaplain had also arrived. RNBSF ¶ 37. Mr. Koh asked if he could see the chaplain, but was denied. PSF ¶ 7. Mr. Koh also asked Johnson if he could make a phone call, but that request was refused as well. PSF ¶ 7 At no time before 7:30 a.m. did either of the Kohs feel they were free to leave. RNBSF ¶ 43, PSF ¶ 9.

Shortly after arriving, Mr. Koh told Johnson he wanted to see his Pastor, Chun Won Chang. Instead of letting Mr. Koh call Pastor Chang, Johnson asked dispatch to summon Pastor Chang to the station. PSF ¶ 10. After Pastor Chang arrived at NPD around 6 a.m., he asked police to see Mr. Koh at least twice, but he was denied access. *Id.* Instead, police interviewed Pastor Chang about Mr. Koh's relationship with Paul, but learned nothing to indicate that Mr. Koh had killed Paul. *Id.*

While the Kohs continued to wait, isolated and under police supervision, several other family members and church friends came to the NPD and asked to see the Kohs, but they were denied access as well. PSF ¶ 12. Around 7 a.m., Chief Wernick told the assembled group of Koh friends and family that they could not see the Kohs. *Id.*[1] Around the same time, an NPD-affiliated chaplain and social worker arrived to assist the Kohs, but Eisen did not allow them to have access to the Kohs either. PSF ¶ 12. Instead, Northbrook police used the chaplain—who was sitting in the same waiting area as the Koh friends and family—to surreptitiously gather information about the Koh family, none of which supported any suspicion of the Kohs. PSF ¶ 12.

---

[1] On April 16, 2009, Wernick had been with the NPD four years. In that time, there had been no homicides in Northbrook. PSF ¶ 79. Paul's death was the first on Wernick's watch that the NPD had investigated as a homicide. *Id.* Before joining the NPD, as an employee of the Evanston Police Department, Wernick founded NORTAF, a task force that assists north suburban agencies in solving major crimes. *Id.* at ¶ 78. On April 16, Wernick was NORTAF's Executive Director and NORTAF was formally activated to assist with the Paul Koh death investigation. *Id.* During a NORTAF activation, the requesting agency (here, the NPD) is in charge of the investigation at all times. *Id.* The lead detective on the Paul Koh death investigation was Graf. As of January 2011, NORTAF boasted a perfect record of solving cases that had been classified as homicides. *Id.* at ¶ 79.

### E.  BECAUSE OF THE KOHS' LANGUAGE BARRIERS, KIM IS CALLED INTO THE INVESTIGATION

The Kohs are both native Korean speakers. It was apparent to all officers who interacted with them on the morning of April 16 that there was a very substantial language barrier. PSF ¶ 14. Investigators observed that Mr. Koh's 911 call was made in "broken English," and a police dispatcher described the Kohs as "quasi-lingual in English but not that good." *Id.* Later, during Mr. Koh's interrogation, Detective Graf observed repeatedly that Mr. Koh could not understand what he was saying in English. PSF ¶ 85.

Eisen asked for someone who could speak Korean to be summoned to the station to help police communicate with the Kohs. PSF ¶ 16. When someone within the NPD suggested to him that they use Language Line, a service that provides trained interpreters on-call by phone, Eisen instructed staff to find a Korean-speaking police officer instead. *Id.*

As Northbrook dispatchers searched local departments for such an officer, Deputy Chief Ross sought the assistance of Phil Kim, a Korean-speaking officer from the Wheeling Police Department. PSF ¶ 96. Kim lived in Northbrook within a mile of the NPD, and he was known to Ross and other NPD officers. PSF ¶ 97.[2] Kim, a Korean-American, was raised in a Korean-speaking family, RWSF ¶ 1, and throughout his life, Kim used Korean in school, family, social, and professional settings, including when he lived in Koreatown, Los Angeles, working in a Korean restaurant that served Korean customers. RWSF ¶¶ 2-4, PSF ¶ 95. As of April 16, Kim was an experienced officer, who had been trained in the Reid interrogation technique, and he had used Korean in his capacity as a police officer on numerous occasions. PSF ¶ 95. Kim arrived at the NPD around 6 a.m. RWSF ¶ 6. When he arrived, he spent about an hour waiting and talking with Johnson, who was responsible for monitoring the Kohs. RWSF ¶ 14.

---

[2] Kim was known to them because he had previously gotten into an altercation with a driver in downtown Northbrook while off-duty and had summoned NPD officers, including Ross, for assistance. RWSF ¶ 12.

## F.  EVIDENCE AT THE SCENE SHOWED PAUL'S DEATH WAS A SUICIDE

Eisen was one of the first officers at the scene of Paul's death. Immediately, he reported over his police radio that Paul's death "look[ed] like a suicide." PSF ¶ 17. Graf also believed at the start of the investigation that Paul's death was suicide. PSF ¶ 85.

Michael Wasowicz, a NORTAF forensic specialist, conducted a preliminary scene investigation on the morning of April 16. RNBSF ¶¶ 29-30. Blood stain patterns and other physical evidence that he and others processed were consistent with suicide, not homicide. PSF ¶ 19. For example, although the scene was bloody, there was no evidence that Paul had been engaged in a physical struggle before he died, and there was a noticeable absence of impact splatter blood stains, which are hallmarks of a struggle involving a weapon like a knife. *Id.* Delicate furnishings and stacks of paper in the areas where Paul had been stabbed were undisturbed. *Id.* Despite significant pooling of blood on the floors, there were no bloody footprints into or out of the areas where Paul had bled that would indicate the presence of another person. *Id.* Moreover, there was no evidence of the type of cleanup that would have been necessary if a knife-wielding assailant had washed him or herself at the Koh home. *Id.* In addition, Paul's hands were completely covered in blood, with the exception of areas between his fingers. *Id.* This "unmistakable" blood stain pattern (the "bloody glove") is commonly found on individuals who wield knives in stabbing episodes. *Id.* In short, while there was evidence at the scene that Paul had died of knife wounds, a trained investigator on the scene would have recognized that there was no physical evidence of a struggle.

## G.  DEFENDANTS PREPARE TO INTERROGATE MR. KOH

Around 7:30 a.m., after Mr. Koh had been held *incommunicado* for three hours since discovering his youngest child's lifeless body, investigators began their first interrogation of Mr.

7

Koh. Before starting, Commander Dunham directed Detective Ustich to videotape the interrogation. RNBSF ¶ 48. Illinois law and NPD policy required interrogations of suspects in homicide investigations to be video recorded. All NPD officers, including Graf and Ustich, were trained on this requirement. *Id.*

Despite this requirement, Graf talked to Mr. Koh off camera. PSF ¶¶ 20-21. Mr. Koh told Graf that he needed medication for diabetes, his ammonia level disorder, and for high blood pressure. *Id.* Graf told Mr. Koh that someone would be bringing his medication, but it never arrived. *Id.* Graf also asked Mr. Koh if he had a lawyer, to which Mr. Koh responded "yes." *Id.* In his state of distraught mourning, Mr. Koh also asked Graf if he could see his Pastor, his daughter, or his church friend, but Graf denied those requests. *Id.* Graf indicated that the only person Mr. Koh could talk to was a lawyer, but though Mr. Koh told Graf he had a lawyer, Mr. Koh did not have his lawyer's phone number with him and was not allowed to make a call. *Id.*

## H.     DEFENDANTS' FIRST INTERROGATION OF MR. KOH

At the beginning of Mr. Koh's first interrogation, Graf stated to Mr. Koh that Kim was present to help with Korean, if Mr. Koh did not understand something. RNBSF ¶ 54. As seen on the video of the interrogation, Kim and Mr. Koh spoke to one another in Korean. PSF ¶ 101. Even though Kim had never met the Kohs before, he used the Korean word for "uncle" when he addressed Mr. Koh and the word "aunt" when he referred to Mrs. Koh. *Id.* ¶ 108. The use of those terms in such a setting indicates an attempt to create an atmosphere of familiarity. *Id.*

Early in the interrogation, Graf told Mr. Koh that he intended to read him his *Miranda* rights, and that he would probably need to interrogate Mr. Koh more than once. *Id.* ¶ 99. Although investigators interviewed several witnesses in connection with the investigation, Mr. Koh is the only witness who was ever *Mirandized*. Graf asked Mr. Koh if he knew what his

*Miranda* rights were, and Mr. Koh indicated that he did not. *Id.* Graf proceeded to read Mr. Koh his *Miranda* rights in English from a pre-printed form. Immediately, Mr. Koh turned to Kim and asked him to translate. *Id.* ¶ 100.

Kim never translated the complete pre-printed *Miranda* form into Korean for Mr. Koh. *Id.* ¶ 103. Instead, Kim and Mr. Koh engaged in a hushed exchange in Korean, during which the following exchanges took place: Kim told Mr. Koh that he was allowed to bring in his own attorney, but not that an attorney would be provided to Mr. Koh if he could not afford one. *Id.* ¶ 105. Kim then raised the issue of money in reference to hiring an attorney, leading Mr. Koh to request affirmation from Kim that it would be okay to proceed without an attorney ("now . . . we don't need an attorney, do we?"). *Id.* Kim answered affirmatively and then directed Mr. Koh to sign and date the pre-printed English *Miranda* form. *Id.* Obviously confused, Mr. Koh began to write down the time that he found Paul dead at home, until Kim directed him to write down the current time, which Kim told Mr. Koh was 7:32 a.m. *Id.*

Well-trained police officers know that it is their job to make sure that a suspect who is being interrogated actually understands his *Miranda* rights. *Id.* ¶ 107. It is not proper police procedure for an officer to advise a suspect that he does not need a lawyer. *Id.*

During the first interrogation, Graf asked Mr. Koh if he had anything to do with Paul's death and Mr. Koh said no. *Id.* ¶ 109. In the face of Mr. Koh's consistent denials, Graf continued to press Mr. Koh with repetitive questioning (a hallmark of interrogation associated with the controversial Reid Technique), making clear that he thought Mr. Koh had in fact killed Paul and was lying to him. *Id.* Further applying the Reid technique, Graf began introducing the idea that perhaps Mr. Koh had killed Paul in self-defense. *Id.* ¶ 110.

9

## I.     DEFENDANTS HOLD MR. KOH *INCOMMUNICADO* AGAIN

Mr. Koh's first interrogation ended around 8:30 a.m., at which point he was placed in an interview room where he sat on a bench, waiting for three additional hours. PSF ¶¶ 22, 114. As he waited, Mr. Koh overheard detectives outside the room saying they believed Mr. Koh had killed his son. *Id.* ¶ 22. At some point, Kim joined Mr. Koh in the interview room and stayed there for quite a while. RWSF ¶ 43.Mr. Koh asked Kim on numerous occasions if he could contact his family and friends, but those requests were denied. PSF ¶ 20. Kim told Mr. Koh that he should confess because Mrs. Koh had implicated him in Paul's death. RWSF ¶ 44.

Meanwhile, Pastor Chang, Youth Pastor Joon Hwang, Mr. Koh's brother-in-law Steven Cho, and two other church friends, Sang Jo and Nami Choi, sat in another room of the police station, waiting to see the Kohs. *Id.* ¶¶ 12, 23. Around 10:30 a.m., the group grew tired of waiting and told the NPD social worker they planned to leave. *Id.* ¶ 23. Several police officers approached the group, saying that they needed to separate and talk to each of them. *Id.* Soon after, the Kohs' daughter Helen arrived at the NPD and told police she needed to see her parents. *Id.* ¶ 24. Police refused her request, too, and instead interviewed her. *Id.*

At no point during any interview of any of the Kohs' family or friends did anyone learn any piece of information that suggested that either of the Kohs had murdered Paul. Nonetheless, investigators' interactions during these interviews indicate that they had already decided that Mr. Koh killed Paul, and they had no interest in gathering any information that did not support their pre-determined conclusion. For example, Paul's uncle Steven Cho told investigators that he believed Paul probably killed himself because Paul had been going through depression and Paul had previously told Cho that he wanted to die, but detectives failed to even record that information in their reports. PSF ¶ 25.

After the interviews, Cho consulted with Youth Pastor Hwang, who had also just been interviewed, and they decided to contact Mr. Koh's attorney. *Id.* They reached out to attorney Michael Shim and asked him to come to the station. *Id.*

## J.    MRS. KOH IS INTERVIEWED

Two different NPD investigators (not Graf and Ustich) interviewed Mrs. Koh along with Kim. In their report, the investigators state that Mrs. Koh was in an NPD "holding area" prior to her interview. PSF ¶ 117. Detectives moved her to the conference room with the video camera to interview her. *Id.* Mrs. Koh gave an account of the prior night, explaining how she found her son that morning in a manner that was consistent with the account Mr. Koh provided in his first interview. PSF ¶ 17. At no point during the interview of Mrs. Koh did investigators learn any piece of information that suggested that either of the Kohs had murdered Paul. *Id.*

Mrs. Koh asked Kim at the end of the interview where Mr. Koh was, and he indicated Mr. Koh was not available. PSF ¶ 18. When the interview ended, one interviewer said, "Let's see where they want her for right now." *Id.* Mrs. Koh was returned to the "holding area." *Id.*

## K.    DEFENDANTS INTERROGATE MR. KOH A SECOND TIME

### 1.    Preparations for the Second Interrogation

Around 11:30 a.m., Graf, Ustich, and Kim began a second interrogation of Mr. Koh. Before that interrogation, personnel involved in the investigation held briefings to share relevant information learned during the various interviews. PSF ¶ 26. Though no single Defendant was involved in all of the interviews just discussed, Graf was briefed on what had occurred. *Id.* Also, before the interrogation, around 10:20 a.m., Graf made clear his intention to interrogate Mr. Koh for as long as it took to get a confession: he requested that someone go out and buy "at least a

half dozen" extra video tapes, the "longest minute count" possible, for him to use in the interrogation. PSF ¶ 27.

### 2.    Defendants' Improper Use of the Reid Technique

When Graf, Ustich, and Kim reinitiated the interrogation, they attempted to use the Reid Technique. RNBSF ¶ 52. Use of Reid, however, was entirely inappropriate, because it required Defendants to assume that Mr. Koh was guilty, despite the fact that no investigation had been conducted that could possibly have led them to conclude that Mr. Koh should be considered a suspect in the murder of his son.[3] This use of the Reid Technique demonstrates that Graf, Ustich, and Kim decided Mr. Koh was guilty from the start of the interrogation. PSF ¶ 29.

### 3.    Mr. Koh's Extremely Compromised State

By the time Mr. Koh's second interrogation began at 11:30 a.m., he had been in custody nearly eight hours. In that time, his multiple requests to see others had been denied, and the only people he was permitted to interact with were police officers, who were lying to him and accusing him of murdering his son. He had not eaten since the day before; he had not taken medications he needed to control his diabetes, high blood pressure, and ammonia level disorder; and he had not slept. PSF ¶ 29. As Graf observed, Mr. Koh was also very cold during the interrogation. *Id.* The combination of these factors weakened him physically. *Id.*

At the same time, Mr. Koh had recently witnessed an unimaginable horror: his son's bloody body lying on the floor of his home. This left him severely traumatized and impaired his cognitive functioning. *Id.* ¶ 30. Experienced investigators know that these factors render a person extremely vulnerable to coercive tactics. *Id.* ¶ 31.

---

[3] The Reid Technique is used by police departments around the United States, though not by the FBI. NBSF ¶ 51. It is widely understood as a way to obtain a confession from a suspect known to be guilty; indeed, the technique presumes the guilt of the subject. PSF ¶ 28. It is similarly widely understood that the Reid Technique is never to be used to determine whether a particular subject is guilty or innocent; it is expressly not to be used on an innocent person precisely because it can be so psychologically coercive, especially when misused by an inexperienced detective on an unduly vulnerable person. *Id.*

In addition to this physical and cognitive degradation, language issues imposed additional limitations on Mr. Koh during the interrogation. Both sides in this case used forensic examiners to evaluate Mr. Koh's English abilities, and both of those experts found him to have "low intermediate" English skills. *Id.* ¶ 125. That proficiency level means Mr. Koh (1) has difficulty reporting past events, separated from the here-and-now; (2) has difficulty when he cannot control the subject of discussion; (3) has difficulty when conversations involve rapid shifts in direction; and (4) has difficulty communicating in settings that involve complex cognitive and linguistic demands. *Id.* Complex cognitive and linguistic demands are placed on a person of Mr. Koh's English skill level when an interrogating police officer like Graf controls the conversations and repeatedly changes topics. *Id.* Mr. Koh's limited English proficiency seriously affected his ability to participate in the interrogation. *Id.*

### 4. Mr. Koh's Clear Signs of Confusion and Distress

At several points during the interrogation, Mr. Koh expressed pointed doubts about his own memory, saying that he didn't know or could not remember things. PSF ¶ 32. Throughout the interrogation, he showed outward physical signs of distress. For example, he hit his head, pounding and clawing at it at times. *Id.* At other times, he retreated into a trance-like state, staring blankly at his interrogators or at the table. *Id.* In addition, there were obvious communication difficulties resulting from Mr. Koh's language barrier. *Id.* ¶ 85.

### 5. Defendants' Illegal Interrogation Tactics

In addition to exploiting Mr. Koh's many deficits, Defendants used overwhelmingly coercive tactics to extract statements from Mr. Koh. Both Graf and Kim raised their voices and yelled at Mr. Koh, RNBSF ¶ 92; Graf accused Mr. Koh of lying numerous times, PSF ¶¶ 36, 109; RNBSF ¶ 93, and Graf repeatedly got very close to Mr. Koh's face, touched him, and

clapped in his face, PSF ¶ 33. Throughout the interrogation, Kim wore his gun. RNBSF ¶ 97. At times, Graf, Ustich, and Kim sandwiched Mr. Koh in close quarters in between them and pressed him with questions. RNBSF ¶ 85. Graf told Mr. Koh that they intended to keep him there, asking him questions, "for days and days and days." PSF ¶ 37.

When Mr. Koh repeatedly denied any involvement in his son's death, Graf rejected the denial by presenting Mr. Koh with only two incriminating scenarios about what had happened— one face-saving (*i.e.*, that Paul's death was an accident) and one repulsive (*i.e.*, that Mr. Koh had flown into a rage and murdered Paul). RNBSF ¶¶ 51, 95. In addition, Graf exploited Mr. Koh's devout religious beliefs and immense grief about Paul, telling him that Paul and God wanted Mr. Koh to confess. PSF ¶ 34.

Throughout the interrogation, Graf lied to Mr. Koh about evidence implicating him in the crime, including false statements to Mr. Koh that Mrs. Koh had implicated him in Paul's murder. RWSF ¶ 46. Moreover, Graf fed numerous facts about the alleged crime to Mr. Koh, in an effort to get him to adopt those facts into a confession narrative. PSF ¶¶ 38, 45-50. At various points, Kim made chopping and slicing gestures to Mr. Koh while Graf suggested to Mr. Koh how he must have stabbed Paul. PSF ¶¶ 50, 122.

By the end of the interrogation, Graf was doing approximately 80% of the speaking. PSF ¶ 35. He ruthlessly exploited Mr. Koh's language barrier, transforming Mr. Koh's lack of comprehension into presumed lack of memory, accusing Mr. Koh of faking his inability to understand, and discouraging Mr. Koh from taking time to try to comprehend what was going on. *Id.* ¶ 36. At the same time, Graf switched back and forth between topics—for example, between the events at the Koh home on the night Paul died to a prior incident where Paul had

swung a golf club erratically—in order to confuse Mr. Koh about what they were discussing and to get Mr. Koh to admit to things that had not happened. *Id.* ¶ 39.

### 6.    Kim's Role in the Interrogation

Kim participated directly in the interrogation of Mr. Koh, at times posing his own questions. RWSF ¶ 121. Kim even questioned Mr. Koh on his own when Graf left the room. *Id.*

In addition, he specifically exploited the language barrier to help Graf coerce statements from Mr. Koh. For example, at the start of the second interrogation, Mr. Koh attempted to describe his feelings about Paul sleeping all day. PSF ¶ 115. In that context, Mr. Koh explained that he used the Korean phrase *gachi jookja* with Paul. *Id.* As Kim knew, *gachi jookja* is a Korean idiom "let's die together," which every Korean speaker knows is not meant to be taken literally. *Id.* ¶ 116. (It is the rough equivalent of an English idiom like, "You're killing me.") Despite this, Kim told the non-Korean speakers in the room that Mr. Koh had said to Paul, "Let's die together." *Id.* ¶ 117. Graf took obvious interest in the answer and said, "Okay, when you were fighting, you said let's die together?" *Id.* ¶ 117. Graf testified that he considered this statement important evidence. *Id.*

At the same time, Kim exploited the language barrier to ask Mr. Koh his own questions and to selectively translate questions being asked by Graf. For example, as the interrogation moved forward, Detective Graf attempted to extract a confession from Mr. Koh by feeding him a story in which he killed Paul in self-defense. *Id.* ¶ 120. While Graf asked repeated questions about whether Paul attacked Mr. Koh with a knife, pushing this self-defense theme, Kim interjected in Korean with questions of his own. *Id.* ¶ 121. The result is that Graf and Kim simultaneously posed different questions to Mr. Koh in two languages; Kim translated some but not all of what Graf asked; and Kim asked his own questions in Korean. In the midst of this, Kim

15

asserted, "He said it was in defense. He said it was in defense!" *Id.* ¶ 119. In fact, there was no basis for Kim to make such a claim about what Mr. Koh said. *Id.* ¶ 120. Again, Graf perceived Kim's statement about acting "in defense," attributed to Mr. Koh, as an important admission. *Id.*

### 7.     Mr. Koh's Involuntary, Inculpatory Statements

Defendants' tactics and Mr. Koh's deficits overbore Mr. Koh's will and led him to adopt self-incriminating statements. Three different experts have rendered opinions along these lines.

Gregg McCrary is a highly regard expert in the field of police practices. PSF ¶ 82. McCrary is a retired supervisory special agent for the FBI and has conducted trainings and presentations for law enforcement officers across the country on various aspects of police procedure. *Id.* He is an adjunct professor of forensic psychology at Nova Southeastern University in Ft. Lauderdale and at Marymount University in Arlington, Virginia, and he has authored numerous publications relating to criminal investigations, including contributions to the FBI's Crime Classification Manual. *Id.* After reviewing all aspects of the Paul Koh death investigation, McCrary opined that the interrogation techniques that the officers used on Mr. Koh and the manner in which they used them were "highly likely to produce the psychological coercion needed to overcome Mr. Koh's consistent statements of innocence." *Id.*

Professor Richard Ofshe is a Professor Emeritus in the Department of Sociology at the University of California, Berkeley. *Id.* ¶ 83. For more than 25 years, Professor Ofshe has studied and researched how interrogation tactics impact a suspect's decision-making. *Id.* Over this period he has been qualified and testified as an expert in federal, state, and military courts across the United States and overseas. *Id.* Based on his analysis of facts in this case, Professor Ofshe has opined that tactics that were used on Mr. Koh were capable of and did elicit false inculpatory statements from Mr. Koh. *Id.*

16

Dr. Robert Galatzer-Levy is a Clinical Professor of Psychiatry and Behavioral Neuroscience at the University of Chicago and he has been qualified to testify in the area of forensic psychiatry. *Id.* ¶ 84. He evaluated Mr. Koh and rendered an opinion that Mr. Koh could not give voluntary statements during his interrogation because he did not understand his legal rights, he could not think through the consequences of what he was saying, and he was unable to accurately recollect events. *Id.*

All of the inculpatory statements that can be attributed to Mr. Koh were made only after Graf fed him the facts, Mr. Koh initially denied them, and then later gave in and accepted Graf's version of events. By the end of the second interrogation session, Mr. Koh adopted a number of facts that Graf had fed to him, agreeing that (1) he had woken up in the middle of the night, (2) got angry when he found out that Paul was not home, (3) waited in the dining room for Paul to come home, (4) confronted him when he arrived, (5) engaged in a physical altercation, (6) grabbed a knife, and (7) cut Paul across the throat. PSF ¶¶ 38, 45-50; RNBSF at ¶¶ 89-91. These statements were used in Mr. Koh's prosecution for murder. PSF ¶¶ 59-73, 77.

## L.    MR. KOH'S ATTORNEY ARRIVES AND, AFTER BEING BLOCKED BY THE DEFENDANTS, FINALLY STOPS THE INTERROGATION

Around noon on April 16, attorney Michael Shim learned that Mr. Koh was being questioned at the NPD in connection with Paul's death. PSF ¶ 40. He immediately called the NPD and told them he was Mr. Koh's attorney and that he was on his way to represent Mr. Koh. *Id.* Shim arrived at the NPD around 12:35 p.m., and he told the person behind the desk that he was Mr. Koh's lawyer and that he wanted to see Mr. Koh immediately. *Id.* ¶ 41. Twenty minutes later, Dunham met Shim, who told Dunham that he was there to represent the Kohs. *Id.*

As depicted in the videotape of Mr. Koh's interrogation, about three minutes before Mr. Koh's third and final interrogation ended, Dunham knocked on the door and summoned Graf out

17

of the room. *Id.* ¶ 42. Outside of the room, Graf told Dunham that Mr. Koh was confessing to killing his son, and Dunham told Graf that an attorney for Mr. Koh was present and that he was going to bring the attorney back. *Id.*

When Graf returned to the room, he noticeably accelerated the pace of the interrogation, yelling at Mr. Koh: "Hyung Seok, come on. Right now, let's be done, hurry up, fast!" *Id.* ¶ 43. He began rushing because he knew Mr. Koh's attorney was coming into the room in a matter of minutes. *Id.* Two minutes later, Shim finally reached the conference room and terminated the interrogation immediately. *Id.* When Shim observed Mr. Koh in the interview room, Mr. Koh was disoriented, disheveled, and tired. *Id.*

## M.    GRAF AND KIM PREPARE FALSE POLICE REPORTS

After interrogating Mr. Koh, Graf prepared a false police report about his interactions with Mr. Koh. The report states, in pertinent part:

> Mr. Koh related in summary but not verbatim in this interview that he had woken up at 1:00 a.m. and had asked his wife if Paul was home. He then got up and checked the house and learned that Paul was not home. He related he was angry because Paul and stayed out late and now that was out late he would not be able to be up for work at 9:30 am the next morning. Mr. Koh waited for Paul to come home and at approx. 2:00 am Paul arrived home. Mr. Koh was very angry and an argument ensured when Paul came into the house. Mr. Koh related that Paul pushed him down to the ground and Mr. Koh then went to the kitchen where he got a knife. Mr. Koh related and displayed how he took a swipe at Paul with the knife causing Paul to be cut. He then later stated and displayed how he grabbed Paul around the nick and cut his neck. A short time later Mr. Koh's attorney Michael Shim arrived and the interview was terminated.

PSF ¶ 54. After interrogating Mr. Koh, Kim volunteered to write a police report about his interactions with Mr. Koh. PSF ¶ 124. In the report, Kim wrote that Mr. Koh said "*gachi jookja*" to Paul and that the phrase meant "Let's die together." *Id.* Both reports contain false facts, tying Mr. Koh to the purported murder, providing him a motive, and ascribing to him some demonstration of the crime—all things that Mr. Koh did not do or provide during his interrogation.

### N.     THE AUTOPSY OF PAUL KOH

On the morning of April 17, 2009, Dr. Cogan of the Cook County Medical Examiner's Office (CCME) performed an autopsy of Paul. NORTAF investigators Helma and DeLeon attended. *Id.* ¶ 55. Medical examiners rely on police investigators to gather information about the cause and manner of death. *Id.* ¶ 56. Though Helma and DeLeon do not recall the substance of their conversations with Dr. Cogan that day, they acknowledge there is no reason why they would not have known at the time of autopsy that Mr. Koh had purportedly confessed, nor is there any reason why they would not have provided that information to Dr. Cogan. *Id.* ¶ 58.

Dr. Cogan testified he had an extreme caseload at the CCME's office and could not devote special attention to cases where there was no real question about cause and manner of death. PSF ¶ 55. During Paul's autopsy, Dr. Cogan had no information about the crime scene, no police reports, no witness statements, and no information about Paul's mental health or drug use—all information that could have helped him to determine cause and manner of death. PSF ¶ 57. In reality, all of Paul Koh's injuries were self-inflicted, as someone who had done a full death investigation would see. RNBSF ¶ 106.

### O.     STATE PROSECUTORS APPROVE CHARGES AGAINST MR. KOH WITHOUT SEEING MR. KOH'S VIDEOTAPED INTERROGATION

Around 11:45 a.m. on April 17, 2009, Cook County Assistant State's Attorney Bob Heilingoetter approved first-degree murder charges against Mr. Koh. Before approving charges, Heilingoetter neither visited the NPD nor viewed any part of Mr. Koh's recorded interrogation. PSF ¶ 60. Instead, Heilingoetter relied on two sources of information when he approved murder charges: (1) a document called a "felony review folder,"[4] which ASA Rick Albanese had filled out while visiting the NPD on April 16; and (2) information that Graf provided to Heilingoetter

---

[4] "Felony review" refers to the process whereby the Cook County State's Attorney's Office (CCSAO) reviews cases to determine whether it will approve felony criminal charges.

19

over the telephone on April 17, relating to Paul's autopsy, which Heilingoetter wrote down on the same felony review folder. *Id.* ¶ 59. In other words, except for what Graf told Heilingoetter about Paul's autopsy, all of the information upon which Heilingoetter based his charging decision was contained in Albanese's April 16 notes on the felony review folder. *Id.*

When Albanese visited NPD on April 16, he spoke to Ustich and Graf, who told him that Mr. Koh admitted to killing Paul. *Id.* at ¶ 61. Albanese viewed some but not all of Mr. Koh's interrogation video. *Id.* at ¶ 63.[5] Albanese wrote down in his felony review folder all of the information that he learned—from video recordings and from Graf and Ustich—during the Koh death investigation. *Id.* at ¶ 62. All of the information that Albanese knew came either from Graf and Ustich or from viewing parts of the videotape of Mr. Koh's interrogation—he did not personally interview any witnesses or do any investigation on his own. *Id.* at ¶ 62.

Albanese formed no opinion about whether there was probable cause to charge Mr. Koh with murder. *Id.* at ¶ 64. Even at his deposition in this civil case, Albanese would not say that there was probable cause to charge Mr. Koh with murder. *Id.*

**P.     GRAF FABRICATES MORE EVIDENCE TO SUPPORT THE PROSECUTION**

In the weeks following the approval of charges against Mr. Koh, detectives including Graf re-interviewed Paul's friends in an effort to make sure the friends' stories about the night that Paul died fit their theory of the crime. *Id.* at ¶ 68. On May 2, 2009, Paul's friend Neil Schnitzler—who had previously given an interview to police—was arrested by NPD for drug possession; he was on supervision for a DUI at the time of that arrest. *Id.* While he was in custody at the NPD, a Northbrook detective spoke to Schnitzler again about his interactions with

---

[5] Albanese could not say how much of the interrogation video he saw, but facts in the record support an inference that he did not watch much. Albanese testified that his felony review notes indicated how much of the video he watched, and those notes indicate he viewed the first 10 minutes of Mr. Koh's second interrogation. PSF ¶ 63. Albanese testified he didn't see police use coercive tactics on the portion of the video he viewed. *Id.* Albanese concedes he might have reviewed draft police reports at the NPD, and, in fact, his description of Mr. Koh's videotaped statement largely tracks the description that Graf wrote in his report, not the video itself. *Id.*

Paul on the night of Paul's death, in an effort to reconcile his story with the stories of other witnesses. *Id.* Schnitzler admitted that the information from his first interview was untruthful. When he was asked whether he might have made phone calls on the night of Paul's death, he specifically disavowed any memory of doing so. *Id.*

Around May 27, 2009, Schnitzler pleaded guilty to drug possession and was sentenced to drug school. *Id.* at ¶ 69. The next day, Graf called Schnitzler to interview him about Paul a third time. *Id.* Graf had by then collected phone records that showed Schnitlzer had in fact called the Kohs' landline at 11:52 p.m. on April 15, the night of Paul's death. *Id.* With Graf's assistance, Schnitzler suddenly recalled significant new details about that phone call—notwithstanding his inability during two prior interviews to remember anything about any phone call. *Id.* Schnitzler now purportedly recalled that, while attempting to call Paul's cell phone to arrange delivery of drugs on the night of Paul's death, he had accidentally called the landline at the Koh home. *Id.* at ¶ 70. Schnitzler's new story was that when that call was picked up, he said, "Hey I have the stuff, meet me back at my house," and then hung up the phone. *Id.* at ¶ 69. The Defendants' theory was that Mr. Koh had heard a call intended for Paul regarding drugs and had flown into a homicidal rage. *Id.* at ¶ 70.

None of that happened. The Kohs never heard the phone ring on the night of Paul's death, and neither of them picked up the phone or conversed with anyone. RNBSF at ¶ 116.

By the time of Mr. Koh's criminal trial, Schnitzler's story had gotten even better for the State: Schnitzler claimed that a few minutes after accidentally calling the Kohs landline, he told Paul about the mistake and, as a result, Paul became "agitated" and quickly went home. PSF ¶ 70. The State relied heavily on Schnitzler's testimony about this call at Mr. Koh's criminal trial,

arguing repeatedly that it was the words that Schnitzler uttered on that accidental call to the Kohs' landline that provided the conspicuously absent motive for Mr. Koh killing Paul. *Id.*

## Q.    MR. KOH'S PROSECUTION

At Mr. Koh's *Gerstein* hearing, the state made a proffer regarding Mr. Koh's videotaped statement that parroted Graf's false police report. For example, the prosecutor doing the *Gerstein* hearing claimed that Mr. Koh "admitted that he lied" in his initial interrogation with police. *Id.* at ¶ 72. The ASA also said that Mr. Koh admitted that "in fact" he was angry at Paul for missing his curfew, he got a knife from his kitchen, and he swung the knife at Paul's neck. *Id.* The ASA also said that Mr. Koh "described" grabbing his son from behind and cutting Paul's neck with a knife. *Id.* Prior to making this proffer, the ASA did not watch the video of Mr. Koh's statements, though she did talk to a police officer about the case, most likely Graf.

On May 13, 2009, a grand jury indicted Mr. Koh for first degree murder. The only evidence at the grand jury was testimony from Graf, who testified that his investigation revealed that Paul and Mr. Koh had an argument, that Mr. Koh was armed with a knife, and that Mr. Koh stabbed Paul in the chest and head and cut Paul across the throat. *Id.* at ¶ 73. The grand jury did not see Mr. Koh's videotaped interrogation or any other piece of evidence. *Id.*

Mr. Koh spent almost four years in Cook County Jail. *Id.* at ¶ 74. His bond was $5 million, an amount he could not afford. The wrongful imprisonment was particularly difficult on Mr. Koh, given his age, his difficulties with English, and his overall lack of sophistication about how to live safely among other Cook County Jail inmates, to say nothing about his inability to properly bury and mourn the loss of his son. In December 2012, the case against Mr. Koh was tried to a jury. Mr. Koh's videotaped statements were introduced as evidence against him, and

22

Defendants Celia, Meents, Johnson, Graf, and Kim testified against Mr. Koh. After a very short deliberation, the jury acquitted Mr. Koh, and he was finally released.

## ARGUMENT

This Court examines all evidence in the light most favorable to the Kohs and draws all inferences in their favor. *Perez v. Thorntons*, 731 F.3d 699 (7th Cir. 2013). Summary judgment is warranted only if Defendants show that there is no genuine issue of fact on any of the Kohs' claims and that they are entitled to judgment as a matter of law. *Id.* "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

Properly construed, the record in this case unambiguously supports each of the Kohs' established federal and state-law claims.[6] Defendants do not argue they are entitled to summary judgment on Mr. Koh's due process claims based on fabrication of evidence, so however the Court decides the pending motions, there will be a trial on those claims. The law governing the remainder of Plaintiffs' federal claims was well established, at the appropriate level of specificity, long before Defendants' misconduct. Accordingly, there is no valid argument that qualified immunity should be granted because of ambiguity in the law. In addition, a huge number of factual disputes material to both federal and state-law claims in the case require resolution by a jury. This Court should deny Defendants' motions.

**A.    A JURY MUST DECIDE PLAINTIFFS' FOURTH AMENDMENT CLAIMS**

Plaintiffs bring Fourth Amendment claims, contending Defendants arrested them without probable cause when they arrived at their home in response to Mr. Koh's 911 calls and

---

[6] As Defendants note, the Court dismissed Plaintiffs' intentional infliction of emotional distress claim as untimely. R.82 at 13-16. Plaintiffs adhere to their view that Defendants' ongoing misconduct after their arrest and charges against Mr. Koh independently give rise to a timely IIED claim, *see Bridewell v. Eberle*, 730 F.3d 672, 679-80 (7th Cir. 2013) (Wood, C.J., concurring), and they preserve the argument for appeal. As the Court has noted, the presence or absence of this claim is unlikely to have practical effect on the trial. R. 82 at 16 n.5.

transported them to the police station. Defendants do not dispute there was no probable cause to arrest the Kohs at any time between 4 a.m. on April 16 (when they were removed from their home) and 1 p.m. that day (when Mr. Koh's interrogation ceased). Instead, they argue that, during that time period, it was not clearly established that they had arrested the Kohs. For the time period from 1 p.m. onward on April 16, Defendants concede that Plaintiffs were under arrest, R.279.11, but they contend that the arrests were arguably supported by probable cause. The law of arrest was clearly established in 2009, and disputes of fact preclude both arguments.

### 1. Legal Framework Governing Plaintiffs' Fourth Amendment Claims

"The constitutional right to be free from arrest without probable cause indisputably was established at the time [Plaintiffs'] were arrested." *Sornberger v. City of Knoxville*, 434 F.3d 1006, 1013 (7th Cir. 2006); *Driebel v. City of Milwaukee*, 298 F.3d 622, 652 (7th Cir. 2002) ("[I]nnumerable decisions . . . have clearly established the right to be free from arrest without probable cause."). When qualified immunity is asserted, "the relevant question is whether 'a reasonable officer could have believed that probable cause existed' to make the arrest." *Sornberger*, 434 F.3d at 1013 (quoting *Hunter v. Bryant*, 502 U.S. 224, 227 (1991)).

The Seventh Circuit holds that, in evaluating at summary judgment whether an officer is entitled to immunity from a false arrest claim, there is "substantial, if not complete, overlap of the issue of immunity and the principal issue on the merits." *Maxwell v. City of Indianapolis*, 998 F.2d 431, 435-36 (7th Cir. 1993); *see also id.* ("The . . . officers attempt to draw a distinction by contending that the relevant inquiry is into 'arguable probable cause,' which is another way of asking whether they had probable cause to think they had probable cause."). Indeed, the Supreme Court held unambiguously in *Malley v. Briggs* that an officer is not entitled to qualified

immunity when a reasonable official in his position would have known that the facts did not establish probable cause. 475 U.S. 335, 345 (1986).

The probable cause (or arguable probable cause) standard is thus an objective one, based on the facts known to the officer. *Fox v. Hayes*, 600 F.3d 819, 833 (7th Cir. 2010). Police officers have probable cause to arrest when, at the time of the arrest, "the facts and circumstances within their knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent man in believing that the [suspect] had committed or was committing an offense." *Beck v. Ohio*, 379 U.S. 89, 91 (1964). The officer's subjective state of mind is irrelevant to this analysis. *Wren v. United States*, 517 U.S. 806, 812-13 (1996).

Four additional legal concepts, all well established in the Seventh Circuit, are important to the probable cause analysis at this stage of this case. First, when the facts underlying a probable cause determination are disputed, a jury must decide the probable cause question:

> If the underlying facts supporting the probable cause determination are not in dispute, the court can decide whether probable cause exists. . . . On the other hand, if the question of probable cause arises in a damages suit, it is a proper issue for the jury if there is room for a difference of opinion concerning the facts or the reasonable inferences to be drawn from them. . . . Accordingly, a conclusion that probable cause existed as a matter of law is appropriate only when no reasonable jury could find that the officers did not have probable cause . . . .

*Maxwell*, 998 F.2d at 434; *see also Williams v. City of Chicago*, 733 F.3d 749, 757 (7th Cir. 2013) (a plaintiff gets "the benefit of conflicts in the evidence about what the officers actually knew at the time"); *Chelios v. Heavener*, 520 F.3d 678, 686 (7th Cir. 2008) (jury must make probable cause determination "if there is room for a difference of opinion concerning the facts or the reasonable inferences to be drawn from them"). The Seventh Circuit has reversed grants of summary judgment where defendants did not establish conclusively that there was no fact issue on probable cause. *Cartwright v. City of Chicago*, 450 Fed. App'x 539, 540-42 (7th Cir. 2011).

Second, "A police officer may not close her or his eyes to facts that would help clarify the circumstances of an arrest." *BeVier v. Hucal*, 806 F.2d 123, 128 (7th Cir. 1986). "'[R]easonable avenues of investigation must be pursued' especially when . . . it is unclear who committed the crime." *Sornberger*, 434 F.3d at 1016; *see also Fox*, 600 F.3d at 834-35. The same requirement is imposed when "it is unclear whether a crime had even taken place." *BeVier*, 806 F.2d at 128; *Phelan v. Village of Lyons*, 531 F.3d 484, 488 (7th Cir. 2008).

Third, knowingly fabricated evidence and false statements cannot support probable cause. *Franks v. Delaware*, 438 U.S. 154, 155-56 (1978); *Alexander v. United States*, 721 F.3d 418, 423 (7th Cir. 2013); *Lawson v. Veruchi*, 637 F.3d 699 (7th Cir. 2011) (reversing grant of summary judgment where false statements precluded finding probable cause); *Jones v. City of Chicago*, 856 F.2d 985, 995 (7th Cir. 1988) (immunity denied when police used false evidence because "[t]he facts show conduct that no reasonable police officer would have engaged in"); *Olson v. Tyler*, 771 F.2d 277, 281 & n.5 (7th Cir. 1985) (when officer intentionally or recklessly includes false facts or omits facts in the probable cause analysis, "he cannot be said to have acted in an objectively reasonable manner"). Such false statements are "demonstrated by showing that the officers entertained serious doubts as to the truth of their statements, had obvious reasons to doubt the accuracy of the information reported, or failed to inform the judicial officer of facts they knew would negate probable cause." *Beauchamp v. City of Noblesville*, 320 F.3d 733, 742-43 (7th Cir. 2003).[7]

Finally, a claim of qualified immunity can be defeated even if the precise conduct in question had not previously been held unlawful. *Hope v. Pelzer*, 536 U.S. 730, 739-741 (2002)

---

[7] While a good-faith application to a judicial or prosecutorial authority can be evidence of probable cause, where there is evidence that "officers themselves realized the weakness of their case, and therefore manipulated the available evidence to mislead" judicial or prosecutorial authorities, officers are not entitled to qualified immunity. *Sornberger*, 434 F.3d at 1016.

("[O]fficials can still be on notice that their conduct violates established law . . . in novel factual circumstances."); *see also Currie v. Chhabra*, 728 F.3d 626, 632 (7th Cir. 2013) (Fourth Amendment rights are well established "even in the absence of earlier cases involving fundamentally similar or materially similar facts"); *Narducci v. Moore*, 572 F.3d 313, 318 (7th Cir. 2009) ("Reasonable notice does not require that there be a case 'fundamentally similar' to the present case[.]"); *Green v. Butler*, 420 F.3d 689, 701 (7th Cir. 2005) (qualified immunity "is not predicated upon the existence of a prior case that is directly on point. The question is whether a reasonable state actor would have known that his actions . . . were unlawful"). Qualified immunity does not protect officers "who knowingly violate the law." *Hunter*, 502 U.S. at 229.

### 2. Under Clearly Established Law, Plaintiffs Were Arrested Long Before 1 p.m. on April 16, When Mr. Koh's Interrogation Ended

As noted, Defendants do not argue (nor could they) that they had arguable probable cause to arrest the Kohs at any point prior to 1 p.m. on April 16, when Attorney Shim terminated Mr. Koh's interrogation. Instead, Defendants rest their argument solely on the meritless contention that the law governing arrests was so unsettled in 2009 that they are entitled to immunity.

The Supreme Court held at least as early as 1985 that exactly what happened to the Kohs in this case is an arrest:

> There is no doubt that at some point in the investigative process, police procedures can qualitatively and quantitatively be so intrusive with respect to a suspect's freedom of movement and privacy interests as to trigger the full protection of the Fourth and Fourteenth Amendments. . . . And our view continues to be that the line is crossed when the police, without probable cause or a warrant, forcibly remove a person from his home or other place in which he is entitled to be and transport him to the police station, where he is detained, although briefly, for investigative purposes. We adhere to the view that such seizures, at least where not under judicial supervision, are sufficiently like arrests to invoke the traditional rule that arrests may constitutionally be made only on probable cause.

*Hayes v. Florida*, 470 U.S. 811, 815-16 (1985) (citations omitted); *see also Sornberger*, 434 F.3d at 1018 ("'A police officer's statement that 'you need to go' somewhere carries substantial authoritative weight. We think very few people could hear such a directive from a police officer

and still think they were free to act otherwise. Once the police removed the [defendants] from their home to the police station, the encounter took on an arrest-like nature.'") (quoting *Gardenhire v. Schubert*, 205 F.3d 303, 314 (6th Cir. 2000)). The facts in this case thus demonstrate an arrest exactly as defined by the Supreme Court twenty-five years before the events at issue. This Court could grant Plaintiffs summary judgment on the question whether they were arrested when they were removed from their home.

But the Court need not go that far. There is at the very least a fact dispute about when Plaintiffs were arrested under established law, which precludes summary judgment. It has long been law that "[a] seizure becomes an arrest when a reasonable person in the suspect's position would have understood the situation to constitute a restraint on freedom of movement of the degree which the law associates with formal arrest." *United States v. Ienco*, 182 F.3d 517, 523 (7th Cir. 1999). "Ascertaining the reasonableness of the suspect's belief that she is under arrest is typically a question of fact for the jury." *Sornberger*, 434 F.3d at 1018.

### a. Plaintiffs Were Arrested At Their Home

Viewing the facts in the light most favorable to Plaintiffs, both Plaintiffs were arrested when they were taken from their home to the police station for questioning around 4 a.m. on April 16. Defendants' assertion that no officer "engaged in any coercive conduct suggesting that cooperation is required," R.279 at 7, is belied by the record. From the moment police arrived at the Kohs' home, Defendants assumed complete authority over the scene and restricted the Kohs' movement. Officers yelled at Mrs. Koh to get out of the house and physically put her on the ground in the front lawn. Police stopped Mr. Koh from getting in his car to go to the hospital and pushed him down next to Mrs. Koh. They then stood watch over the Kohs in the front yard until Eisen directed Johnson to take the Kohs to the police station. Mr. Koh's requests before they left

to see his son, get his cell phone, and get his medications were refused. The Kohs were ordered into Johnson's squad car. They were not asked if they wanted to go to the police station. Instead, they had no choice but to go where the officers told them. Their requests to accompany their son to the hospital were refused. Though the Kohs were not in handcuffs when they arrived at the station, there can be no dispute that they did not feel free to leave.[8]

A reasonable jury considering these facts could easily conclude the Kohs were arrested well before their interrogations. *E.g.*, *Kirchner v. Thomas*, 2014 WL 6790754, at *4 (N.D. Ill. Dec. 2, 2014) (plaintiff arrested when she was not permitted to drive herself and instead had to be escorted in a police vehicle—"hardly the stuff of voluntary cooperation"); *United States v. Askew-Bell*, 2007 WL 1035156, at *6 (N.D. Ill. Apr. 2, 2007) (arrest evident when officer responded to a request about using the restroom by saying he would accompany the arrestee).[9]

### b. Plaintiffs Were Certainly Under Arrest When They Were Held *Incommunicado* At the NPD Between 4 a.m. and 7:30 a.m.

Even if the Court concludes the Kohs were not arrested in their front yard, they were certainly under arrest at the station before Mr. Koh's interrogation began. During that period of time, numerous friends and family came to the station to comfort the Kohs; they repeatedly

---

[8] While Defendants offer explanations for their conduct toward the Kohs—for example, that they had to search the home for intruders, preserve the scene, and keep the Kohs from getting wet on their front lawn, R.279 at 7, NBSF ¶ 22—those justifications (even pretending they were not disputed, which they are) have no bearing on whether the Kohs were arrested.

[9] *Hall v. Bates*, 508 F.3d 854 (7th Cir. 2007), which Defendants cite, does not warrant a different result. There, officers called a plaintiff on the phone and asked if she would come to the station to provide information on her husband's alleged fraud. In response, the plaintiff agreed to go to the station, ultimately spent 2.5 hours there, and then left on her own accord. The Seventh Circuit found there was no arrest and in *dicta* remarked that the arrest inquiry could be more easily answered if citizens started to ask officers detaining them whether they were free to leave, which the plaintiff in Hall had not done. Contrary to Defendants' suggestion, this *dicta* did not impose new "magic words" that plaintiffs must utter before they sue for illegal arrest. The established law still sets the standard for what constitutes an arrest. Moreover, in this case, the Kohs' many requests denied by Defendants and Defendants' actions show they were not free to leave and could not have reasonably thought they were. *Wells v. City of Chicago*, 896 F. Supp. 2d 725, 731-32 (N.D. Ill. 2012) ("Examples of circumstances that might indicate a seizure, even where the person did not attempt to leave, would be the threatening presence of several officers, the display of a weapon by an officer, some physical touching of the person of the citizen, or the use of language or tone of voice indicating that compliance with the officer's request might be compelled.").

asked for access to the Kohs; their presence was known to Wernick and Ross; but the Kohs were never allowed see them. At the same time, Plaintiffs were held separately, in non-public areas of the station, under constant police supervision, including by Johnson or Ochab. Mr. Koh made requests for a phone call and visits that were denied. And both Mr. and Mrs. Koh have testified that they did not feel that they were free to leave.

Defendants stress that the Kohs did not ask to leave. But that is irrelevant, especially here were every piece of evidence suggests that the answer to the question would be "no." Plaintiffs were taken from their home under an immense show of force and authority, their requests to go to a location other than the police station were ignored, they were separated from one another and all friends and family at the police station, and they were supervised by police constantly.

### c. At Latest, Plaintiffs Were Under Arrest Between 7:30 a.m. and 1 p.m., When They Were Interrogated

Even if the Kohs were not under arrest prior to their interrogations, they were certainly under arrest by their time of their interrogations. Mr. Koh was first interrogated by three police officers until 8:30 a.m., and then from 11:30 a.m. to 1 p.m.; between the two interrogations, Mr. Koh was held *incommunicado* in an interview room for three hours; and throughout, Mr. Koh's requests for outside contact were all denied. Meanwhile, Mrs. Koh was first interviewed at 10 a.m.; she was held separately from Mr. Koh, *incommunicado*, in a "holding area" for more than six hours before that; she, too, was denied all contact with others; and, after her interview, Mrs. Koh was held overnight. This treatment of Plaintiffs is identical to that at issue in *Dunaway v. New York*, 442 U.S. 200, 212-13 (1979), where the Supreme Court decided that an arrest occurred when a person was taken from a friend's home to the police station and interrogated.

Like Plaintiffs, Dunaway was not told he was under arrest or formally booked, but the Court was clear that such formalities are not necessary to the constitutional analysis.[10]

### 3. There Was Never Probable Cause to Believe Plaintiffs Killed Paul

Defendants concede that the Kohs were under arrest after Mr. Koh's interrogation was terminated by Attorney Shim. R.279 at 11. From that point on, they contend, probable cause supported Plaintiffs' arrests. The summary judgment record, viewed in the light most favorable to Plaintiffs, demonstrates that a reasonable officer in Defendants' position would not have thought there was probable cause—or arguable probable cause—to suspect the Kohs of killing their son at this point in time. Under the legal principles outlined above, Defendants are not entitled to qualified immunity on Plaintiff's Fourth Amendment claims.

Defendants argue they are entitled to qualified immunity because they made reasonable mistakes about the existence of probable cause. It is true that the Supreme Court recognizes that such mistakes may give rise to immunity, *Hunter v. Bryant*, 502 U.S. 224, 227 ( 1991), "[b]ut the mistakes must be those of reasonable men, acting on facts leading sensibly to their conclusions of probability," *Brinegar v. United States*, 338 U.S. 160 (1949). Long before Plaintiffs were arrested and Mr. Koh prosecuted, the Seventh Circuit made plain that police who create false evidence by definition cannot be reasonably mistaken. *See*, *e.g.*, *Hammond v. Kunard*, 148 F.3d 692, 697 (7th Cir. 1998) (no police officer who manufactures evidence "could reasonably believe that he was not violating . . . constitutional rights"). Here, "[s]o clear is the absence of probable cause that [Defendants] cannot take shelter in the doctrine of qualified immunity, which provides

---

[10] Defendants rely heavily on the Cook County criminal court's ruling on Mr. Koh's motion to quash in support of their argument for summary judgment. Plaintiffs explain below why the state court's rulings have no impact on the viability of Plaintiffs' claims at summary judgment or Defendants' assertions of qualified immunity.

a defense if a reasonable officer could have mistakenly believed that probable cause existed." *Aleman v. Village of Hanover Park*, 662 F.3d 897, 904 (7th Cir. 2011).

### a. Defendants Did Not Have Arguable Probable Cause to Believe That Any Crime Had Been Committed

At the outset, construing the record in Plaintiffs' favor, a reasonable officer would not have thought there was probable cause to believe Paul's death was a homicide in the first place.

First, as discussed above, the physical evidence at the scene pointed to suicide and not homicide. The first officers to respond admitted that the death "look[ed] like a suicide. Similarly, forensic examiners who inspected the scene observed evidence consistent with suicide and inconsistent with homicide.[11] Even if the meaning of physical evidence at the scene were a battle-of-the-experts scenario, which it is not (even Defendants' own retained crime scene expert in this case does not opine in this case that the scene was indicative of homicide, PSF ¶ 18), that battle must be resolved in favor of Plaintiffs' experts, who opine that the scene indicates suicide, not homicide. *Abdullahi v. City of Madison*, 423 F.3d 763, 773 (7th Cir. 2005) (competing expert conclusions signal the existence of a genuine issue of material fact).[12]

---

[11] In support of their argument that probable cause existed, Defendants submit an affidavit at summary judgment from NORTAF forensic examiner Wasowicz, in which he asserts that (1) he concluded on the morning of April 16 that Paul had been attacked, and (2) he reported those findings to investigators at a NORTAF briefing he attended that morning. This evidence is inadmissible and contradicted by other evidence at summary judgment.

First, Wasowicz testified unambiguously at his deposition that he could not remember what he said at the briefing; he could only say what he thought he would have said. Yet somehow in his new affidavit, Wasowicz now remembers exactly what he said. These contradictory parts of Wasowiciz's affidavit should be stricken. It is not appropriate for a party to rely on affidavits at summary judgment that directly contradict sworn testimony. *Bank of Illinois v. Allied Signal Safety Restraint Sys.*, 75 F.3d 1162, 1171 (7th Cir. 1996). Second, to the extent Defendants intend to present testimony from Wasowicz about his usual practices (what he would have said), such speculative testimony is not admissible unless it satisfies the requirements of Federal Rule of Evidence 406, which is not the case here. *Nelson v. City of Chicago*, 810 F.3d 1061, 1073-75 (7th Cir. 2016) (speculative habit evidence about what an officer would have done on a particular occasion that he does not actually remember is not admissible unless it can satisfy the requirements of FRE 406). Finally, even if Wasowicz's affidavit were admissible, he is subject to substantial impeachment based on his prior sworn testimony and his notes and report made contemporaneous with the investigation, all of which make no mention of Paul being attacked. RNBSF ¶ 70.

[12] In the Northbrook Defendants' statement of facts, they reference an investigative opinion rendered at the outset of Mr. Koh's criminal proceeding by Jeff Lair, an expert who was retained by Elliot Zinger, Mr. Koh's original criminal defense attorney, who was quickly replaced. As Plaintiffs note in response to this statement, Mr. Lair's opinion is not admissible in this case, most importantly because it has no bearing on what police would have

Second, in addition to the physical evidence, investigators amassed a wealth of information on April 16 about Paul's suicide risk and his disturbed mental state, including the following:

1. Paul had told his sister Helen Koh that he was hearing voices and that he "needed to get a gun to kill the voices in his head,";
2. Paul was seeing a counselor;
3. Paul had substance abuse issues;
4. Paul struggled with shyness, depression, and low self-esteem;
5. Paul once told a youth pastor, "I don't want to live sometimes. I don't like myself," and the youth pastor referred Paul for private practice counseling;
6. Mr. and Mrs. Koh were researching recovery centers for Paul;
7. A close family friend who had seen Paul at dinner on the night before Paul's death said that Paul "looked sick" to him, that something "just wasn't right" with Paul, and that Paul "seemed sick" in some way whenever he saw him;
8. Paul's uncle worried for a long time about whether Paul might kill himself, Paul had said to the uncle that he did not want to live, and Paul's uncle observed that Paul slept a lot and seemed unmotivated;
9. Paul's friend Neil Schnitzler mentioned "anxiety attacks" and "depression" in reference to Paul;
10. Mr. Koh's described Paul as "pretty much depressed" and said that Paul often slept all day;
11. Mrs. Koh described Paul as "acting depressed," and
12. Two of the Kohs' neighbors independently reported to police that Paul had shown up at their doorsteps completely nude and asking odd questions a few weeks prior.

PSF ¶ 66. Combined with the physical evidence, this additional evidence made perfectly clear to the Defendants that Paul's death was a suicide.[13] Certainly, fact disputes preclude a finding at summary judgment that there was probable cause to suspect Paul's death was a homicide.

---

seen at the Koh home on April 16, 2009. RNBSF ¶ 114. When Lair went to the scene, physical evidence, including Paul's body, Paul's clothes, and the weapon were all removed from the home. Lair had no access to investigators' pictures, notes, or reports, and he had no basis to render opinions on what the police saw on April 16, 2009.

[13] Although Defendants did not personally gather all of the information just discussed, there are more-than-sufficient facts in the record from which a reasonable jury could infer that, as the main investigators, Graf, Ustich, Wernick, and Dunham would have known information gathered by other investigators during the course of this high-profile investigation. That group met at least once after Mr. Koh's first interrogation and again prior to Mr. Koh's second interrogation. By all accounts, there was a free-flow of information during NORTAF investigations, and Graf, Ustich, Wernick, and Dunham were present during key briefings held throughout the day, which is to be expected in any unfolding death investigation. PSF ¶ 26.

### b. Defendants Did Not Have Arguable Probable Cause to Believe That Mr. Koh Killed Paul

Even if one assumes for the sake of argument that Defendants had probable cause to believe that Paul's death was a homicide, disputes in the record foreclose the conclusion that Defendants had arguable probable cause to believe that either of his parents killed him.[14]

Perhaps most damning to Defendants' arguments about probable cause is the irreconcilable inconsistency between their treatment of Mr. Koh, on the one hand, and Mrs. Koh, on the other. The factual record construed in Plaintiffs' favor demonstrates quite clearly that Defendants never suspected Mrs. Koh of killing her son, and never thought they had probable cause to arrest her for murder. They concede as much. Yet, other than the difference in their genders, all of the facts known to Defendants would make Mrs. Koh just as much a suspect as Mr. Koh. As discussed above, the facts themselves do not establish probable cause, but Defendants' different treatment of Mr. and Mrs. Koh demonstrates that a reasonable officer would not conclude that there was probable cause to suspect either of them of murder.

### i. Statements Extracted During Mr. Koh's Interrogation Did Not Establish Probable Cause to Arrest Mr. Koh for Murder

Nothing in the statements Defendants extracted during Mr. Koh's interrogation established probable cause to believe that Mr. Koh had killed his son. This is the case primarily because all of the material information developed during the interrogation of Mr. Koh was coerced by Defendants, was obviously false, and thus cannot form the basis of probable cause. It is well-established that fabricated evidence and false statements cannot support probable cause. *Franks*, 438 U.S. at 155-56; *Alexander*, 721 F.3d at 423; *Jones*, 856 F.2d at 995. Below, Plaintiff

---

[14] As discussed, Defendants do not attempt to argue they had probable cause to arrest either of the Kohs before to the end of Mr. Koh's interrogation. R. 279 at 5-11. Accordingly, Defendants essentially concede that if Plaintiffs were under arrest at a point earlier in time, the arrest occurred without probable cause, at least for purposes of deciding their summary judgment motion. Regardless, Plaintiffs in this section outline the disputed facts that preclude finding, at any point in time, that Defendants are entitled to immunity on the probable cause question.

discusses in detail the illegal and coercive interrogation that Mr. Koh suffered. A reasonable jury could conclude, based on the summary judgment record, that all of the material facts extracted during Mr. Koh's interrogation were false and cannot form the basis of probable cause. For that reason alone, Defendants are not entitled to immunity from Plaintiffs' Fourth Amendment claims based on their interrogation of Mr. Koh.

Separately, however, there is a dispute about whether any of the facts developed by Defendants during their interview actually implicate the Kohs in the murder of their son. Even if one assumed that the facts that the Defendants extracted from Mr. Koh were reliable, many if not all of those facts were proven false, eliminating any lingering notion that Mr. Koh's statement was reliable evidence of his guilt. For example, Graf got Mr. Koh to accede to Graf's narrative that Mr. Koh confronted Paul as he walked through the front door, but the investigation revealed that Paul went to his bedroom after he came home on the night he died and spent some amount of time upstairs, changing his clothes and depositing his wallet and keys in his room before his death. PSF ¶ 51. Likewise, after Graf leaned on Mr. Koh repeatedly to admit that he got a knife from the kitchen, Mr. Koh finally gave in, indicating that he got the knife from a knife rack in the kitchen. *Id.* In fact, there was no knife rack in the Kohs' kitchen. *Id.* Similarly, Mr. Koh finally gave into Graf's insistence that either Mr. or Mrs. Koh had placed a call to Paul's cell phone on the night that Paul died, but the phone records Defendants accessed showed no call made from the Koh's home. Simply put, Mr. Koh's statement was not a reliable piece of evidence that could form the basis of probable cause, particularly not to a trained investigator. PSF ¶ 52 (McCrary opining that Mr. Koh's statement was not supported by the actual evidence, facts learned in the post-confession investigation, to the extent there was one, demonstrated Mr. Koh's statement was not reliable evidence, and did not support probable cause).

### ii. Other Evidence Did Not Establish Probable Cause to Arrest Mr. Koh for Murder

Anticipating the finding that Mr. Koh's coerced statements cannot give rise to probable cause, Defendants attempt to cobble together facts independent of Mr. Koh's statements that they learned on April 16 and that they contend gave them probable cause to arrest Mr. Koh. R.279 at 12-14 (listing 16 pieces of information). The problem for Defendants, however, is that several of these items are hotly disputed, and the remainder does not establish arguable probable cause.

The following are Plaintiffs' responses to the items on Defendants' list, demonstrating the factual disputes that preclude summary judgment:

- Regarding item (6), Plaintiffs strongly contest the assertion that evidence at the scene showed signs of a "violent struggle." Likewise, there is no evidence in the record about what kind of noise such a struggle would have generated; nor whether any purported noise would have been audible from the Kohs' bedroom, which contrary to Defendants' unsupported assertion, was not "nearby" the location where Paul died. All of the facts in item (6) are disputed and must be resolved in Plaintiffs' favor.

- Plaintiffs also dispute that investigators knew of item (12) on April 16. In January 2009, Paul purportedly had a prior encounter with Meents, during which Paul told Meents his parents had kicked him out of the house. Although Graf testified that he knew about this interaction before Mr. Koh's interrogation, there are sufficient facts in the record for a jury to discredit his account; most notably, that Graf never once mentioned during Mr. Koh's interrogation anything about Mr. Koh having kicked Paul out of the house. RNBSF ¶ 69. A reasonable jury could infer that, if Graf had had this information at the time of Mr. Koh's interrogation, he would have used it in the course of his over-the-top efforts to get Mr. Koh to confess. *Williams v. City of Chicago*, 733 F.3d 749, 756 (7th Cir. 2013) (noting that plaintiffs get "the benefit of conflicts in the evidence about what the officers actually knew at the time").

- Defendants also rely on statements from Mr. and Mrs. Koh's interviews (items (5) and (7)) that—according to Defendants' view of the facts—were inconsistent with evidence at the scene. But these statements do not amount to convincing evidence that Plaintiffs were lying, much less that they murdered their son. The record shows that trained investigators like Graf know that people who have experienced the kind of horror and trauma that the Kohs experienced that morning often cannot remember details accurately. That does not mean they are lying, and such an assertion is not a basis of probable cause. RNBSF ¶ 79.

- Regarding item (7), Mr. Koh's statement about washing his hands, it would have been obvious to investigators that Mr. Koh was not lying and was simply wrong about where he had washed his hands. As the first responders observed, Mr. Koh's hands were clean and wet with water when they encountered Mr. Koh at the scene. Mr. Koh had obviously just washed his hands at the house, which is readily explained by the fact that the Kohs were preparing to leave their house after they both had touched Paul's bloody body in an effort to render aid. Mr. Koh indicated that he thought he might have washed his hands at the station, but he was not sure. Although he said he did not wash them at home, he was simply mistaken about what would be to an innocent person a completely benign and non-noteworthy detail—particularly to someone who had just discovered his dead child. Because this fact is equally amenable to multiple inferences, investigators had no reason to take Mr. Koh's misstatement as evidence of guilt. *Sornberger*, 434 F.3d at 1016 (holding that reasonable avenues of investigation must be pursued to clarify the facts). This fact certainly cannot form the basis of probable cause at summary judgment.

- Item (5) concerns the movement of Paul's body. It is true that the physical evidence showed Paul's body had been turned over after he died. But this evidence is fully consistent with Mr. Koh's statement. Mr. Koh

36

told investigators that Mrs. Koh, after discovering Paul, had turned him over from face down to a face up, in order to try to help him. The physical evidence corroborated this as well.

- Regarding items (11) and (16), both of these pieces of "information" are statements that Mr. Koh made involuntarily as a result of the officers' misconduct. For all the reasons described above, these statements cannot support probable cause to arrest Mr. Koh.

- Finally, regarding the 11:52 p.m. phone call discussed in item (14), the only information police had about that call at the time of Plaintiffs' arrest is that the Kohs did not hear it or answer. A phone call that no one hears or answers means nothing, and it does not provide probable cause to suspect anyone of murder.

Stripped of these items, all that remains on Defendants' list of 16 pieces of information supporting probable case is the following: Paul died of stab wounds inside the Kohs' home; there was no sign of forced entry; Paul died before Mr. Koh called 911; Paul had substance abuse problems that had caused problems at home, but he had committed himself to stop using, and he was supported by his parents in that effort; and despite those efforts, Paul had gone out and smoked marijuana with his friends before his death. While these facts might justify further investigation into the circumstances of Paul's death, they hardly amount to probable cause to arrest Mr. Koh for murder.[15] On Plaintiffs' side of the balance, at the time that Mr. Koh's interrogation ended, Defendants had all of the information discussed above pointing to suicide.[16]

Moreover, again assuming that a reasonable police officer would have had reason to believe that Paul's death was a homicide—a contested issue—evidence pointed away from Mr. Koh and toward others. By the end of Mr. Koh's interrogation, investigators knew Paul had previously been stabbed by one of his friends, and that Paul's friends were involved in drugs. PSF ¶¶ 24, 66; RNBSF ¶ 69. Considering that Paul was clearly stabbed to death by someone, any reasonable officer would at least try to talk to the guy who stabbed Paul in the past, prior to deciding that Mr. Koh, who had no criminal record or history of violence whatsoever, was guilty.

---

[15] Defendants attempt to suggest that parental angst about a non-achieving son could literally drive a father to murder. *E.g.*, R.275 at 23. Plaintiffs doubt that they would invoke that argument if the father was a white American rather than a Korean-American.

[16] The only exceptions are that Richard Yen had not yet been interviewed and the Kohs' neighbor Sean McWilliams had not yet called the NPD to report that Paul once had shown up nude at his front door. Those two pieces of information were relayed to police later in the afternoon on April 16.

Given that there were no signs of forced entry, any reasonable police officer would investigate whether someone known to Paul, other than his father, could have been the perpetrator. *BeVier*, 806 F.2d at 128 ("A police officer may not close her or his eyes to facts that would help clarify the circumstances of an arrest."). Lastly, Mr. Koh was considerably smaller, older, and less physically healthy than Paul, yet he bore no indication whatsoever—injuries, bloodstains, etc.— of having overpowered a much younger, bigger, and stronger man in a knife fight. PSF ¶ 53.

Considering all facts known to the officers at the time, drawing all reasonable inferences in Plaintiffs' favor, there was no arguable probable cause to arrest Mr. Koh for Paul's murder.

### c. Defendants Also Did Not Have Arguable Probable Cause to Believe That Mrs. Koh Committed Any Crime

Defendants' assertion that they had probable cause to arrest Mrs. Koh also fails. By Defendants' own admission, any probable cause they had to arrest Mrs. Koh hinged on the "truth" of the inculpatory statements that they themselves forced Mr. Koh to make. As explained above, those statements cannot form the basis of probable cause.

Even if police could have reasonably considered Mr. Koh's inculpatory statements to be true, there was still no evidence available to police indicating that Mrs. Koh had any knowledge of or part in Paul's death. The only facts that Defendants point to in support of their theory that Mrs. Koh might be culpable are either completely unsupported or disputed. For example, Defendants assert that Paul's death was the result "an unbelievably violent and noisy struggle" that occurred "close to [the Kohs'] bedroom," R.279 at 16, without any evidence—and indeed contrary evidence—in the record. Defendants also assert that the Kohs had an opportunity to "collaborate" by talking under a blanket "in their native Korean" for three hours at NPD, but that assertion is also disputed. Even if there were some basis for these facts, it would be improper for to Court to draw unsupported inferences in Defendants' favor at this stage.

In reality, there was no basis to arrest Mrs. Koh for anything, and the police knew it. Defendants assert in their motions that they were simply "holding" Mrs. Koh until prosecutors made a charging decision, R.279 at 16, but facts in the record directly contradict that assertion. Prosecutors in this case uniformly deny that they were ever asked to review charges against Mrs. Koh. RNBSF ¶ 108. And if any officer believed there were facts to support criminal charges against Mrs. Koh, presumably they would have talked to prosecutors about those charges. No such conversation ever happened. Likewise, when police finally decided to release Mrs. Koh the next day, Northbrook detectives attempted to get her signature on a deceptively-worded "release" form, which looks like something that one needs to be sign to be "released" from lockup, but in fact "releases" Northbrook from civil liability for the arrest. Even Defendants' own retained police practices expert concedes that there was no probable cause to arrest Mrs. Koh for murder, and when pressed he would not even say that there was probable cause to arrest Mrs. Koh for any lesser crime, like obstruction. PSF ¶ 112. When the record is viewed in the light most favorable to Plaintiffs, there was no probable cause for Mrs. Koh's arrest.

**B.  A JURY MUST DECIDE MR. KOH'S FIFTH AND FOURTEENTH AMENDMENT CLAIMS THAT DEFENDANTS VIOLATED MR. KOH'S RIGHT TO BE FREE OF COMPULSORY SELF-INCRIMINATION**

Mr. Koh was forced to give statements implicating himself in a crime that did not happen and that he did not commit. Those statements were used against him in criminal proceedings, in violation of his clearly established rights under the Fifth and Fourteenth Amendments. The totality of circumstances surrounding Mr. Koh's interrogation entails a tremendous number of factual disputes. Construed in Plaintiffs' favor, Mr. Koh's interrogation was plainly illegal and resulted in statements that were entirely involuntary. Summary judgment on Mr. Koh's claims under the Fifth and Fourteenth Amendments should be denied.

1.    **It Was Established Long Before 2009 That Police Cannot Compel Involuntary Statements from An Accused For Use In Criminal Proceedings**

The Supreme Court made clear as early as 1936 that the Constitution is violated when involuntary statements compelled by state actors are used against a defendant in criminal proceedings. *Brown v. Mississippi*, 297 U.S. 278 (1936). By the time of Mr. Koh's interrogation, Supreme Court cases stretching back a century put government officials on notice that compulsory self-incrimination violates the Fifth and Fourteenth Amendments. *E.g.*, *United States v. Verdugo-Urquidez*, 494 U.S. 295, 264 (1990) (19 years before Mr. Koh's interrogation); *Miller v. Fenton*, 474 U.S. 104 (1985) (24 years); *Malloy v. Hogan*, 378 U.S. 1, 6 (1964) (45 years); *Bram v. United States*, 168 U.S. 532, 542 (1897) (112 years).

Three years before Mr. Koh's interrogation, the Seventh Circuit held—in a civil case brought under section 1983, involving precisely the same sort of police coercion at issue in this case—that a compelled statement violates clearly established Fifth and Fourteenth Amendment rights, even if charges are ultimately dropped before a conviction. *Sornberger*, 434 F.3d at 1023-27. These precedents foreclose Defendants' argument that they are entitled to qualified immunity because of a lack of clarity in governing law.

2.    **Whether Mr. Koh's Confession Was Voluntary Is A Fact-Bound Determination Based on the Totality of Circumstances**

To the extent Defendants' immunity argument is based on the assertion that their actions did not violate the Constitution, that position is foreclosed by factual disputes. It is similarly well-established that "whether a confession was involuntary requires an examination of the totality of the surrounding circumstances, including the characteristics of the person in custody and the details of the interrogation that resulted in the statement." *Etherly v. Davis*, 619 F.3d 654, 660-61 (7th Cir. 2010); *see also Schneckloth v. Bustamonte*, 412 U.S. 218, 226 (1973)

40

(voluntariness determined by "the factual circumstances surrounding the confession" and the "psychological impact on the accused"); *Blackburn v. Alabama*, 361 U.S. 199, 206 (1960) (voluntariness inquiry "must be broad"); *Kerr v. City of Chicago*, 424 F.2d 1134, 1138 (7th Cir. 1970) ("To consider whether the confession was voluntary, it is necessary for the jury to be allowed to consider all relevant facts regarding the circumstances under which a confession from the plaintiff was obtained.").[17]

A wide variety of interrogation tactics short of torture render confessions involuntary. "A false promise of lenience is an example of forbidden interrogation tactics, for it would impede the suspect in making an informed choice as to whether he was better of confessing or clamming up." *United States v. Stadfeld*, 689 F.3d 705, 709 (7th Cir. 2012). Likewise, "[t]hreats to a suspect's family or children, even if implicit, certainly may render confessions involuntary for purposes of due process." *Sornberger*, 434 F.3d at 1023; *see also Lynumn v. Illinois*, 372 U.S. 528, 533 (1963) (confession involuntary when suspect told she could lose benefits and custody of children); *Rogers v. Richmond*, 365 U.S. 534, 543 (1961) (confession involuntary when police threatened to take suspect's wife into custody). Other lies and misleading statements that provoke false information can also render a confession involuntary. *See Spano v. New York*, 360 U.S. 315, 323 (1959) (confession involuntary when officer told suspect (a friend of his) that officer would get in trouble if he did not confess). Similarly, a confession is coerced when police use abusive language and feed the suspect the facts that make up the confession. *See Hill v. City of Chicago*, 2009 WL 174994, at *8 (N.D. Ill. Jan. 26, 2009) (reasonable police officer would

---

[17] An examination of the totality of circumstances renders inappropriate any argument about the legality of particular interrogation techniques assessed in isolation. *See Schneckloth*, 412 U.S. at 226 (decisions do not turn "on the presence or absence of a single controlling criterion; each reflect[s] a careful scrutiny of all the surrounding circumstances"); *Halsey v. Pfeiffer*, 750 F.3d 273, 307 (3d Cir. 2014) (summary judgment cannot be granted based on examination of particular interrogation techniques or factors involved in an interrogation); *Wilson v. Lawrence County*, 260 F.3d 946, 953 (8th Cir. 2001) ("[A] totality of the circumstances analysis does not permit state officials to cherry-pick cases that address individual potentially coercive tactics, isolated one from the other, in order to insulate themselves when they have combined all of those tactics in an effort to overbear an accused's will.").

have known in 1992 "that coercing a confession by abusive language and physical contact, along with coaching the suspect as to the details of the confession, clearly violates the suspect's constitutional right against self-incrimination").

Just as important as the tactics used by the police is their effect on the accused. *Fikes v. Alabama*, 352 U.S. 191, 193-97 (1957) (it is "highly material . . . to ascertain [the defendant's] character and background"). Analyses of coercion therefore consider the education, age, and intelligence of the accused; what the accused has been told about his constitutional rights before providing statements; the length of the detention; the repeated or prolonged nature of questioning; and the deprivation of food or sleep. *Smith v. Duckworth*, 856 F.2d 909, 912 (7th Cir. 1988). With respect to advice about constitutional rights, evidence that a confession was given without a knowing waiver of *Miranda* establishes involuntariness, *Haynes v. Washington*, 373 U.S. 503, 509-11 (1963) (confession involuntary when police refused to allow suspect to make phone call and did not inform him of right to remain silent or right to counsel); as does a confession extracted in violation of the right to counsel, *Edwards v. Arizona*, 451 U.S. 477, 482 (1981) (confession taken without knowing and intelligent waiver of right to counsel violates the Fifth and Fourteenth Amendments).

The fundamental question is whether "the circumstances prevent the person being questioned from making a rational choice." *Weidner v. Thieret*, 866 F.2d 958, 963 (7th Cir. 1989). If a criminal defendant's confession is not "'the product of an essentially free and unconstrained choice by its maker'" and "'if his will has been overborne and his capacity for self-determination critically impaired, the use of his confession offends due process.'" *Schneckloth*, 412 U.S. at 225-26 (quoting *Culombe v. Connecticut*, 367 U.S. 568, 602 (1961)). In this case, this fundamental question must be resolved by a jury.

###   3.   Construing the Record in Plaintiff's Favor, Defendants' Misconduct Plainly Violated Established Law

To accept Defendants' contention that their interrogation of Mr. Koh complied with the law and resulted in a voluntary confession, this Court would have to completely disregard central facts in the record and draw inferences in Defendants' favor. Properly construed, the record shows an obviously unlawful interrogation that resulted in an involuntary confession, in violation of clearly established law. Indeed, construed in Plaintiff's favor, there are an overwhelming number factors weighing in favor of the conclusion that Mr. Koh's confession was involuntary.

As described, Mr. Koh was in an extremely vulnerable mental state when he was interrogated. Mr. Koh had an obvious language barrier—one acknowledged by Defendants and visible on the video—which made it cognitively challenging for Mr. Koh to report on past events, to deal with topic shifts in conversation, and to engage in complex conversation at all. Compounding the problem, Kim was not translating; instead, he added to confusion, partially translated, intentionally translated incorrectly, asked his own questions unrelated to Graf, and made false statements about the conversation that was occurring. A reasonable jury could conclude that incriminating statements obtained from a person who does not speak the language and who does not understand the conversation that is occurring are involuntary without considering any other factors.

Additional evidence that Mr. Koh was physically and mentally compromised also forecloses summary judgment on the question whether Mr. Koh's incriminating statements were voluntary. Mr. Koh had just found his son dead in his home—he and his wife were traumatized and in shock. As officers were aware, the Kohs were frantic and out of their minds at the scene. Although Mr. Koh attempted to summon a support network of friends and family, Defendants completely denied the Kohs such contact. In addition, Mr. Koh was held *incommunicado* for

43

eight hours. He was short on sleep; he had not taken his medication for his serious health conditions; and he had not eaten since the night before. According to medical experts, this combination of factors caused confusion and impaired memory and rendered his statement involuntary. PSF ¶¶ 29, 30, 84. Police were aware of Mr. Koh's deficits because they could observe them, and they were aware more generally that it is unfair to interrogate anyone under such circumstances. *Id.* ¶ 31.

Defendants' extreme interrogation tactics also preclude summary judgment on Mr. Koh's coerced confession claims, particularly when one considers the effect of those tactics on someone in Mr. Koh's uniquely incapacitated state. Together, Graf, Ustich, and Kim yelled at Mr. Koh; badgered him; manipulated him; made false statements about the evidence; lied to him about the consequences of a confession; threatened to keep him there for "days and days and days;" played on his devout religious views by invoking God and implying that God wanted him to confess to killing Paul; touched him and intimidated him physically; displayed weapons; interrogated him in a cold room; and refused to accept his consistent denials of guilt. PSF ¶¶ 27-50, 109. These things are observable on the video of Mr. Koh's interrogation and they are supported by facts in the record. These tactics standing alone would permit a reasonable jury to conclude that Mr. Koh's confession was involuntary.

Further demonstrating that Mr. Koh's statements were involuntary is the fact that Mr. Koh did not receive *Miranda* warnings, and he did not knowingly and voluntarily waive his *Miranda* rights. Though Graf read to Mr. Koh from a pre-printed *Miranda* form, Mr. Koh clearly indicated he did not understand and needed Kim to translate. Kim purported to translate that form, but the things he said to Mr. Koh did not reflect *Miranda* warnings. As the actual translation of what Kim said shows, his wording and syntax is garbled, and his statements about

44

Mr. Koh's rights are fatally incomplete and misleading. PSF ¶¶ 103-05. A reasonable inference from the exchange is that Kim affirmatively advised Mr. Koh that he did not need a lawyer. PSF ¶ 108-05. Accordingly, the lack of *Miranda* warnings and lack of a knowing waiver from Mr. Koh is an additional reason that a reasonable jury could find Mr. Koh's confession involuntary.

Finally, as discussed above, Mr. Koh's off-camera conversation with Graf and his questions to Kim on camera support the inference that Mr. Koh invoked his right to counsel. Attorney Shim arrived at the station around 12:35, before Mr. Koh made any inculpatory statement. Dunham—who knew Graf, Ustich, and Kim were interrogating Mr. Koh—knew Shim was there and ran down the clock, making him wait 20 minutes before even acknowledging him. Dunham then went to tell Graf about Shim's presence, which made Graf turn up the heat on Mr. Koh, ensuring that he extracted statements from Mr. Koh before the interrogation ended. This denial of counsel is yet another factor that the jury could rely upon to conclude that Mr. Koh's confession is involuntary.

In addition to being a factor in the totality of circumstances, Defendants' denial of counsel to Mr. Koh is a *per se* violation of Mr. Koh's Fifth and Fourteenth Amendment rights. The Supreme Court since *Edwards* has presumed that a confession extracted during custodial interrogation after invocation of the right to counsel violates the Constitution. *Edwards*, 451 U.S. 477; *see also Smith v. Illinois*, 469 U.S. 91, 95 (1984) (noting the "bright-line rule that *all* questioning must cease after an accused requests counsel"); *Fare v. Michael C.*, 442 U.S. 707, 719 (1979) (discussing the "rigid rule" that "an accused's request for an attorney is *per se* an invocation of his Fifth Amendment rights, requiring that all interrogation cease").[18]

---

[18] Though Plaintiff made clear he was not proceeding with a Sixth Amendment claim based on the right to counsel, he never abandoned his claim that denial of counsel violated his Fifth and Fourteenth Amendment rights.

45

There are many disputes relating to the voluntariness of Mr. Koh's confession. A jury must decide whether Defendants extracted involuntary statements from Mr. Koh, in violation of his Fifth and Fourteenth Amendment rights.

**4.    The Record Supports This Court's Prior Decision, Reached On Motions To Dismiss, That the Interrogation Video Supports A Fact Dispute About Whether Mr. Koh's Statements Were Voluntary**

The discussion above demonstrates that Mr. Koh's Fifth and Fourteenth Amendment rights were clearly established, and that factual disputes underlie those claims. No more is needed to deny summary judgment. It is worth noting, however, that nothing Defendants point to in the record undermines this Court's decision at the motion-to-dismiss stage that the video of Mr. Koh's interrogation is amenable to an inference of an involuntary confession.

Evaluating motions to dismiss, the Court stated that it would "consider the interrogation video in conjunction with the Kohs' complaint," viewing "the video in the light most favorable to the Kohs." *Koh v. Graf*, 2013 WL 5348326, at *10 (N.D. Ill. Sep. 24, 2013). Analyzing the video and the complaint under established law, the Court concluded that "it is plausible that a reasonable officer conducting Mr. Koh's interrogation would have known that he was violating the Fifth Amendment by berating, lying to, and physically intimidating a detainee who did not understand English and had not eaten, slept, or taken necessary medication." *Id.* at *11 (citing *Arizona v. Fulminante*, 499 U.S. 279, 287 (1991), *United States v. Nguyen*, 155 F.3d 1219, 1222-23 (10th Cir. 1998), *Andersen v. Thieret*, 903 F.3d 526, 530 (7th Cir. 1990), and *McMillen v. Briley*, 2002 WL 69488, at *1, 8 (N.D. Ill. Jan. 18, 2002)). The Court thus denied qualified immunity on Plaintiff's Fifth and Fourteenth Amendment claims. *Id.*

The clarity of the constitutional right at issue has not changed since that decision. Similarly, the interrogation video, construed in the light most favorable to Plaintiff still shows

what it showed then. The difference now is evidence in the record relating to the interrogation that does not appear on the video. In order to grant summary judgment, this Court would have to conclude that this new evidence, construed in Mr. Koh's favor, so contradicts what is seen on the video that no reasonable jury could concluded that Mr. Koh's statements were involuntary. As discussed, the new evidence discussed above does exactly the opposite—it reinforces this Court's conclusion at the motion-to-dismiss stage, and that decision should stand here.

### 5. Defendants' Arguments for Summary Judgment On Plaintiff's Coerced Confession Claims Lack Merit

Defendants argue that two aspects of Mr. Koh's criminal prosecution in the Circuit Court of Cook County defeat his coerced confession claims. Neither argument has merit.

First, they argue that the criminal trial judge's denial of Mr. Koh's motion to suppress his self-incriminating statements should preclude Mr. Koh's claim that his confession was involuntary. This precise collateral estoppel argument was rejected by the Seventh Circuit in *Sornberger*. 434 F.3d at 1021-23; *see also Evans v. Katalinic*, 445 F.3d 953, 955–56 (7th Cir.2006) (estoppel argument based on state-court decision "absurd" when there is no extant criminal judgment against the plaintiff); *Hill*, 2009 WL 174994, *11-12 (collecting cases and concluding that state court denial of motion to suppress did not estop civil rights plaintiff from re-litigating the legality of his confession). This estoppel argument—and Defendants' variation on it—should be rejected here as well.[19]

---

[19] Defendants to some extent attempt to reframe this as an issue of qualified immunity, arguing that the state court's decision shows that they acted reasonably. R.279 at 23; R.275. at 15-16. This is a distinction without a difference: if Defendants' position was adopted, any state court determination on a motion to suppress would have preclusive effect because it would automatically render individual defendants immune. Defendants cannot endow the state court decision with preclusive effect simply by reframing the decision as evidence that immunity is appropriate.

Even if that were not the case, the state judge's decision is not entitled to some special weight in a qualified immunity analysis. First, the entire thrust of Mr. Koh's claims is that the state court proceeding was corrupted by the Defendants' misconduct. Among other things, the state judge was deprived of evidence about the true circumstances of Mr. Koh's confession and was given false reports from Graf and Kim. Second, even if a judicial officer made a

Second, Defendants argue that the State's Attorney's decision to prosecute Mr. Koh and to use his videotaped confession in that prosecution renders them not liable for their misconduct. To the extent that Defendants are arguing that there is a break in the chain of causation between their misconduct and the constitutional harm that Mr. Koh suffered, that argument is also foreclosed by clear Seventh Circuit precedents.

A prosecutor's decision to use a confession in criminal proceedings does not supersede and break the chain of causation between the officer's coercion of that confession and the constitutional harm that results from its use. *See Malley*, 475 U.S. at 345 (judge's decision to issue arrest warrant based on police affidavit does not break chain of causation when reasonable officer would know affidavit did not establish probable cause); *Whitlock v. Brueggemann*, 682 F.3d 567, 582-83 (7th Cir. 2012) (police liable when they fabricate evidence later used by prosecutors, even when the prosecutor's action of introducing the evidence completes the constitutional violation); *see also Fields v. Wharrie*, 740 F.3d 1107, 1112 (7th Cir. 2014) (while officer who discloses falsity of evidence and encourages prosecutor not to use it may not be responsible if prosecutor later uses the evidence, investigators and prosecutors who work together are all liable for causing an injury).[20]

In the same vein, it makes no difference if an immune actor sits in the chain of causation or participates in misconduct with police. Where state actors engage together in conduct that violates the Constitution, the police cannot piggyback on the immunity of others. *Dennis v. Sparks*, 449 U.S. 24, 28-29 (1980); *Steidl v. Fermon*, 494 F.3d 623, 631 (7th Cir. 2007).

decision based on all of the evidence, that decision would not necessarily have viewed the evidence in the light most favorable to Mr. Koh, as this Court must at summary judgment. In state court, the judge was acting as fact finder. Third, and relatedly, it is not clear why a state court decision about suppression of evidence should dictate this Court's decision about whether federal constitutional law is clearly established or prevent a jury from considering the evidence where factual disputes make summary judgment under Rule 56 impossible.

[20] Defendants rely chiefly on the Fifth Circuit decision *Murray v. Earle*, 405 F.3d 278, 285 (5th Cir. 2005), a decision that directly conflicts with the Seventh Circuit precedents just discussed and therefore that cannot be relied upon by this Court.

Moreover, to the extent Defendants suggest they disclosed everything about their investigation, their interrogation of Mr. Koh, and their misconduct detailed above, that fact, too, is disputed. The record includes evidence showing that prosecutors—like the state-court judge—were not given all relevant information by Defendants regarding the crime, Mr. Koh's interrogation, or the purported confession. For example, Plaintiff contends that Mr. Koh's prosecution was based on Graf's and Kim's reports that falsely related that Mr. Koh confessed to killing his son and detailed the manner in which he had killed his son. PSF ¶¶ 54, 123

The action of judges and prosecutors in Mr. Koh's underlying criminal case do not break the chain of causation between Defendants' misconduct and the constitutional harm that Mr. Koh suffered. Nor does it render Defendants immune from suit.

## C.     A JURY MUST DECIDE MR. KOH'S SUBSTANTIVE DUE PROCESS CLAIM

For all of the reasons discussed above, Defendants' interrogation of Mr. Koh shocked the conscience, in violation of Plaintiff's right to substantive due process. Though based on the same set of facts discussed already, this substantive due process claim is separate from Mr. Koh's Fifth and Fourteenth Amendment claim addressed in the previous section.[21]

The Supreme Court has long held that deprivations of liberty "based on evidence obtained by methods that are 'so brutal and so offensive to human dignity' that they 'shoc[k] the conscience' violate the Due Process Clause." *Chavez v. Martinez*, 538 U.S. 760, 774 (2003) (quoting *Rochin v. California*, 342 U.S. 165, 172 (1952)). Following these cases, the Seventh Circuit holds that police interrogations inflicting bodily or mental harm violate substantive due process because an "[i]nterrogation so coercive is a form of criminal procedure incompatible

---

[21] The Wheeling Defendants only address whether Mr. Koh's interrogation was conscience shocking to the extent that it violated substantive due process. R.275 at 9-10. They provide no argument for summary judgment on Mr. Koh's claim based on the right to be free of compelled self-incrimination. Accordingly, whatever the Court's disposition of Mr. Koh's substantive due process claim, Mr. Koh should still be allowed to proceed against the Wheeling Defendants on his claim that self-incriminating statements coerced from him and used against him in criminal proceedings were involuntary.

with traditional liberties[.]" *Wilkins v. May*, 872 F.2d 190, 195 (7th Cir. 1989). It is "for the trier of fact to decide whether a particular incident involving interrogation . . . is so terrifying in the circumstances as to constitute a deprivation of liberty within the meaning of the due process clause." *Bielanski v. County of Kane*, 550 F.3d 632, 641 (7th Cir. 2008). For all of the reasons discussed above, a jury must decide whether Mr. Koh's interrogation shocked the conscience.

**D.      A JURY MUST DECIDE MR. KOH'S DUE PROCESS CLAIMS REGARDING FABRICATION OF EVIDENCE**

Though Defendants ask the Court to enter judgment for them on all Plaintiffs' claims, their motions do not discuss Mr. Koh's due process claims whatsoever. In this case, Mr. Koh contends and has produced evidence that Defendants fabricated false evidence for use against him during criminal proceedings, depriving him of liberty.[22]

**1.      Defendants Forfeited Any Argument for Judgment On This Claim**

By omitting any discussion of Mr. Koh's due process fabrication claims, Defendants have forfeited any argument for summary judgment on those claims. *Carmichael v. Village of Palatine*, 605 F.3d 451, 460 (7th Cir. 2010); *Sublett v. John Wiley & Sons, Inc.*, 463 F.3d 731, 736 (7th Cir. 2006). It will be too late for Defendants to raise an argument that they are entitled to summary judgment on Mr. Koh's fabrication claims for the first time in reply briefs. *Costello v. Grundon*, 651 F.3d 614, 635 (7th Cir. 2011) (reversing summary judgment granted on issue first raised in a reply). Nonetheless, Plaintiffs discusses the record evidence supporting Mr. Koh's due process claims here, should the Court choose to look past Defendants' forfeiture.

**2.      Legal Framework Governing Plaintiffs' Due Process Fabrication Claims**

The Seventh Circuit has "consistently held that a police officer who manufactures false evidence against a criminal defendant violates due process if that evidence is later used to

---

[22] These claims have been in the case throughout the litigation. *See* Plaintiffs' Second Amended Complaint, Doc. No. 133, ¶¶ 40-42, 53-56; Order on Motions to Dismiss, R.82, at 5.

50

deprive the defendant of her liberty in some way." *Whitlock v. Brueggemann*, 682 F.3d 567, 580 (7th Cir. 2012); *see also Saunders-El v. Rohde*, 778 F.3d 556, 559 (7th Cir. 2015); *Newsome v. McCabe*, 319 F.3d 301, 303 (7th Cir. 2003); *Jones v. City of Chicago*, 856 F.2d 985, 993 (7th Cir. 1988). This right was clearly established decades ago. *Fields v. Wharrie*, 740 F.3d 1107, 1114 (7th Cir. 2014) ("*Fields II*") (right "was established law by 1985 (indeed long before)," and citing *Napue v. Illinois*, 360 U.S. 264, 269 (1959), *Pyle v. Kansas*, 317 U.S. 213, 215-16 (1942), and *Mooney v. Holohan*, 294 U.S. 103, 110-13 (1935)); s*ee also Dominguez v. Hendley*, 545 F.3d 585, 589 (7th Cir. 2008) ("There was and is no disputing that such conduct [fabricating evidence in 1989] violates clearly established constitutional rights"). Indeed, more than 75 years before the misconduct at issue here, *Brown v. Mississippi* held that fabricated statements about confessions used in criminal proceedings violated due process, even when police had disclosed all tactics they used during their interrogations of the criminal suspects. 297 U.S. at 283-86.

The question at summary judgment is whether a reasonable jury could find that Defendants fabricated evidence they knew to be false, which was used to deprive Mr. Koh of his liberty. A jury could conclude that Defendants Graf, Ustich, and Kim each did so.

### 3. Defendants' Fabrication of False Evidence Relating to Mr. Koh's Statements

Chief among the fabricated evidence are false police reports and statements attributing to Mr. Koh a categorical confession to murdering his son Paul in self-defense. Although Mr. Koh made inculpatory statements, he never gave a confession, certainly not one that would be considered reliable to trained law enforcement. PSF ¶ 52. Mr. Koh never gave a narrative account of killing Paul, and he did not provide any details that were not directly suggested to him by Graf. Nevertheless, Graf reported to prosecutors and wrote in his report that Mr. Koh confessed to killing Paul and gave details about precisely how he did it, even though Mr. Koh

never said that. Graf's false account of Mr. Koh's "confession" was parroted by prosecutors at

Mr. Koh's *Gerstein* hearing and again by Graf in grand jury testimony. *Id.* ¶¶ 72-73.[23]

Kim also fabricated evidence. During the interrogation, when Graf was pressing hard on

the self-defense theme, Kim claimed falsely that Mr. Koh admitted in Korean that he "did it in

defense." Graft considered this a key admission. But in reality, Mr. Koh had not said anything to

Kim along those lines. Kim had no basis to attribute this statement to Mr. Koh. An intentional

false translation is the same as wholesale fabrication of a false statement.[24]

### 4. Defendants' Fabrication of False Evidence Relating to Other Witnesses

Graf also fabricated statements from other witnesses implicating Mr. Koh. At the

charging stage, Graf reported to Albanese that Pastor Hwang, Paul's youth pastor, told

investigators that Paul was afraid of Mr. Koh, and they characterized the pastor as an "outcry

witness." *Id.* ¶ 67. This information was completely false. Even the detectives who interviewed

Pastor Hwang did not claim that he had told them such a thing, *id.*, and Pastor Hwang denies it

too, *id*. This false information factored into the prosecutors' decision to approve felony charges

against Mr. Koh. *Id.*

In addition, Graf fabricated a false statement from Neil Schnitzler after Mr. Koh was

charged. As discussed, Graf fed Schnitzler facts so that he could falsely testify that he

accidentally called the Kohs' landline on the night that Paul died and said something to

whomever picked up about drugs. This despite that he had previously denied any knowledge of a

---

[23] While Defendants are immune for the testimony they gave and preparation for that testimony, *Rehberg v. Paulk*, 132 S. Ct. 1497, 1506-07 (2012), that immunity does not protect them from their pretrial acts of fabrication, *id.* at 1507 n.1 ("Of course, we do not suggest that absolute immunity extends to *all* activity that a witness conducts outside of the grand jury room. For example, we have accorded only qualified immunity to law enforcement officials who falsify affidavits . . . and fabricate evidence concerning an unsolved crime . . . ."). Nor does the fact that Defendants later engaged in additional conduct for which they are immune interrupt the chain of the causation for their early non-immune fabrications. *Fields II*, 740 F.3d at 1111-12; *Whitlock*, 682 F.3d at 582-85.

[24] Kim similarly reported that Mr. Koh had told Paul "let's die together," when he knew full well that Mr. Koh had used a well-known idiom that has no such odious meaning. PSF ¶ 116. In this way, Kim fabricated additional evidence of Mr. Koh's guilt

phone call. Graf's fabrication of this false story became important motive evidence against Mr. Koh—prosecutors at trial argued that this call sent Mr. Koh into a homicidal rage.

### 5. The Use of Fabricated Evidence to Deprive Mr. Koh Of His Liberty

As noted above, each of the pieces of fabricated evidence just discussed was used against Mr. Koh in criminal proceedings and caused a deprivation of liberty. This is true even though Mr. Koh was ultimately acquitted years later. *Fields II*, 740 F.3d at 1112 (due process violated when fabricated evidence inflicts injury before conviction); *Julian v. Hanna*, 732 F.3d 842, 846-47 (7th Cir. 2013) (fabrication affects liberty interests both before and after conviction). Mr. Koh was arrested, charged, indicted, prosecuted, and tried for murder. He was held in the Cook County Jail on $5 million bond for the nearly four years it took his case to make it to trial.[25] *Serino v. Hensley*, 735 F.3d 588, 594 (7th Cir. 2013) (being detained on fabricated evidence states a due process claim). This sort of deprivation of liberty based on fabricated evidence is undeniably a deprivation of due process, and this claim should proceed to trial.

### E. A JURY MUST DECIDE PLAINTIFFS' *MONELL* CLAIMS

Northbrook is liable for constitutional violations caused by (1) its express policies, (2) its widespread practices, or (3) actions of its final policymakers. *Monell v. Department of Social Services*, 436 U.S. 658, 694 (1978); *Valentino v. Village of S. Chicago Heights*, 575 F.3d 664, 674 (7th Cir. 2009). There is sufficient evidence for a jury to conclude Northbrook is liable as a result of its express policies and the actions of its final policymaker, Chief Wernick.

---

[25] Mr. Koh's extended pretrial detention distinguishes this case from the Seventh Circuit's line of decisions involving arrests followed by release on bail. *See Bianchi v. McQueen*, 2016 WL 1213270 (7th Cir. Mar. 29, 2015); *Saunders-El*, 778 F.3d at 560-61; *Alexander v. McKinney*, 692 F.3d 553, 557 (7th Cir. 2012).

1.      **Northbrook Is Liable For Its Express Policy That Caused the Violation of Plaintiffs' Constitutional Rights**

A municipality is liable when the enforcement of its express policy violates a constitutional right. *Calhoun v. Ramsey*, 408 F.3d 375, 379 (7th Cir. 2005). In this case, Northbrook maintained such a policy. NPD General Order 15.14 sets forth a protocol for responding to major crimes. With respect to witnesses at crime scenes, GO 15.14 instructs: (1) secure and separate all witness, (2) arrange transportation to the station, and (3) do not release witnesses until they have been interviewed. NBSF ¶124.

Northbrook claims it is entitled to summary judgment on this claim because, in its view, Plaintiffs were not arrested until after Mr. Koh's interrogation. However, for all of the reasons set forth above, there are sufficient facts in the record for a jury to conclude that the Kohs were arrested at their home at 4 a.m. on April 16.

Northbrook next argues that Plaintiff cannot show any causal link between GO 15.14 and the Kohs arrest. In support of this argument, Northbrook relies upon affidavits from Eisen and Johnson claiming that (1) although they were aware of GO 15.14 on April 16, they did not interpret it to be taken literally; and (2) that NPD general orders are considered "guidelines" only. These affidavits are hardly conclusive. Ample facts in the record undermine the claims in these affidavits and support a conclusion that officers were acting pursuant to GO 15.14 during their interactions with the Kohs on the morning of April 16.

First, Eisen and Johnson have admitted they were acting pursuant to NPD policies at all times during their interactions with the Kohs. RNBSF ¶ 125. Facts in the record also show that all NPD officers were made aware of General Orders when they went into effect and were specifically trained on all new orders. *Id.* Further, jurors are free to use their common sense and disregard the assertion that NPD General Orders are mere "guidelines." The policy at issue is

called a general order, not a general guideline. By its plain meaning, the word "order" certainly does not equate to a "guideline." Even Wernick does not subscribe to the fanciful view that these are mere guidelines. *Id.*

Wernick's deposition testimony on the subject of the Kohs' pre-interview detention at NPD also supports the view that NPD officer are trained to detain witnesses at the police station for investigatory purposes, just as GO 15.14 provides. *Id.* Wernick concedes that it would be the practice in the NPD to do what GO 15.14 requires.

Finally, what happened to the Kohs on April 16 is exactly what GO 15.14 commands: the Kohs were transported from the scene to the police station and held until they gave statements. Eisen and Johnson reflexively brought Mr. and Mrs. Koh to the police station, and then made them wait for hours until detectives were ready to take statements from them. The only explanation given for why the Kohs were made to wait *incommunicado* for hours on the most devastating day of their lives is that police believed they could hold them until after they were interviewed. GO 15.14 is the best explanation for why Defendants had that idea. A jury could easily conclude that all NPD officers were acting pursuant to GO 15.14 during their interactions with the Kohs on April 16.[26] Summary judgment should be denied on Plaintiffs' express policy claim. Northbrook's express policy commands the arrest of all witnesses without any regard to probable cause.

---

[26] Northbrook makes one final effort to defeat this claim by asserting that no policymaker was "on notice" that GO 15.14 resulted in any previous problem. This argument is a non-starter. Leaving aside the implied notice that Wernick is familiar with the General Orders signed by him, it is well-established that there is no requirement that a policymaker be on notice of a problem for an "express policy" *Monell* claim to survive. *Calhoun*, 408 F.3d at 379-80 ("[O]ne application of the offensive policy resulting in a constitutional violation is sufficient to establish municipal liability.").

2.     **Northbrook Is Liable For The Actions of Wernick, Its Final Policymaker, Regarding Arrests and Interrogations**

When a constitutional violation is committed by a person who sets municipal policy, the municipality is responsible under § 1983, even if the action in question is undertaken only once. *Valentino*, 575 F.3d at 675 (citing *Pembaur v. City of Cinncinati*, 475 U.S. 469, 480-81 (1986)).

a.     **Northbrook Has Not Shifted the Summary Judgment Burden On The Identity of Its Final Policymaker for Arrests and Interrogations**

As Northbrook observes, Plaintiffs contend in this litigation that Wernick was its final policymaker for law enforcement functions like arrests and interrogations. R.279 at 43. In discovery, Defendants disputed Plaintiffs' contention, asserting instead that the Northbrook Village Manager Richard Nahrstadt is Northbrook's final policymaker on these issues. Notably, however, Northbrook has abandoned this position at summary judgment; Northbrook does not even attempt to argue that anyone other than Wernick is its final policymaker for these functions. R.279 at 43. Northbrook has therefore failed to shift the summary judgment burden to Plaintiffs on this issue. *See Carmichael*, 605 F.3d at 460.

To be sure, ample evidence in the record supports finding that Wernick was Northbrook's final policymaker. On this issue, the critical inquiry is (1) whether the official is constrained by policies; (2) whether the official's decision on the issue in question is subject to meaningful review; and (3) whether the decision made by the official is within the realm of that official's authority. *Vodak v. City of Chicago*, 639 F.3d 738, 748 (7th Cir. 2011). Ultimately, the question for the Court is "whether the promulgator, or the actor, as the case may be—in other words, the decisionmaker—was at the apex of authority for the action in question." *Id.*

Wernick was unquestionably at the "apex of authority" in Northbrook for the functions at issue here. He promulgated all official NPD policies on these matters. When he testified at his

deposition about forming NPD policies, he mentioned no involvement by the Northbrook Village

Manager. Although Nahrstadt testified that he technically had final say over all Northbrook

policies, Nahrstadt did not exercise that authority over these core law enforcement functions, nor

did he constrain Wernick's authority in any meaningful way on these functions. RNBSF ¶ 125.

"Customary practices having the force of law may be considered as proof of delegation[.]"

*Kujawski v. Bd of Comm. of Bartholomew*, 183 F.3d 734, 737 (7th Cir. 1999); *see also Vodak*,

639 F.3d at 748-49 (rejecting argument that City Council was final policymaker; although the

Superintendent was required to act in accordance with ordinances, the City Council had passed

no ordinance constraining the Superintendent in the area in question). For Rule 56 purposes,

ample evidence supports the conclusion that Wernick was Northbrook's final policy maker for

purposes of Plaintiffs' *Monell* claims.

### b. The Record Links Wernick To Plaintiffs' Constitutional Violations

Rather than disputing Plaintiffs' contention that Wernick is Northbrook's final

policymaker, Northbrook's asserts that Plaintiffs cannot link Wernick to the tortious conduct at

issue in this case. R.279 at 43. This contention ignores ample facts in the record that show

Wernick's direct involvement in the investigation.

Even though Wernick had no personal interaction with the Kohs, he either directed

subordinates to engage in misconduct or ratified their misconduct, such that municipal § 1983

liability may attach. *City of St. Louis v. Praprotnik*, 485 U.S. 112, 127 (1988) ("If the authorized

policymakers approve a subordinate's decision and the basis for it, their ratification would be

chargeable to the municipality because their decision is final."); *Pembaur v. City of Cincinnati*,

475 U.S. 469, 481 (1986) ("[W]here action is directed by those who establish governmental

policy, the municipality is . . . responsible."). Wernick personally responded to the Koh home in

the morning of April 16. RNBSF ¶ 126. Although he was not present when Eisen directed Johnson to take the Kohs to the NPD, the Kohs were taken pursuant to an express policy that was promulgated by Wernick—GO 15.14 bears his signature.

Wernick remained at the Kohs' residence long enough to meet with NORTAF Commander McEnerney and to make public statements to the media out in front of the Kohs' home. PSF ¶ 79. Wernick returned to the station, where he personally informed the Kohs' friends and family that they would not be able to see the Kohs. *Id.* ¶ 12. He was involved in at least investigative activities, RNBSF ¶ 102, and he was present with Graf, Ustich, Dunham, and McEnerney for the briefings that occurred between Mr. Koh's interrogations, where the decision was made to extract statements from Mr. Koh. *Id.* ¶¶ 26, 44. Wernick also viewed the videotape of Mr. Koh's interrogation, along with the Village Manager and other detectives. *Id.* ¶ 78.

In addition to this direct evidence of his involvement, circumstantial evidence in the record supports an inference that Wernick was intimately involved in the investigation as it unfolded, if not directing it himself. Although a multi-jurisdiction task-force called NORTAF was activated to investigate Paul Koh's death, the activation in no way diminished Northbrook's or the Chief's role in the investigation. *Id.* ¶¶ 80-81. At the time, Wernick wore two hats: he was the executive director and a founding father of NORTAF as well as Northbrook's Chief of Police. *Id.* Given his unique role, it is reasonable to infer that everyone on NORTAF and in NPD looked to Wernick for investigative guidance and leadership.

Based on these facts, a jury could certainly find that Wernick either personally made or, at minimum, ratified his subordinates' decisions in dispute in this case.

## F.     A JURY MUST DECIDE MR. KOH'S MALICIOUS PROSECUTION CLAIM

In addition to federal claims, Mr. Koh brings a state-law claim for malicious prosecution. To succeed, Mr. Koh must show (1) initiation or continuation of criminal proceedings, (2) without probable cause, (3) with malice, (4) terminating in the plaintiff's favor. *Logan v. Caterpillar*, 246 F.3d 912, 921-22 (7th Cir. 2011). Defendants assert they are entitled to summary judgment on each of the first three of these elements, which are addressed in turn.

### 1.     Defendants Commenced and Continued A Criminal Proceeding

Defendants argue that, if anyone, only Graf can be liable on Mr. Koh's malicious prosecution claim because he was the only person who initiated a criminal proceeding against Mr. Koh. R.279 at 30. This argument misunderstands what it means to "commence or continue" criminal proceedings under Illinois law.

To be liable for malicious prosecution "the defendant must have initiated the criminal proceeding or his participation in it must have been of so active and positive a character as to amount to advice and cooperation." *Logan*, 246 F.3d at 922. Cases stress that this standard does not focus on who makes the decision to prosecute, who signs an affidavit, or who leads the investigation. Instead, "liability extends to all persons who played a significant role in causing the prosecution of the plaintiff." *Turner v. City of Chicago*, 2013 WL 4052607 (N.D. Ill. 2013); *see also Alexander v. United States*, 721 F.3d 418, 423 (7th Cir. 2013) (defendant "causes" an action to be commenced "even if that person does not conduct the prosecution personally").

Defendants Graf, Kim, Ustich, Dunham, and Wernick each played leading roles in fabricating a case against Mr. Koh and causing his prosecution, starting on the day that Paul killed himself and ending when Mr. Koh was acquitted. None of these Defendants can claim to have played such an insignificant role that they are absolved of liability, particularly when the

facts are viewed and inferences are drawn in Mr. Koh's favor. Police officers who engage together in misconduct and deceive other actors in the justice system are routinely found to have commenced and continued criminal prosecutions. *E.g.*, *Starks v. Waukegan*, 946 F. Supp. 2d 780, 794-95 (7th Cir. 2013) (police who engage in misconduct cannot blame others involved in the prosecution); *Padilla v. City of Chicago*, 2013 WL 1208567, at *16 (N.D. Ill. Mar. 26, 2013) (same); *Freeman v. Brown*, 2012 WL 3777074, at *6 (N.D. Ill. Aug. 29, 2012). Indeed, a material false statement to a prosecuting authority supports a finding that the commencement element is satisfied. *Wallace v. City of Zion*, 2011 WL 3205495, at *5 (N.D. Ill. July 28, 2011); *Boyle v. Torres*, 756 F. Supp. 2d 983, 1000 (N.D. Ill. Dec. 21, 2010). Defendants Graf, Ustich, Kim, Dunham, and Wernick were sufficiently engaged in the investigation at all times to be liable for malicious prosecution.

Graf and Ustich were the lead interrogators and they were the investigators who provided information to felony review prosecutors. PSF ¶¶ 59, 61. Although NPD made the video of Mr. Koh's statement available to prosecutors to watch before charging, facts in the record indicate they watched very little. The prosecutor who approved murder charges against Mr. Koh, Heilingoetter, did not view any portion of the video. Instead, he relied on notes Albanese made about the video when he watched part of it at the NPD. Albanese could not say, based on the portion of the video that he viewed, if there was probable cause to charge Mr. Koh with murder.

Even if prosecutors had viewed Mr. Koh's entire videotaped statement, that does not extinguish Defendants' liability because Defendants made additional false statements separate and apart from those appearing on the videotape. *See*, *e.g.*, *Simon v. Northwestern University*, 2016 WL 1237666, at *7 (N.D. Ill. Mar. 29, 2016) (investigators who supply false information to prosecutors may be liable for malicious prosecution even when prosecutors independently

investigate and prosecute the crime); *Allen v. Berger*, 784 N.E.2d 367, 370 (Ill. App. Ct. 2002) ("[W]hen a person makes a knowingly false report to a prosecuting officer, the resulting prosecution is attributable to that person."). Graf and Ustich also made false statements to prosecutors about a witness who reportedly told investigators that Paul was "scared" of his father, PSF ¶ 67; they did not tell prosecutors that the "facts" Mr. Koh adopted in the course of making inculpatory statements were not at all consistent with the physical evidence, *id.* ¶¶ 59-61; they did not tell prosecutors about any of the overwhelming evidence investigators learned that pointed toward suicide as a cause of death, *id.* ¶¶ 66; and they did not tell prosecutors facts that would call into question the voluntariness of Mr. Koh's statements, for example, that Mr. Koh had been in custody and held in isolation since 4 a.m. that morning, and that Mr. Koh lacked needed medication, food, and sleep.

Kim was also sufficiently engaged in the investigation to be liable for malicious prosecution. He participated directly in the two most important witness interviews in the case: those of Mr. and Mrs. Koh. He therefore had more direct knowledge of these witnesses' accounts than anyone on the investigative team. As explained above, Kim played a key role in coercing inculpatory statements from Mr. Koh, statements that were be used to prosecute him. Although Kim did not speak directly to prosecutors in connection with charging decisions, he certainly withheld crucial information known to them at that stage, specifically: that he did not translate *Miranda* for Mr. Koh; that he advised Mr. Koh that he did not need a lawyer; that Mr. Koh's repeated requests to contact family and friends were denied; that he told Mr. Koh off-camera that Mrs. Koh implicated him in the Paul's murder; and that he concealed the real meaning of Mr. Koh's use of the term "*gachi jookja*."

Finally, even though Wernick and Dunham did not personally interview witnesses or participate in the investigation on the ground, as noted above, they had enough participation in investigative meetings so that a jury can infer that they had access to all the same information as Graf and Ustich. In addition, a jury could conclude that they were on board with Graf's decision, made before Mr. Koh's second interrogation began, to obtain inculpatory statements from Mr. Koh, and to use those statements to prosecute him, regardless of their reliability. Dunham did his part to specially assist the investigation when he inexplicably made attorney Shim wait at the police station, while Graf, Kim, and Ustich were squeezing the last few inculpatory statements of Mr. Koh. PSF ¶¶ 40-44.

### 2. Defendants Lacked Probable Cause

As with Plaintiffs' Fourth Amendment claims, Defendants lacked probable cause to institute or to continue criminal proceedings against Mr. Koh. "In a malicious prosecution case, probable cause is defined as a state of facts that would lead a person of ordinary care and prudence to believe or to entertain an honest and sound suspicion that the accused committed the offense charged." *Williams*, 733 F.3d at 759. Again, Plaintiff gets "the benefit of conflicts in the evidence about what the officers actually knew at the time." *Id.* at 756. And when facts underlying a probable cause analysis are disputed, a jury must decide the question. *Chelios*, 520 F.3d at 686. Finally, as with the Fourth Amendment claims, fabricated statements cannot support probable cause in a malicious prosecution case. *Olson*, 771 F.2d at 280; *cf. Kincaid v. Ames Dep't Stores*, 670 N.E.2d 1103, 1110 (Ill. 1996) (witness statements supporting probable cause must be reliable and not induced by the police).

#### a. Evidence Gathered Between the End of Mr. Koh's Interrogation and the Filing of Charges Did Not Establish Probable Cause

As previously argued, at the conclusion of Mr. Koh's interrogation, probable cause did not exist to arrest Mr. Koh for murder. Between then and the time charges were filed on April 17, no information established probable cause to accuse Mr. Koh of murder.

The only piece of information learned during this time period that even remotely cuts in Defendants' favor is that a Cook County Medical Examiner, Dr. Cogan, examined Paul's body and concluded that Paul's death was a homicide. On this score, however, facts in the record support an inference that Dr. Cogan learned from investigators that Mr. Koh had confessed to Paul's murder, and so Dr. Cogan did not look far beyond the homicide theory. PSF ¶¶ 55-58.

Additionally, Dr. Cogan's homicide finding, combined with the physical evidence at the scene that pointed to a suicide, added up at best to an equivocal death scenario, which is hardly probable cause to think Mr. Koh killed Paul. Even if investigators could have reasonably concluded that Paul's death was a homicide based on the CCME finding alone, that information was mitigated by other information learned during physical exams of the Kohs, which also occurred prior to charging. When forensic examiners took Mr. Koh's clothing and observed his body for physical evidence, they observed no stains on Mr. Koh's clothes or injuries to his body that were consistent with him having been in a bloody knife fight with Paul. PSF ¶ 53. By this point in the investigation it was also evident that Mr. Koh was much smaller and older than Paul, and there was no way Mr. Koh could inflict such harm on Paul, certainly not without sustaining some kind of injury himself. *Id.* If Paul was killed, it was certainly not Mr. Koh who killed him, and Plaintiff is entitled to argue to a jury that any lingering suspicion otherwise fell far short of probable cause to prosecute someone for murder.

### b.     The Indictment Does Not Establish Probable Cause

As the Wheeling Defendants point out, in some cases the return of an indictment is *prima facie* probable cause, R.275 at 25, but it "is not conclusive evidence of probable cause." *Freides v. Sani-Mode Mfg. Co.*, 211 N.E.2d 286, 289 (Ill. 1965). "It may be rebutted by other evidence such as proof that the indictment was obtained by false or fraudulent testimony before the grand jury, or by failing to make a full or complete statement of facts, or by other improper or fraudulent means." *Id.*; *see also Jones*, 856 F.2d 985, 994 (7th Cir. 1988) ("[A] prosecutor's decision to charge, a grand jury's decision to indict, a prosecutor's decision not to drop charges but to proceed to trial—none of these decisions will shield a police officer who deliberately supplied misleading information that influenced the decision[.]"). As explained above, ample facts in the record demonstrate that Graf, Usich, and Kim lied about and withheld evidence from prosecutors. Based on this misdirection, prosecutors presented false and misleading information to both the state-court judge and to the grand jury.

### 3.     Defendants Acted With Malice

Defendants' next argument, that there is no evidence of malice, must be rejected. In this context, "malice" means that the officer who initiated the prosecution had "any motive other than that of bringing a guilty party to justice." *Aleman*, 662 F.3d at 907. A trier of fact may infer malice from lack of probable cause. *Jimenez v. City of Chicago*, 830 F. Supp. 2d 432, 451 (N.D. Ill. 2011). Like probable cause, malice is ordinarily determined by the jury. *Carbaugh v. Peat*, 189 N.E.2d 14, 19-20 (Ill. App. Ct. 1963). Facts in the record support an inference that Defendants acted with a motive other than to get justice for Paul's death.

First, as explained above, Defendants lacked probable cause to believe that Mr. Koh killed Paul yet pursued murder charges anyway. If they truly had been motivated by a desire to

64

uncover facts about Paul's death, then they would have followed up on the many leads that pointed to suicide. Likewise, they would not have advised Mr. Koh that he did not need a lawyer during the interrogation, and they would not have obstructed Attorney Shim's access to Mr. Koh. In addition, Defendants' misrepresentations to prosecutors and omissions at the charging stage demonstrate malice. As does Graf's fabrication of evidence from other witnesses. *Williams*, 733 F.3d at 760-61 (police lies about key aspects of the case demonstrates malice).

The same is true of the lie Kim told twice on the stand in Mr. Koh's criminal case, about his having worked in a Korean restaurant in Koreatown for some 9 years, when in fact, he worked there only for approximately 11 months. Kim's need to lie to bolster his credibility as a translator is evidence of his consciousness of guilt.

Facts also support a conclusion that racial or ethnic bias influenced investigators' decision to pursue charges. In an email exchange while Mr. Koh's criminal case was pending, Wernick expressed to McEnerney his disdain for the Koh family, to which McEnerney responded by calling Mr. Koh "Hop Sing," saying that Mr. Koh killed Paul "for breaking the family rules." PSF ¶ 76. Meanwhile, Eisen testified that a main reason he believed Mr. Koh killed his son is "the culture of the Korean community." *Id.* According to Eisen, the failure to honor one's father or mother in the Korean community is connected to violence, even murder. *Id.* A jury may infer malice from this type of evidence. *See Mack v. First Sec. Bank of Chicago*, 511 N.E.2d 714, 719 (Ill. App. Ct. 1987).

Finally, the record also supports an inference that investigators were motivated by their desire for the professional accolades that would inevitably go along with solving the first "homicide" to come along in Northbrook in years. Turning Paul's death into a homicide and turning Mr. Koh into the perpetrator was an easy way to satisfy everyone. *See Simon*, 2016 WL

1237666, at *7 (reasonable inference that defendants were motivated to frame an innocent man by a desire for professional prestige). Indeed, after it was done, Wernick appeared on the news and heroically ensured the community of its safety, and Wernick promoted Graf to Sergeant, even though others were ahead of Graf on the seniority list. PSF ¶ 87. All of this evidence supports an inference of malice as well.

## G.      A JURY MUST DECIDE THE CONSPIRACY CLAIMS AGAINST KIM

For § 1983, and any civil conspiracy, the "minimum ingredient . . . is an agreement to commit some future unlawful act in pursuit of a joint objective." *Redwood v. Dobson*, 476 F.3d 462, 466 (7th Cir. 2007). Thus,"[t]o be liable as a conspirator you must be a voluntary participant in a common venture, although you need not have agreed on the details of the conspiratorial scheme or even know who the other conspirators are. It is enough if you understand the general objectives of the scheme, accept them, and agree, either explicitly or implicitly, to do your part to further them." *Jones*, 856 F.2d at 992; *see also Proffitt v. Ridgway*, 279 F.3d 503, 507 (7th Cir. 2002) (noting that, "in civil as in criminal law" a conspirator is liable "for the wrongful acts of the other conspirators committed within the scope of the conspiracy.").

Circumstantial evidence may itself "provide adequate proof of conspiracy," because the "law does not demand proof that each conspirator knew the exact limits of the illegal plan or the identity of all participants therein," but requires only "that there be a single plan, the essential nature and general scope of which is known to each person who is to be held responsible for its consequences." *Richardson v. City of Indianapolis*, 658 F.2d 494, 500 (7th Cir. 1981). "The question whether an agreement exists should not be taken from the jury in a civil conspiracy case so long as there is a possibility that the jury can infer from the circumstances (that the alleged conspirators) had a meeting of the minds and thus reached an understanding to achieve the

66

conspiracy's objectives." *Hampton v. Hanrahan*, 600 F.2d 600, 621 (7th Cir. 1979). The crux of Defendant's argument is that Kim cannot be liable for conspiracy because he had no knowledge of the investigation beyond what is depicted on the videotapes, but facts in the record support an inference that Kim knew far more, that he reached an agreement with Graf to coerce inculpatory statements from Mr. Koh, and that he committed overt acts in furtherance of that agreement.

After Kim arrived at the police station on April 16, he spent approximately an hour with Johnson, who had been one of the initial responders, took the Kohs to the NPD, and sat with them for two hours. Johnson knew the Kohs were not free to leave, that they wanted to go to the hospital, and that they wanted to talk to their pastor. Although Johnson and Kim deny they talked about the Kohs, it is not plausible that they would sit together and talk for an hour under these circumstances and not talk about the Kohs. A jury is free to use common sense to discredit that account and find that Johnson told Kim everything he had learned.

Likewise, the jury is free to discredit Kim's assertion that he did not talk to Graf or Ustich about anything of substance prior to Mr. Koh's interview. They certainly had the opportunity to talk, and, for all the same reasons Kim would have talked to Johnson about the investigation, he also would have talked to Graf and Ustich about it. Also, the Reid Technique instructs that interpreters should be briefed on the facts of the case before going into an interview. PSF ¶ 98.

Kim's utter failure to translate *Miranda* and his decision to advise Mr. Koh that he didn't need a lawyer also demonstrate that he knew that investigators believed Mr. Koh was guilty and wanted to help them get inculpatory statements from Mr. Koh. Likewise, Kim observation during Mr. Koh's first interview of Graf repeatedly asking accusatory questions and Graf's attempt to

introduce the self-defense theme also support a conclusion that Kim knew Mr. Koh was a suspect, was under arrest, and that they intended to extract inculpatory statements from him.

After Mr. Koh's first interrogation, Kim accelerated his efforts to help Graf wear Mr. Koh down. During the break, Kim falsely told Mr. Koh that Mrs. Koh had implicated him in the murder and that he should confess. During Mr. Koh's second interview, Kim posed his own questions of Mr. Koh and used the language barrier to facilitate Graf's belief that Mr. Koh was making inculpatory statements, which encouraged Graf and helped him toward his ultimate goal of obtaining a confession.

The way the Wheeling Defendants describe it, one would think that Kim was a random, hapless Korean-speaking person pulled off the street, who knew nothing other than the Korean language. That is not the case. Kim was a seasoned police officer; he was called upon to assist in the investigation of the biggest potential crime to occur in Northbrook, the town he lived in; and he actively participated in that investigation. Kim is not entitled to summary judgment on Plaintiffs' conspiracy claims.

## H.  A JURY MUST DECIDE THE FAILURE-TO-INTERVENE CLAIM AGAINST KIM

To prove a failure to intervene claim, Plaintiffs must show that the putative defendant had a realistic opportunity to intervene to prevent a constitutional violation from occurring. *Yang v. Hardin*, 37 F.3d 282, 285 (7th Cir. 1994). Kim argues he is entitled to summary judgment because (1) he lacked knowledge of the overall investigation, and (2) he had no authority over events that occurred at the NPD on April 16 and could not intervene. Both arguments lack merit.

As explained above, the record supports an inference that Kim had knowledge of the investigation as it unfolded. Regarding Kim's purported lack of opportunity to intervene, the Seventh Circuit has never limited a police officer's duty to intervene to torts that are committed

68

only by members of the officer's own department. On the contrary, the duty to intervene extends broadly to police officers who have no supervisory authority over other police tortfeasors. *See Byrd v. Brishke*, 466 F.2d 6, 11 (7th Cir. 1972); *Chatman v. City of Chicago*, 2015 WL 1090965, at *8 (N.D. Ill. Mar. 10, 2015) (police from different agencies liable for failure to intervene because they were on the same "investigative team"). Indeed, the duty to intervene extends to non-police actors who have no authority over police. *See Ali v. Village of Tinley Park*, 79 F. Supp. 3d 772, 778-79 (N.D. Ill. 2015); *Rivera v. Lake County*, 974 F. Supp. 2d 1179, 1191 (N.D. Ill. 2013); *Harris v. City of Chicago*, 2015 WL 5445012, at *4 (N.D. Ill. Sept. 15, 2015).

Kim's reliance on *Sornberger*, 434 F.3d 1006 and *Duran v. Town of Cicero*, 2005 WL 2563023 (N.D. Ill. Oct. 7, 2005) are misplaced. *Sornberger* dealt with a defendant who was not even present in the physical location where the alleged constitutional violation occurred, and *Duran* concerned a violation that occurred in a small crowded area that took place over a matter of seconds. Unlike those cases, Kim spent more than eight hours at NPD on April 16, and he had as much sustained contact with the Kohs than anyone. Kim had ample opportunity over the hours he spent on the investigation to raise concerns about the Kohs treatment.

## I.     A JURY MUST DECIDE THE CONSPIRACY AND FAILURE-TO-INTERVENE CLAIMS AGAINST THE NORTHBROOK DEFENDANTS

The Northbrook Defendants' arguments on Plaintiffs' conspiracy and failure-to-intervene claims largely rise and fall on their argument that no constitutional violations occurred.  As indicated above, constitutional violations did occur, and so the derivative arguments fail.

As a throwaway point, the Northbrook Defendants assert they are entitled to summary judgment on these claims because Plaintiffs have not generated evidence to support them. R.279 at 38. This bald assertion is insufficient to shift the summary judgment burden. *Carmichael*, 605 F.3d at 460 ("The defendants, the moving party on the summary judgment motion, never

fulfilled the obligation of setting forth the basic facts and law which, in their view, warranted summary judgment on this claim."); *United States v. Useni*, 516 F.3d 634, 658 (7th Cir. 2008) ("We have repeatedly warned that perfunctory and undeveloped arguments, and arguments that are unsupported by pertinent authority, are waived[.]"). Nonetheless, the record supports Plaintiffs' conspiracy and failure-to-intervene claims against the Northbrook Defendants.

Celia and Meents failed to intervene in the Kohs unlawful arrest at the scene. In the time they spent at the scene with the Kohs, while the Kohs were restrained in their front yard, they had ample opportunity to intervene, but they did not. Eisen's dashboard camera video from that morning shows significant period in which several responders stand idle in the Kohs' driveway, as the Kohs are detained off-camera on the front lawn. Instead of intervening, Meents actually facilitated the unlawful arrest, by not allowing Mr. Koh access to his phone or medication and by forcing him from the vicinity of his car to his front lawn. To the extent that Ustich is not directly liable for fabricating evidence or coercing inculpatory statements based on his role in the interrogation, then a failure to intervene claim may be brought against him for not intervening to stop Graf's coercive interrogation. Finally, as described above, Wernick and Dunham were engaged in all aspects of the investigation and did nothing to stop the unconstitutional acts described in this brief.

## J.    A JURY MUST DECIDE THE DERIVATIVE CLAIMS

Finally, Defendants assert they are entitled to judgment on Plaintiffs' *respondeat superior* and indemnification claims, and Mrs. Koh's loss of consortium claim, arguing these claims are derivative of others. Plaintiffs' underlying claims survive, and so should these derivative claims.

## CONCLUSION

For all of these reasons, Defendants' motions for summary judgment should be denied.

RESPECTFULLY SUBMITTED,

**HYUNG SEOK KOH and
EUNSOOK KOH**

By: /s/ Jon Loevy
    *One of Plaintiff's Attorneys*

Arthur Loevy
Jon Loevy
Elizabeth Mazur
Steven Art
**LOEVY & LOEVY**
312 N. May St., Ste. 100
Chicago, IL 60607
jon@loevy.com

**CERTIFICATE OF SERVICE**

I, Jon Loevy, an attorney, hereby certify that, on April 6, 2016, I filed the foregoing

PLAINTIFF'S CONSOLIDATED RESPONSE IN OPPOSITION TO DEFENDANTS'

SUMMARY JUDGMENT MOTIONS using the Court's CM/ECF system, which effected

service on all counsel of record.

/s/ Jon Loevy
*One of Plaintiff's Attorneys*

Arthur Loevy
Jon Loevy
Elizabeth Mazur
Steven Art
**LOEVY & LOEVY**
312 N. May St., Ste. 100
Chicago, IL 60607
jon@loevy.com