| | | |
|---|---|---|
| HYUNG SEOK KOH and EUNSOOK KOH, | ) | |
| | ) | |
| Plaintiffs, | ) | No. 11 C 02605 |
| | ) | |
| v. | ) | |
| | ) | Judge Edmond E. Chang |
| MARK GRAF, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Hyung Seok Koh and Eunsook Koh bring this civil rights lawsuit against Northbrook police officers Mark Graf, John Ustich, Charles Wernick, Roger Eisen, Matthew Johnson, Scott Dunham, Bryan Meents, and Keith Celia; Wheeling police officer Sung Phil Kim; and the Villages of Northbrook and Wheeling.[1] R. 133, Second Am. Compl.[2] The Kohs' claims arise out of the Defendants' investigation into the death of their son, Paul Koh. Both the Northbrook Defendants and the

---

[1]This Court has subject matter jurisdiction under 28 U.S.C. § 1331 over the § 1983 claims, and supplemental jurisdiction over the state-law claims.

For convenience's sake, the Court will refer to the Northbrook officers and the Village of Northbrook collectively throughout the Opinion as the "Northbrook Defendants," unless context dictates otherwise. Likewise, the Court will refer to Officer Kim and the Village of Wheeling collectively as the "Wheeling Defendants," unless context dictates otherwise.

[2]Citations to the record filings are "R." followed by the docket number and, when necessary, a page or paragraph number. Citations to the parties' Local Rule 56.1 Statements of Fact are "WDSOF" (for the Wheeling Defendants' Statement of Facts) [R. 276]; "NDSOF" (for the Northbrook Defendants' Statement of Facts) [R. 280]; "PSOF" (for the Kohs' Statement of Additional Facts) [R. 315]; "Pls.' Resp. WDSOF" (for the Kohs' Response to the Wheeling Defendants' Statement of Facts) [R. 309]; "Pls.' Resp. NDSOF" (for the Kohs' Response to the Northbrook Defendants' Statement of Facts) [R. 311]; "Wheeling Defs.' Resp. PSOF (for the Wheeling Defendants' Response to the Kohs' Statement of Additional Facts) [R. 323]; and "Northbrook Defs.' Resp. PSOF (for the Northbrook Defendants' Response to the Kohs' Statement of Additional Facts) [R. 328].

Wheeling Defendants have moved for summary judgment on all of the Kohs' claims. R. 274, Wheeling Defs.' Mot. Summ. J.; R. 278, Northbrook Defs.' Mot. Summ. J; R. 362, Defendants' Joint Mot. Summ. J.[3] For the reasons below, the motions are granted in part and denied in part.

## I. Background

For purposes of the summary judgment motions, the facts are viewed in the light most favorable to the Kohs (because they are the non-movants), and all reasonable inferences are drawn in their favor. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

## A. At the Scene

At around 3:45 a.m. on April 16, 2009, Eunsook Koh found her 22-year-old son, Paul Koh, lying in a pool of blood in the entryway of their family home. R. 280, NDSOF ¶ 1; R. 315, PSOF ¶ 2; R. 288-2, Exh. 82, Mar. 22, 2010 Pretrial Hr'g Tr. 42:9-43:14 (sealed).[4] Mrs. Koh's screams woke up her husband, Hyung Seok Koh,

---

[3]After briefing on the original summary judgment motions (R. 274 and R. 278) was complete, both sides moved to add additional authority. The Kohs' additional authority, *Manuel v. City of Joliet*, 137 S.Ct. 911 (2017) opened the door for a new version of the Kohs' Fourth Amendment claim. *See* R. 356, Mar. 31, 2017 Order at 1. Because the defense had not had an opportunity to address the expanded Fourth Amendment Claim, the Court allowed the defendants to file a joint summary judgment motion against the *Manuel v. Joliet* claim. *Id.* at 1-2. This joint motion was filed accordingly. R. 362, Defs.' Joint Mot. Summ. J. The Court considers the joint motion as incorporating all prior summary judgment filings and briefs. *See* Mar. 31, 2017 Order at 2.

[4]The exhibits to the parties' Rule 56.1 statements of fact are numbered sequentially. Exhibits 1-104 are attached to the Northbrook Defendants' Statement of Facts [R. 280], Exhibits 105-107 are attached to the Wheeling Defendants' Statement of Facts [R. 276], and Exhibits 108-184 are attached to the Plaintiffs' Statement of Facts [R. 315]. Exhibits 185-186 are attached to the Plaintiffs' Response to the Wheeling Defendants' Statement of Facts [R. 309], Exhibit 187 is attached to the Northbrook Defendants' reply brief [R. 329], and Exhibits 188-189 are attached to the Northbrook Defendants' Response to the Plaintiff's Statement of Facts [R. 328].

who frantically called 911. PSOF ¶¶ 2-3; NDSOF ¶¶ 1-2; R. 280-2, Exh. 1, 911 Call Tr. 1-3. While waiting for the police, the Kohs (thinking that Paul might still be alive) dressed to go to the hospital. PSOF ¶ 3; R. 282-2, Exh. 11, May 11, 2010 Pretrial Tr. 39:13-23. Mr. Koh then called 911 a second time and asked for help. PSOF ¶ 3; NDSOF ¶ 2; Exh. 1, 911 Call Tr. 4-5.

Within minutes, Northbrook police officers Eisen, Johnson, Meents, and Celia arrived at the Kohs' house. NDSOF ¶ 3; PSOF ¶ 4; Exh. 6, NPD Call Detail Report (sealed). The officers found Mr. Koh with a cordless phone in his hand near the front door of the house and Mrs. Koh crouched over Paul's body. NDSOF ¶ 4; R. 280-5, Exh. 4, Celia Dep. Tr. 35:6-37:10. Paul had suffered major stab wounds to his throat and chest. NDSOF ¶¶ 5, 29; Exh. 4, Celia Dep. Tr. 36:23-37:7. Mr. Koh was frantic and screaming for someone to help his son; Mrs. Koh was crying. PSOF ¶ 4; Exh. 4, Celia Dep. Tr. 36:5-38:7. Celia and Meents told Mrs. Koh to come out on to the lawn. Exh. 4, Celia Dep. Tr. 42:21-43:12. Meanwhile, Mr. Koh went out to try to start the family car, but Meents followed him and corralled him back to the front yard. R. 280-6, Exh. 5, July 15, 2010 Pretrial Hr'g Tr. 12:6-13:17. The Kohs were pushed to the ground on their lawn, and sat there for ten to fifteen minutes while Johnson and Meents watched over them. NDSOF ¶¶ 8, 11; PSOF ¶ 5; Exh. 5, July 15, 2010 Pretrial Hr'g Tr. 15:19-21; NDSOF Exh. 7, Meents Dep. Tr. 71:1-19. At various times, the Kohs asked to go into the house to see their son, to gather Mr. Koh's medications, to get Mr. Koh's cell phone, and to go to the hospital. NDSOF ¶¶ 8, 12-13, 15; R. 283-6, Exh. 17, Hyung Seok Koh Dep. Tr. 354:4-355:8. These

requests were denied. NDSOF ¶¶ 12-13, 15; Exh. 11, May 11, 2010 Pretrial Hr'g Tr. 76:8-20; Exh. 5, Meents Dep. Tr. 132:2-9.

At the direction of Commander Eisen, Officers Johnson and Meents took the Kohs to Johnson's squad car. R. 380-4, Exh. 3, Eisen Dep. Tr. 56:6-9; R. 282, Exh. 9, Johnson Dep. 67:22-68:7; Exh. 5, Meents Dep. Tr. 89:8-16. The Kohs maintain—and the Northbrook Defendants do not deny (at the summary judgment stage)—that the officers "pushed" and "sort of shoved" them into the squad car. R. 311, Pls.' Resp. NDSOF ¶ 16; Exh. 17, Hyung Seok Koh Dep. Tr. 363:16-364:17 ("[T]hey held our arm or twisted our arm, and then they sort of shoved us into the squad car."); R. 283, Exh. 12, Mar. 22, 2010 Pretrial Hr'g Tr. 57:24-58:7 ("I was asking to go to the hospital, but he said you don't have to go to the hospital and took me to the squad car, pushed me to the squad car."). Johnson drove the Kohs to the Northbrook Police Department. NDSOF ¶ 22; R. 282, Exh. 9, Johnson Dep. Tr. 76:19-21. Neither he nor any other officer ever asked the Kohs whether they wanted to go to the station. PSOF ¶ 6; Exh. 5, July 15, 2010 Pretrial Hr'g Tr. 41:18-42:12; Exh. 82, Mar. 22, 2010 Pretrial Hr'g Tr. 64:8-65:14 (sealed).

## B. At the Police Station

When the Kohs arrived at the police station, Mr. Koh asked to sit in the station's chapel, but his requests were denied. PSOF ¶ 7; NDSOF ¶ 37; R. 287-21, Exh. 79, Nov. 13, 2009 Pretrial Hr'g Tr. 59:3-9 (sealed). Instead, Officers Johnson and Ochab escorted the Kohs to a conference room in the police station. NDSOF ¶¶ 34-35; Exh. 9, Johnson Dep. Tr. 85:20-87:20. On the way there, one of the officers

asked Mrs. Koh to wash her bloodstained hands in the women's restroom. PSOF ¶ 8; NDSOF ¶ 34; Exh. 9, Johnson Dep. Tr. 85:20-86:23. The officers watched Mrs. Koh as she did so, and investigators inspected the bathroom after she finished. PSOF ¶ 8; Exh. 9, Johnson Dep. Tr. 87:3-11; R. 284-4, Exh. 28, Wasowicz Dep. Tr. 66:8-24.

The Kohs were taken to the conference room and were given blankets and beverages. NDSOF ¶ 44; Exh. 9, Johnson Dep. Tr. 89:1-19. Johnson or other officers watched over the Kohs throughout their time in the conference room.[5] NDSOF ¶ 44; Exh. 9, Johnson Dep. 220:2-13. Mr. Koh asked to make a phone call, but was not allowed to do so. PSOF ¶ 11; *see also* R. 328, Northbrook Defs.' Resp. PSOF ¶ 11 (noting that the Deputy Chief Ross "directed Officer Johnson to hold off on the phone call for a few minutes until a translator was present"); R. 308-27, Exh. 134, Transcript of NPD Audio Recordings at 11-12; R. 292-4, Exh. 103, Ross Dep. Tr. 82:17-84:6. Johnson did eventually contact Mr. Koh's pastor, who arrived at the

---

[5]The parties dispute how long the Kohs remained together in the conference room before Mr. Koh's first interview. All of the defendants maintain that the Kohs were together that morning until Mr. Koh was interviewed; the Kohs assert that they were separated after just 5 to 10 minutes together. *Compare* NDSOF ¶ 44 ("The Kohs remained in the investigative conference room until Mr. Koh was interviewed. … [T]he Kohs were huddled together under a blanket, conversed in Korean and the television (with volume) was on."); R. 276, WDSOF ¶¶ 10-11 (When Officer Kim arrived around 6:00 a.m., he observed Mrs. and Mr. Koh "covered in a blanket and talking in Korean"); Exh. 9, Johnson Dep. Tr. 89:20-90:8 ("We were in there for quite some time."); R. 284-12, Exh. 34, Ochab Dep. Tr. 49:1-8 (Officer Ochab was with the Kohs in the conference room for "an hour, two hours"), *with* Pls.' Resp. NDSOF ¶ 44 ("The Kohs were separated after approximately 5-10 minutes; they did not talk to each other, and they weren't huddled together under a blanket speaking Korean to each other."); R. 288-3, Exh. 83, May 11, 2010 Pretrial Hr'g Tr. 96:12-22 ("Q: Isn't it true … that it was more like three hours that you were together with your husband in that conference room? / A: Not that long, no. / Q: You're claiming it was more like five to ten minutes? / A: That's how I recall."). *But see* R. 284-15, Exh. 37, Eunsook Koh Dep. Tr. 248:20-22 (Mrs. Koh acknowledges that the police separated her from her husband after about three hours).

station around 6:00 a.m. PSOF ¶ 10; Exh. 82, Mar. 22, 2010 Pretrial Hr'g Tr. 12:21-13:14 (sealed). Despite his repeated requests, however, Pastor Chang was not allowed to see Mr. Koh. PSOF ¶ 10; Exh. 82, Mar. 22, 2010 Pretrial Hr'g Tr. 17:20-18:8 (sealed). Other friends and family members came to the police station and asked to see the Kohs, but their requests were likewise denied. PSOF ¶¶ 12, 24; R. 286, Exh. 48, Hwang Dep. Tr. 102:17-103:7 (sealed); R. 288-3, Exh. 83, May 11, 2010 Pretrial Hr'g Tr. 147:12-149:19; Exh. 79, Nov. 13, 2009 Pretrial Hr'g Tr. 91:13-95:17 (sealed). Instead, the police interviewed these individuals about Mr. Koh's relationship with his son. PSOF ¶¶ 10, 12-13; Exh. 82, Mar. 22, 2010 Pretrial Hr'g Tr. 15:1-8 (sealed); Exh. 83, May 11, 2010 Pretrial Hr'g Tr. 150:8-151:11.

### C. The Investigation

As the Kohs waited at the police station, the investigation into Paul's death progressed. Commander Eisen directed dispatchers at the station to locate a Korean-speaking police officer to help facilitate communication with the Kohs, who had difficulty communicating in English.[6] PSOF ¶ 16; Exh. 3, Eisen Dep. Tr. 151:7-155:3. A Wheeling police officer, Defendant Kim, responded to the request and arrived at the Northbrook police station to provide interpretation assistance. NDSOF ¶ 45; WDSOF ¶ 8; R. 284-17, Exh. 39, Kim Dep. Tr. 80:10-81:9.

At around 5:00 a.m., Northbrook's Chief of Police, Defendant Wernick, arrived at the Kohs' house. NDSOF ¶ 26; R. 280-7, Exh. 6, NPD Call Detail Report

---

[6]Though the Kohs did not notify the officers that they needed help in reading or understanding English, *see* NDSOF ¶ 39; Exh. 17, Hyung Seok Koh Dep. Tr. 398:24-399:3, officers who interacted with the Kohs recognized that there was a language barrier, PSOF ¶ 14; Exh. 34, Ochab Dep. Tr. 7:11-16 (noting that Mr. Koh's 911 call "was coming as also a language barrier").

(sealed). Chief Wernick notified the North Regional Major Crimes Task Force (NORTAF), a regional team designed to assist with major crime investigations, about Paul's death. NDSOF ¶¶ 26-27; R. 284-1, Exh. 25, Wernick Dep. Tr. 58:15-19. In response to Chief Wernick's notice, NORTAF investigators arrived on scene. NDSOF ¶¶ 28-32; R. 284-3, Exh. 27, McEnerney Dep. Tr. 81:4-82:10; R. 284-4, Exh. 28, Wasowicz Dep. Tr. 26:22-28:7. Later that morning, a group of NORTAF members and other law enforcement officers conducted a briefing on the Koh case at the Northbrook police station. *See* NDSOF Exh. 9, Johnson Dep. Tr. 153:12-16; NDSOF Exh. 28, Wasowicz Dep. Tr. 31:1-32:12. What happened at this meeting is not entirely clear—most of the attendees cannot remember exactly who was there or what information was shared—but it appears that NORTAF forensic supervisor Wasowicz presented his preliminary impressions of the scene, and that Officer Johnson shared information that he learned from the Kohs. Exh. 9, Johnson Dep. Tr. 160:10-161:10; Exh. 28, Wasowicz Dep. Tr. 32:13-34:8; R. 284-5, Exh. 29, Wasowicz Aff. ¶ 14; Exh. 27, McEnerney Dep. Tr. 116:13-117:11. The Kohs had informed Johnson that Paul Koh used marijuana, and that Paul was depressed and the Kohs believed he might have committed suicide. Exh. 9, Johnson Dep. Tr. 160:2-161:9; NDSOF ¶¶ 23, 41.

## 1. Mr. Koh's First Interview

At around 7:30 a.m., Mr. Koh was interviewed by Northbrook detectives Graf and Ustich—the first of two police interrogations he would undergo that morning. NDSOF ¶ 52; R. 285-1, Exh. 42, Video of Hyung Seok Koh Interview 1. Officer Kim

was present to assist with Korean-language interpretation. NDSOF ¶ 52; Exh. 42, Video of Hyung Seok Koh Interview 1. This first interview lasted about 55 minutes. NDSOF ¶ 52; Exh. 42, Video of Hyung Seok Koh Interview 1. Before the start of the interview, Mr. Koh made another request for his medications (which he used to control his diabetes, high blood pressure, and ammonia level disorder). PSOF ¶ 20; R. 289-1, Exh. 85, Mar. 16, 2010 Pretrial Hr'g Tr. 14:3-15:12.[7] Detective Graf responded that someone would bring him the medications, but that did not happen.[8] PSOF ¶ 20; R. 289-1, Exh. 85, Mar. 16, 2010 Pretrial Hr'g Tr. 14:3-15:12.

Before questioning Koh on the events of the night before, Graf administered *Miranda* warnings in English. NDSOF ¶ 54; R. 285-3, Exh. 44, Hyung Seok Koh Interview Tr. 1-3.[9] Koh nodded that he understood the warnings, but then asked Officer Kim to "transfer" (apparently meaning to say "translate"). Exh. 42, Video of Hyung Seok Koh Interview 1 at 00:01:30-00:01:36. Kim did translate at least part of the *Miranda* warnings into Korean, but the parties debate whether Kim translated

---

[7] The Wheeling Defendants maintain that "[t]hroughout Mr. Koh's interview ... Mr. Koh never mentioned any need for medication or other provisions in the presence of Officer Kim." WDSOF ¶ 32; R. 284-17, Exh. 39, Kim Dep. Tr. 131:4-22. (Q: Why are you sure that he would tell you within hours of his son's death that he needed medication? / A: Well, if it's medication, you need to take it regularly, I mean."); *but see* R. 309, Pls,' Resp. WDSOF ¶ 32.

[8] It does seem that Mr. Koh was eventually given his medications, but only after the end of his second interview, when it became clear that he was going to be detained indefinitely. *See* R. 285-2, Exh. 43, July 15, 2010 Pretrial Hr'g Tr. 72:17-73:13. According to Graf, this was the first and only time that Mr. Koh asked for his medications. *See id.* at 73:14-16. But Graf's version conflicts with Mr. Koh's testimony that he asked for his medications before the first interview, and at this stage the Court must take Mr. Koh's word as true.

[9] The Northbrook Defendants rely on a transcript of Mr. Koh's videotaped interviews to support their summary judgment motion. *See* R. 285-3, Exh. 44, Hyung Seok Koh Interview Tr. Though the Kohs "do not stipulate to the accuracy of the entire transcript, [they] admit that its use at summary judgment is generally helpful and appropriate ... ." Pls.' Resp. NDSOF ¶ 54. Because the parties agree to use the transcript at this stage in the proceedings, the Court will rely on it in deciding the motions.

the warnings properly, and whether Mr. Koh understood them. *See* PSOF ¶ 102-105; WDSOF ¶ 36; R. 309, Pls.' Resp. WDSOF ¶ 36; R. 323, Wheeling Defs.' Resp. PSOF ¶¶ 102-105. Mr. Koh ultimately executed an English-language *Miranda* waiver form at Graf's and Kim's directions. Exh. 42, Video of Hyung Seok Koh Interview 1 at 00:02:13-00:02:36; NDSOF ¶ 54; R. 285-4, Exh. 45, *Miranda* Waiver Form; Exh. 44, Hyung Seok Koh Interview Tr. 1-3.

The first interview was conducted mostly in English, with little intervention from Kim. *See generally* Exh. 42, Video of Hyung Seok Koh Interview 1. Although Mr. Koh was able to answer some questions and communicate at a basic level in English, some of his answers were confusing or unresponsive to Graf's questions. *See, e.g.*, Exh. 44, Hyung Seok Koh Interview Tr. 3-4, 36. Graf nevertheless continued questioning Mr. Koh in English, and raised the possibility that Mr. Koh might have harmed Paul. *See, e.g.*, *id.* at 36-37. Throughout this first interview, Mr. Koh repeatedly denied any involvement in Paul's death. PSOF ¶ 109; NDSOF ¶ 59; Exh. 44, Hyung Seok Koh Interview Tr. 36-37; 39-42; 45. Graf and Mr. Koh also discussed Paul's drug use and depression. NDSOF ¶ 63; Exh. 44, Hyung Seok Koh Interview Tr. 52-58.

## 2. Mrs. Koh's Interview

Two NORTAF detectives (not defendants in this case) interviewed Mrs. Koh as soon as Mr. Koh's first interview ended. NDSOF ¶ 73; R. 308-14, Exh. 121, Eunsook Koh Interview Tr. Officer Kim also provided interpretation assistance during Mrs. Koh's interview, which lasted around 55 minutes. NDSOF ¶ 73; R. 286-

13, Exh. 54, Video of Eunsook Koh Interview. Mrs. Koh's version of events mostly corroborated Mr. Koh's. PSOF ¶ 111; Wheeling Defs.' Resp. PSOF ¶ 111; NDSOF ¶¶ 74-76; *see also* Exh. 54, Video of Eunsook Koh Interview; Exh. 121, Eunsook Koh Interview Tr.[10]

### 3. Meetings Before Mr. Koh's Second Interview

Before resuming their interrogation of Mr. Koh, Graf and Ustich met with several of their superiors to discuss how to proceed. PSOF ¶ 26; R. 284-14, Exh. 36, Graf Dep. Tr. 91:4-93:24; Exh. 28, Wasowicz Dep. Tr. 30:13-32:12. Present at these meetings[11] were Northbrook Chief of Police Charles Wernick, Investigations Unit Commander Scott Dunham, NORTAF Commander Dennis McEnerney, and NORTAF investigative team leader John Walsh. Exh. 36, Graf Dep. Tr. 91:23-92:12; NDSOF Exh. 40, Ustich Dep. Tr. 85:1-4. Graf and Ustich relayed their suspicions about Mr. Koh, noting that he did not vehemently deny his lack of involvement in Paul's death, and that they thought his answers were evasive. NDSOF Exh. 40, Ustich Dep. Tr. 85:21-86:4; 95:1-14. The group discussed various pieces of evidence that had been uncovered by the ongoing investigation, including crime scene evidence that seemed to indicate a struggle, and evidence of tension between Paul and Mr. Koh. NDSOF Exh. 40, Ustich Dep. Tr. 95:6-96:1; R. 285-5, Exh. 46, May 16,

---

[10]The Kohs rely on a transcript of Mrs. Koh's videotaped interview to support their Response to the Defendants' summary judgment motions. *See* R. 308-14, Exh. 121, Eunsook Koh Interview Tr. Like the transcript of Mr. Koh's interviews, the Court will also rely on this transcript in deciding the summary judgment motions.

[11]It is a little unclear whether this was one meeting or multiple meetings, *see* Exh. 36, Graf Dep. Tr. 92:9-92:20; Exh. 40, Ustich Dep. 84:21-85:4, but that detail does not matter to the summary judgment analysis. For the sake of simplicity, the Court adopts the Kohs' assertion that there were multiple meetings. *See* PSOF ¶ 26.

2011 Pretrial Hr'g. Tr. 39:21-42:19. Dunham instructed Graf and Ustich to "press Mr. Koh a little bit harder." Ustich Dep. Tr. 96:16-19.

### 4. Mr. Koh's Second Interview

At around 11:30 a.m., Detectives Graf and Ustich, joined again by Officer Kim, began questioning Mr. Koh a second time. NDSOF ¶ 78; Video of Hyung Seok Koh Interview 2. Before reinitiating questioning, Detective Graf offered Mr. Koh food, coffee, juice, and water. NDSOF ¶ 80; Exh. 44, Hyung Seok Koh Interview Tr. 58. Although Mr. Koh had not recently eaten, slept, or taken his medications, PSOF ¶ 29; Exh. 17, Hyung Seok Koh Dep. Tr. 354:22-355:8, all he said in response was, "Yeah, what I need is I'll let you know," Exh. 44, Hyung Seok Koh Interview Tr. 59; *see also* NDSOF ¶ 80.

As demonstrated on the video recording, the questioning in the second interview was more aggressive. Graf, implementing a particular law-enforcement interrogation technique, pressed Koh hard about the events of the night before, confronting him with inconsistencies (real and imagined) in his story. *See* NDSOF Exh. 36, Graf Dep. Tr. 105:2-110:15; *see also* NDSOF ¶¶ 50-51. At first, Mr. Koh denied any involvement in Paul's death, sticking to his story that he had gone to bed and had slept until he was awoken by Mrs. Koh at around 3:45 a.m. *See, e.g.*, Exh. 44, Hyung Seok Koh Interview Tr. at 68, 101-02. In response, Graf intensified his questioning, eventually moving to sit in a chair next to Mr. Koh (up until this point, Detective Graf had been sitting across the table from Mr. Koh). NDSOF ¶ 85; R. 286-14, Exh. 55, Video of Hyung Seok Koh Interview 2 00:45:11-00:45:24; Exh.

44, Hyung Seok Koh Interview Tr. 103. Detective Graf also began to raise his voice, yell at Mr. Koh, and touch Mr. Koh on his arms and legs. PSOF ¶ 33; Northbrook Defs.' Resp. PSOF ¶ 33; NDSOF ¶ 92; Pls.' Resp. NDSOF ¶ 92; Exh. 55, Video of Hyung Seok Koh Interview 2 00:55:20-01:09:53.

Graf began to present details of his theory of the crime, stating that he knew that Mr. Koh had called Paul the night before and stayed up waiting for Paul to come home. NDSOF ¶ 87; Pls.' Resp. NDSOF ¶ 87; Exh. 44, Hyung Seok Koh Interview Tr. 108-111, 114. Though Mr. Koh initially denied Graf's version of events (even despite Graf's repeated accusations that Mr. Koh was lying), he eventually began to go along with Graf's suggestions. *See* Exh. 44, Hyung Seok Koh Interview Tr. 111-144; *see also* PSOF ¶¶ 38, 45-50; Northbrook Defs.' Resp. PSOF ¶¶ 38, 45-50; NDSOF ¶¶ 87, 93; Pls.' Resp. NDSOF ¶ 87. As the questioning went on, Mr. Koh became visibly distressed, sitting hunched in his chair and occasionally hitting himself in the head or chest. Exh. 55, Video of Hyung Seok Koh Interview 2 00:44:03, 01:08:10-01:09:53; R. 286-16, Exh. 57, Video of Hyung Seok Koh Interview 3[12] 00:03:15-00:03:20, 00:10:50-00:10:52, 00:12:18-00:12:20; *see also* PSOF ¶ 32. For the most part, Kim did not provide translation assistance, and Graf did not leave time between questions to allow for translation. *See generally* Exh. 55, Video of Hyung Seok Koh Interview 2; Exh. 57, Video of Hyung Seok Koh Interview 3.

Eventually, Mr. Koh agreed (that is, the details of his story were suggested by Graf and Mr. Koh assented) that he stayed up until 1:00 a.m. waiting for Paul to

---

[12]There are two videotapes of the second interview, labeled "Video of Hyung Seok Koh Interview 2" and "Video of Hyung Seok Koh Interview 3." The tape labeled "Video of Hyung Seok Koh Interview 1" is the recording of Mr. Koh's first interview.

come home; that Mr. Koh was mad because Paul had been out late smoking marijuana with friends; and that the two got into an argument when Paul finally came home, which culminated in Mr. Koh stabbing his son in the chest and slitting his son's throat with a knife in self-defense. Exh. 44, Hyung Seok Koh Interview Tr. 111-144; *see also* NDSOF ¶¶ 89-90; Pls.' Resp. NDSOF ¶¶ 89-90. As with most of the details in that version, it was Detective Graf who presented Mr. Koh with the self-defense storyline. *See* Exh. 44, Hyung Seok Koh Interview Tr. 135-136; *see also* PSOF ¶ 119; Wheeling Defs.' Resp. PSOF ¶ 119; NDSOF ¶ 94.

About three minutes before what would be the end of the interview, Officer Dunham knocked on the door. PSOF ¶ 42; Exh. 57, Video of Hyung Seok Koh Interview 3 at 00:18:19. Graf stepped outside the interview room and told Dunham that Mr. Koh was in the middle of confessing to his son's murder. PSOF ¶ 42; R. 284, Exh. 24, Dunham Dep. Tr. 65:13-66:10. Dunham told Graf that Mr. Koh's attorney, Michael Shim, was at the police station[13] and would be brought back to the interview room. PSOF ¶ 42; Exh. 24, Dunham Dep. Tr. 66:21-68:18. While Dunham escorted Mr. Shim back to the interview room, Graf continued to question Mr. Koh. PSOF ¶ 43; Exh. 36, Graf Dep. Tr. 203:14-16. Graf picked up the pace of the interview and put more pressure on Mr. Koh to confess. PSOF ¶ 43; Exh. 44, Hyung Seok Koh Interview Tr. 144 ("Hyungseok, come on. Right now, let's be done, hurry up, fast."). Koh eventually made statements that could be interpreted as an

---

[13]Two of the Kohs' family members reached out to Shim for assistance earlier that morning once they realized that Mr. Koh was a suspect. PSOF ¶¶ 25, 40. Shim called the Northbrook Police Department to tell them he was Mr. Koh's attorney before arriving at the station. *Id.* ¶ 40. Once at the station, Shim had to wait twenty minutes before he was able to meet with Officer Dunham and go back to the interview room to see Mr. Koh. *Id.* ¶ 41.

admission that he had stabbed Paul.[14] *See* Exh. 44, Hyung Seok Koh Interview Tr. at 144-45. Mr. Koh also made stabbing or slashing motions with his hands in response to Graf's questioning about whether and how he had cut Paul. Exh. 57, Video of Hyung Seok Koh Interview 3 at 18:40-20:09. The interview terminated when Mr. Shim arrived and insisted that Graf stop the questioning. Exh. 57, Video of Hyung Seok Koh Interview 3 at 21:08-21:36.

### D. Criminal Proceedings

As soon as the interview was over, Detective Graf met with Chief Wernick and Officers Dunham, Ustich, and McEnerney. PSOF ¶ 44. (Officer Kim was not present at this meeting, nor at the meetings that took place in between Mr. Koh's interviews earlier that morning. WDSOF ¶ 18.[15]) In light of Mr. Koh's inculpatory statements, the group decided to call the Cook County State's Attorney's Office to seek approval to file murder charges against him. PSOF ¶ 44; Exh. 36, Graf Dep. Tr. 327:11-329:18. In response to this call, two assistant Cook County State's Attorneys, Diane Sheridan and Rick Albanese, went to the Northbrook Police Department that afternoon and reviewed portions of Mr. Koh's videotaped

[14]Mr. Koh's inculpatory statements were ambiguous. *See* Exh. 44, Hyung Seok Koh Interview Tr. at 144-45. ("Q: Did you cut his-- / A: Oh, yeah. / Q: Did you cut his throat? / A:. Maybe, maybe it's -- / Q: Not maybe, what happened? / A: I grab -- okay." "Q: Was he in front—and then you went like this and you cut his neck (indicating)? / A: Yeah. / Q: Is that what you did, did you cut his neck? / A: But I'm not clear in my mind.").

[15]In their response to the Wheeling Defendants' Statement of Facts, the Kohs deny the Wheeling Defendants' statement that "Officer Kim was involved in no meetings with any NORTAF or Northbrook Police Officer[s] regarding the status of the investigation of Paul Koh" on the grounds that "Officer Kim had [] interactions with Northbrook police officers in connection with the death investigation of Paul Koh." *See* Pls.' Resp. WDSOF ¶ 18. But even if Kim was involved in some meetings or conversations with NORTAF or Northbrook officers during the investigation, there is no evidence that Kim was at the meetings that took place between Mr. Koh's two interviews, or the meeting after the second interview.

confession.[16] PSOF ¶¶ 44, 59-61; NDSOF ¶ 108; Pls.' Resp. NDSOF ¶ 108; R. 308-50, Exh. 157, Felony Review Folder. Sheridan also met with Graf and McEnerney. NDSOF ¶ 108; Pls.' Resp. NDSOF ¶ 108.

The next morning, Assistant State's Attorney Bob Heilengoetter approved first-degree felony murder charges against Mr. Koh. NDSOF ¶ 109; R. 287-9, Exh. 67, Felony Compl. In reaching that decision, ASA Heilengoetter relied on information contained in a "felony review folder" compiled by ASA Albanese. PSOF ¶¶ 59, 62; Northbrook Defs.' Resp. PSOF ¶¶ 59, 62; Exh. 157, Felony Review Folder. The folder included autopsy results, Albanese's notes about Mr. Koh's video-recorded statements, and ASA Heilengoetter's notes from a phone conversation he had with Detective Graf earlier that day. Exh. 157, Felony Review Folder; *see also* PSOF ¶¶ 59-60; Northbrook Defs.' Resp. PSOF ¶¶ 59-60. ASA Heilgoetter did not view any portion of the video himself. PSOF ¶ 60; R. 287-10, Exh. 68, Heilengoetter Dep. Tr. 78:21-79:6. The parties dispute whether ASA Heilengoetter relied on any other evidence or on anyone else's input when deciding whether to bring charges, *compare* PSOF ¶¶ 59, 65; Pls.' Resp. NDSOF ¶ 110, *with* NDSOF ¶ 110; Northbrook Defs.' Resp. PSOF ¶¶ 59, 65, as well as the extent to which ASA Heilengoetter knew about Paul's mental health issues, *compare* PSOF ¶ 66, *with* Northbrook Defs.' Resp. PSOF ¶ 66. Detective Ustich filled out the felony complaint before Detective Graf signed off on it. NDSOF ¶ 109; Exh. 157, Felony Review Folder.

---

[16]It is unclear how much of the videotapes Albanese reviewed that day. PSOF ¶ 63; Northbrook Defs.' Resp. PSOF ¶ 63; R. 308-50, Exh. 157, Felony Review Folder; R. 308-17, Exh. 124, Abanese Dep. Tr. 28:12-16 ("Q: Do you recall at all like how long the part or parts that you watched? / A: I don't recall if it was a part or the entire video.").

On May 13, 2009, the state obtained a grand jury indictment against Mr. Koh for first-degree murder. PSOF ¶ 73; *see also* R. 308-63, Exh. 170, Grand Jury Tr. Detective Graf testified before the grand jury. PSOF ¶ 73; *see also* Exh. 170, Grand Jury Tr. Charges were never brought against Mrs. Koh, and she was released on April 17, 2009 after spending the night in a jail cell. NDSOF ¶ 111; R. 287-11, Exh. 69, Eunsook Koh Prisoner Checklist. Mr. Koh, on the other hand, ultimately spent almost four years in Cook County Jail awaiting trial. R. 316, Pls.' Resp. Br. at 22; *see* PSOF ¶¶ 73-74. Finally, after a three-week trial in December 2012—during which the defense (that is, Mr. Koh) argued that Paul took his own life—a jury acquitted Mr. Koh of all charges. PSOF ¶ 74; NDSOF ¶ 122.

## II. Standard of Review

Summary judgment must be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue of material fact exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). In evaluating summary judgment motions, courts must view the facts and draw reasonable inferences in the light most favorable to the non-moving party. *Scott v. Harris*, 550 U.S. 372, 378 (2007). The Court may not weigh conflicting evidence or make credibility determinations, *Omnicare, Inc. v. UnitedHealth Grp., Inc.*, 629 F.3d 697, 704 (7th Cir. 2011), and must consider only evidence that can "be presented in a form that would be admissible in evidence." Fed. R. Civ. P. 56(c)(2). The party

seeking summary judgment has the initial burden of showing that there is no genuine dispute and that they are entitled to judgment as a matter of law. *Carmichael v. Vill. of Palatine*, 605 F.3d 451, 460 (7th Cir. 2010); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986); *Wheeler v. Lawson*, 539 F.3d 629, 634 (7th Cir. 2008). If this burden is met, the adverse party must then "set forth specific facts showing that there is a genuine issue for trial." *Anderson*, 477 U.S. at 256.

### III. Analysis

Both sets of Defendants have moved for summary judgment on all the claims in the Kohs' Second Amended Complaint. In Count One of that complaint, the Kohs allege that the Defendants arrested them without probable cause (or, in Officer Kim's case, extended Mr. Koh's unlawful detention) in violation of the Fourth Amendment. R. 133, Second Am. Compl. ¶¶ 48-52. In Count Two, the Kohs allege that the Defendants violated Mr. Koh's right against self-incrimination and his right to due process under the Fifth and Fourteenth Amendments. *Id.* ¶¶ 53-56. Count Three alleges that the Defendants failed to intervene to prevent these constitutional violations, *id.* ¶¶ 57-60, Count Four targets the Village of Northbrook, alleging that the Northbrook Defendants were acting pursuant to an unconstitutional municipal policy and practice, *id.* ¶¶ 61-65, and Count Five alleges that the Defendants conspired to violate the Kohs' constitutional rights, *id.* ¶¶ 66-70. Finally, in the wake of the Supreme Court's decision in *Manuel v. City of Joliet*, 137 S. Ct. 911 (2017), the Kohs contend that Mr. Koh's pretrial detention violated the Fourth Amendment. R. 357, Pls.' Supp. Br. at 1-3.

The Kohs also bring a few state-law claims. Count Six is a malicious prosecution claim, which alleges that the Defendants fabricated evidence,[17] withheld exculpatory information, and subjected Mr. Koh to criminal proceedings without probable cause. Second Am. Compl. ¶¶ 71-75. Count Seven is (or was[18]) an intentional infliction of emotional distress claim, *id.* ¶¶ 76-80, and Count Eight alleges loss of consortium on behalf of Mrs. Koh, *id.* ¶¶ 81-84. Finally, Counts Nine and Ten allege *respondeat superior* and indemnification against the Villages of Northbrook and Wheeling. *Id.* ¶¶ 85-93. With the claims laid out, the Court analyzes each in turn.

## A. Conspiracy and Failure to Intervene

Before digging into the Kohs' substantive claims, their derivative claims for conspiracy and failure to intervene merit a brief discussion. The Northbrook Defendants assert that the Kohs have not established sufficient facts to demonstrate that individual defendants should be liable for conspiracy or failure to intervene. Northbrook Defs.' Br. at 37-38. In its prior opinion on the Defendants' motion to dismiss, the Court noted the complaint's[19] lack of clarity on which Defendants supposedly committed which violations, but held that this group pleading was appropriate at the pleading stage. R. 82, Opinion on Mot. Dismiss at

---

[17]Although the Second Amended Complaint treated the evidence fabrication as part of the malicious prosecution claim, *see* Second Am. Compl. ¶ 73, the Kohs now argue that the fabrications also violated Mr. Koh's federal constitutional right to due process. *See* Pls.' Resp. Br. at 50. Both versions of the evidence fabrication claim are addressed below. *See* Parts III.D and III.E, *below*.

[18]The Court already dismissed the Kohs' intentional infliction of emotional distress claim as untimely filed. *See* R. 82, Mot. to Dismiss Order at 13-16.

[19]This was the First Amended Complaint, but the Second Amended Complaint made similar allegations.

9. At the same time, the Court noted that the Kohs would eventually bear the burden of tying particular Defendants to particular injuries. *Id.* at 10. Northbrook now argues that the Kohs have not met that burden, and that summary judgment is therefore warranted on the conspiracy and failure to intervene claims.

There is a problem with this argument: the Northbrook Defendants do not explain which Defendants are entitled to summary judgment, on what claims, or (if it matters) at what point in time during the course of events particular Defendants ceased being even potentially liable. This is a fatal oversight. On summary judgment, the moving party carries the burden of demonstrating that there are no genuine issues of material fact and that it is entitled to summary judgment as a matter of law. Fed. R. Civ. P. 56(a). In this case, Northbrook's motion is so vague on the group-allegations argument that the Court is left to guess which Defendants Northbrook believes are entitled to summary judgment on which theories of liability. *See* R. 279, Northbrook Defs.' Br. at 37-38; R. 329, Northbrook Defs.' Reply Br. at 36-37.[20] Northbrook's vague arguments are especially troubling in this case, because there *is* evidence from which a reasonable jury could infer that at least some of the Defendants conspired to deprive the Kohs of their constitutional rights, and that some Defendants failed to intervene to prevent the violations. So, contrary

---

[20]Northbrook argues in its Reply that its Rule 56.1 Statement of Facts provides adequate notice of the grounds for its motion for summary judgment on the conspiracy and failure to intervene claims. Northbrook Defs.' Reply Br. at 36. Northbrook's Statement of Facts does set forth Northbrook's version of the facts of the case in detail. But even with the facts laid out clearly, Northbrook is still asking the Court and the Plaintiffs to guess which defendants Northbrook believes are entitled to summary judgment and on what claims.

to Northbrook's argument, it is not enough to simply point out to an absence of evidence to support the Kohs' claims. *See* Northbrook Defs.' Mot. Summ. J. at 38.

To be sure, the Kohs do have the ultimate burden of proving conspiracy and failure to intervene, and it is very unlikely that they will be able to do so for all Defendants when it comes to the trial. It seems clear, for example, that liability for the on-scene arresting officers—Meents, Johnson, Eisen, and Celia—must cut off at some point in time after the Kohs arrived at the police station and the interrogations began. Unsupported allegations of a conspiracy of which there is no evidence will not be enough at trial (and indeed would not have been enough to withstand a properly detailed motion for summary judgment). Unfortunately, Northbrook has not made these arguments in enough detail to give the Kohs or the Court fair notice of the grounds for summary judgment. Northbrook's motion for summary judgment on the conspiracy and failure to intervene claims is denied.

## B. False Arrest

Moving on to the substantive claims, the Kohs allege the Defendants arrested them without probable cause (or, in Officer Kim's case, extended Mr. Koh's unlawful detention) in violation of the Fourth Amendment.[21] To evaluate this claim, the Court must answer two key questions. First, at what point were the Kohs under

---

[21]The Kohs also asserted strip-search claims, arguably as free-standing independent claims. *See* Second Am. Compl. ¶ 50. They did not, however, respond to the part of the Northbrook Defendants' motion seeking summary judgment on those claims. *See* Northbrook Defs.' Br. at 25-28; *see also* NDSOF ¶¶ 98-105. So those claims are waived and summary judgment is granted against them. *See Sentinel Ins. Co. v. Serra Int'l*, 119 F. Supp. 3d 886, 891 (N.D. Ill. 2015) ("[A] party opposing summary judgment must inform the trial judge of the reasons, legal or factual, why summary judgment should not be entered. … If the opposing party fails to do so, the claim is deemed waived and the nonmoving party will lose the motion." (internal quotation marks and citation omitted)).

arrest for Fourth Amendment purposes? Second, when, if ever, did the arresting officers have probable cause (or at least arguable probable cause) to detain the Kohs?

## 1. Timing of the Arrest

An arrest occurs when, "in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave." *United States v. Tyler,* 512 F.3d 405, 409-10 (7th Cir. 2008) (quotations and citations omitted). This is an objective standard: the officer's and the suspect's subjective beliefs are not part of the legal analysis. *Carlson v. Bukovic*, 621 F.3d 610, 618-19 & n.15 (7th Cir. 2010). Relevant circumstances include the location of the arrest, the officers' statements and conduct, use of threats or threatening conduct, and whether the suspect was removed to another location. *United States v. Scheets*, 188 F.3d 829, 836-37 (7th Cir. 1999); *see also Fox v. Hayes*, 600 F.3d 819, 833 (7th Cir. 2010); *Tyler,* 512 F.3d at 410. The "characteristics" of the suspect, including whether the suspect "ha[s] problems understanding the English language," are also relevant to determining whether an arrest occurred. *United States v. Espinosa-Alvarez*, 839 F.2d 1201, 1205 (7th Cir. 1987); *see also United States v. Schumacker*, 577 F. Supp. 590, 595 (N.D. Ill. 1983). This is because individuals who have difficulty understanding English might feel "a greater compulsion to comply with the request of the police." *Espinosa-Alvarez*, 839 F.2d at 1205.

From the very beginning of their encounter with the Kohs, the Northbrook police officers acted in a way that would lead reasonable persons to think that they were not free to leave. The officers' first action upon arriving at the scene was to yell at Mrs. Koh to leave the house and sit down on the grass outside. NDSOF ¶ 8; Exh. 12, Mar. 22, 2010 Pretrial Hr'g. Tr. 51:23-52:2. Two Northbrook officers then grabbed Mrs. Koh by her arm and shoulder and forced her down onto the grass. NDSOF ¶ 8; Exh. 12, Mar. 22, 2010 Pretrial Hr'g. Tr. 52:15-22, 53:5-8. When Mr. Koh looked like he might be trying to leave the scene—he went to the driveway to try to start his car to take Paul to the hospital—Officer Meents told Mr. Koh that he had to go back to the front lawn. Exh. 5, July 15, 2010 Pretrial Hr'g Tr. 12:6-13:17. Meents then escorted Mr. Koh away from the car and back to the front lawn, despite Mr. Koh's protests that he wanted to go to the hospital. *Id*. at 13:11-17; R. 283-7, Exh. 18, Jan. 5, 2010 Pretrial Hr'g Tr. 21:15-22:7. The officers pushed Mr. Koh down onto the grass by his shoulders, and told him not to move. NDSOF ¶ 11; Exh. 10, Nov. 13, 2009 Pretrial Hr'g Tr. 35:11-16, 38:9-15; Exh. 11, May 11, 2010 Pretrial Hr'g Tr. 68:14-21. Officers also screamed at Mr. Koh to "shut up" and "be quiet." Exh. 18, Jan. 5 2010 Pretrial Hr'g Tr. 23:22-24:1-3. Once the Kohs were on the ground on the front lawn, Meents and Johnson stood over them in them for as long as fifteen minutes, remaining in "close proximity" to the Kohs the entire time. NDSOF Exh. 5, July 15, 2010 Pretrial Hr'g Tr. 15:19-21; R. 280-8, Exh. 7, Meents Dep. 71:1-19. During this time, the officers denied the Kohs' requests to go into the house for medications, to retrieve their cell phone, and to see their son.[22] NDSOF ¶¶

_____

[22]Although this denial might have been prompted by the officers' *subjective* desire to

12-13, 15; Exh. 11, May 11, 2010 Pretrial Hr'g Tr. 76:8-20; Exh. 5, Meents Dep. Tr. 132:2-9; R. 283-6, Exh. 17, Hyung Seok Koh Dep. Tr. 354:4-355:8. Based on the officers' actions at the scene—shoving the Kohs around, standing guard over them for an extended period of time, ordering them to sit on the ground, screaming at them, and refusing their requests to leave the lawn—a jury could reasonably find that the Kohs were not free to leave when the officers stood over them on the lawn in front of their house.

Even if the Kohs were not arrested on the lawn, a reasonable jury could find that they were under arrest by the time they were taken to the police station in Johnson's squad car. Where "the police, without probable cause … forcibly remove a person from his home or other place in which he is entitled to be and transport him to the police station … for investigative purposes," courts will find a Fourth Amendment violation. *Hayes v. Florida*, 470 U.S. 811, 816 (1985); *see also Sornberger v. City of Knoxville, Illinois*, 434 F.3d 1006, 1018 (7th Cir. 2006) (holding that a reasonable jury could find that the plaintiff was under arrest when an officer told her that she "needed" to accompany him to the station, despite the lack of any overt threat of force). In this case, the shocked and grieving Kohs—who, according to their testimony, had already been yelled at, shoved, and loomed over by multiple uniformed police officers—were "escorted" to Johnson's squad car by two officers, who never asked whether the Kohs *wanted* to go to the police station. PSOF ¶ 6;

---

preserve evidence at the crime scene, the officers' subjective intentions do not matter. *Carlson*, 621 F.3d at 618-19 & n.15 (7th Cir. 2010). To a reasonable person in the Kohs' position, the officers' refusal to allow them into their home would have been evidence that they were not free to leave.

Exh. 5, July 15, 2010 Pretrial Hr'g Tr. 41:18-42:12; Exh. 82, Mar. 22, 2010 Pretrial Hr'g Tr. 64:8-65:14 (sealed). The Kohs testified that this "escort" involved yet more physical force, claiming that the officers held their arms while bringing them to the car and "shoved" or "pushed" them inside. NDSOF ¶ 16; Exh. 12, Mar. 22, 2010 Pretrial Hr'g Tr. 62:1-12; Exh. 17, Hyung Seok Koh Dep. Tr. 364:10-365:18. In the car, the Kohs even made explicit requests *not* to be taken to the police station (they asked again to go to the hospital) and were ignored. PSOF ¶ 4; Exh. 10, Nov. 13, 2009 Pretrial Hr'g Tr. 45:18-20, 52:11-14, 58:3-14; Exh. 11, May 11, 2010 Pretrial Hr'g Tr. 74:7-75:13; Exh 82, Mar. 22, 2010 Pretrial Hr'g Tr. 63:2-11, 73:21-24 (sealed).[23] All of these actions—particularly given the Kohs' apparent difficulty understanding and speaking English—would have given reasonable persons in the Kohs' position good reason to think that compliance was not optional, but required.

What's more, a reasonable jury could find that the Kohs continued to be under arrest throughout their time at the police station. If anything, the Kohs' inability to leave was reinforced during their time in the police station conference room. According to Mrs. Koh, the door of the conference room where the Kohs were held was kept closed while they were inside. Exh. 12, Mar. 22, 2010 Pretrial Hr'g Tr. 102:16-23. Johnson or other officers watched over the Kohs the entire time. NDSOF ¶ 44; Exh. 9, Johnson Dep. Tr. 220:2-13. The officers also denied the Kohs' requests to make phone calls—indeed, Deputy Chief Ross explicitly instructed Johnson not to allow the Kohs to make calls until a police translator could listen in.

---

[23]Johnson denies that the Kohs asked to go to the hospital, *see* Exh. 9, Johnson Dep. Tr. 71:24-72:3, but at this stage, the Court must believe the Kohs over Johnson.

PSOF ¶ 11, Exh. 134, Transcript of NPD Audio Recordings at 11-12; Exh. 103, Ross Dep. Tr. 82:17-84:6 (Ross ordered Johnson to wait for a translator "[s]o the officers would be able to know what was said."). The Kohs' inability make calls effectively left them stranded at the police station. The Kohs were brought to the station in Johnson's police vehicle; when they arrived it was around 4:00 a.m. on a cold April morning.[24] If they could not call for a ride, the Kohs had no reasonable way to leave the station (short of asking the officers who arrested them for a lift). In view of these facts, a jury could easily find that the Kohs remained under arrest from the time the officers arrived at the house through the entirety of their time at the police station.

All of these facts also prevent the Court from finding that the arresting officers are entitled to qualified immunity as a matter of law. To avoid judgment on qualified immunity grounds, the Fourth Amendment right that the Defendants allegedly violated must have been "clearly established" as of the time of the alleged arrest. *Roe v. Elyea*, 631 F.3d 843, 858 (7th Cir. 2011). The "clearly established" inquiry entails examining the right "in a particularized sense, rather than at a high level of generality." *Alicea v. Thomas*, 815 F.3d 283, 291 (7th Cir. 2016). Ultimately, the question for qualified immunity "is whether the state of the law at the time that

---

[24]Johnson believes he arrived at the scene around 3:45 a.m., and that he took the Kohs to the station around twenty minutes later. *See* Exh. 9, Johnson Dep. Tr. 44:3-10, 83:8-14. It took only three or four minutes to drive to the station, *id.* at 76:19-21, meaning the Kohs must have arrived at the station around 4:00 a.m. Officer Meents noted that the weather that day was cold, but not freezing. Exh. 7, Meents Dep. Tr. 58:19-20. *See also* NDSOF ¶ 22 ("Johnson transported the Kohs to the Northbrook Police Department … because it was dark outside [and] extremely cold.")

[the Defendants] acted gave [them] reasonable notice that [their] actions violated the Constitution." *Roe*, 631 F.3d at 858.

A reasonable officer would have known that pushing on the Kohs' shoulders and directing them to sit quietly on the ground outside of their house before taking them to a police car and driving them to a police station constituted an arrest under the Fourth Amendment. *See Hayes*, 470 U.S. at 815-16; *Sornberger*, 434 F.3d at 1017-18. Indeed, the officers' actions read like a checklist of the factors that the courts have set out for evaluating whether a suspect is under arrest. In *United States v. Scheets*, for example, the Seventh Circuit noted that factors to be considered in the arrest analysis include:

> [W]hether the encounter occurred in a public or private place; whether the suspect was informed that he was not under arrest and free to leave; whether the suspect consented or refused to talk to the investigating officers; whether the investigating officers removed the suspect to another area; whether there was physical touching, display of weapons, or other threatening conduct; and whether the suspect eventually departed the area without hindrance.

*Scheets*, 188 F.3d at 836-37. Running through the list, the Northbrook officers ordered the Kohs to leave their home; never suggested that the Kohs were free to leave; ignored the Kohs' requests to go to the hospital; removed the Kohs from their home to the police station; pushed and shoved the Kohs; yelled at Mr. Koh to "shut up"; and kept the Kohs under police supervision at the station instead of releasing them. On these facts, a reasonable officer would have known that the Kohs were under arrest even on their front lawn (by that time, the officers had verbally and physically intimidated the Kohs, restricted their freedom of movement using physical force, and denied their requests to move). And a reasonable officer

certainly would have known that the Kohs were under arrest by the time they were taken to the police station and held there. So qualified immunity cannot shield the Defendants on this element of the false arrest analysis.

## 2. Probable Cause

The Fourth Amendment inquiry does not end with the conclusion that the Kohs were arrested. The Kohs' false arrest claim fails if the arresting officers had probable cause to detain them. Police officers have probable cause to arrest someone if "the facts and circumstances within their knowledge and of which they had reasonably trustworthy information were sufficient to warrant a prudent [person] in believing that the [suspect] had committed or was committing an offense." *Beck v. Ohio*, 379 U.S. 89, 91 (1964). The "totality of the circumstances" must establish a reasonable belief that criminal activity occurred. *Gibbs v. Lomas*, 755 F.3d 529, 537 (7th Cir. 2014). Whether or not probable cause exists then "is often a matter of degree, varying with both the need for prompt action and the quality of information available." *Maxwell v. City of Indianapolis*, 998 F.2d 431, 434 (7th Cir. 1993). Generally, the question of probable cause is a question for the jury. *See id.* (probable cause "is a proper issue for the jury if there is room for a difference of opinion concerning the facts or the reasonable inferences to be drawn from them").

Even where officers make an arrest without probable cause, qualified immunity may kick in to defeat a false-arrest claim. The doctrine of qualified immunity will protect the Defendants if they decided, "in an objectively reasonable fashion," that they had probable cause to arrest the Kohs. *Sornberger*, 434 F.3d at

1014-15. As discussed above, the ultimate question is whether the officers had "reasonable notice," given the state of the law at the time, that their actions violated the Constitution. *Roe*, 631 F.3d at 858.

Notably, the Defendants do not even try to argue that they had probable cause—or even arguable probable cause—to arrest the Kohs at their home. *See* Northbrook Defs.' Br. at 5-11. In fact, the Northbrook Defendants explicitly concede that there was no probable cause to arrest Mrs. Koh until, at the earliest, the end of Mr. Koh's second interview. *Id.* at 15. So, the question is when (if ever) in the course of the ongoing investigation the officers developed sufficient information to justify the continued detention of Mr. and Mrs. Koh.

### a. Mr. Koh

For Mr. Koh, the NORTAF/NPD debriefing sessions held between Mr. Koh's two interviews mark a turning point in the probable cause analysis. In the time between Mr. Koh's first and second interviews, Officers Graf and Ustich met with NORTAF and NPD supervisors. *See* PSOF ¶ 26; Exh. 36, Graf Dep. Tr. 91:15-93:5. During these meetings, Graf and Ustich shared their impressions of the first interview. Exh. 36, Graf Dep. Tr. 93:21-94:11; Exh. 40, Ustich Dep. Tr. 85:15-86:15. Ustich noted that Mr. Koh did not vehemently deny involvement in Paul's death, and that the manner of his denial seemed oddly casual. Ustich also thought that Mr. Koh's answers were evasive or not forthcoming. Exh. 40, Ustich Dep. Tr. 85:21-86:4; 95:1-5.

The officers also discussed physical evidence from the house, which arguably suggested that Paul's death was a homicide. First, Graf and Ustich learned that investigators had found blood in Mr. and Mrs. Koh's master bathroom. Exh. 40, Ustich Dep. Tr. 95:13-14; Exh. 36, Graf Dep. Tr. 99:19-100:16. To Graf, this suggested that the Kohs had cleaned up the crime scene. Exh. 36, Graf Dep. Tr. 100:10-16. Second, there was a small metal cross and a broken necklace chain covered in blood and lying on the floor. *See* Exh. 40, Ustich Dep. Tr. 95:19-20; *see also* NDSOF ¶ 30; Exh. 28, Wasowicz Dep. Tr. 34:14-36:9; Exh. 29, Wasowicz Aff. ¶ 14; Exh. 29A, Wasowicz Aff. Exh. A at NB 369.[25] The broken necklace suggested that Paul had been attacked and that a struggle had ensued. Third, Graf and Ustich learned that the NORTAF forensic team, who by that time had been able to inspect the house, believed that Paul's death was a homicide, because, in their opinion, Paul would not have been able to inflict the injuries on himself.[26] NB SOF Exh. 46, May 16, 2011 Pretrial Hr'g Tr. 100:13-14, 102:1-5.

There also was some motive evidence that Graf and Ustich learned about during the debriefing sessions. Specifically, Paul and his father had an unusually confrontational relationship. NDSOF ¶ 68; Exh. 46, May 16, 2001 Pretrial Tr. 39:24-

---

[25]The Kohs admit that Officer Wasowicz observed the metal cross covered in blood when he investigated the Kohs' house that morning. *See* Pls.' Resp. NDSOF ¶ 30. The observation does not appear in Officer Wasowicz's contemporaneous field notes, *see* R. 339, Wasowicz Field Notes, NB 171-747, but the fact is undisputed.

[26]The Kohs' experts opine that Paul's death was, in fact, suicide. *See* R. 308-16, Exh. 123, Dr. Laposata Trial Tr. 55:17-22; PSOF Exh. 138, Moses Dep. Tr. 99:21-25. But the question for probable cause is not whether Paul's death was *actually* a suicide; the issue is what information the officers had, and whether they were reasonably entitled to rely on it. In this case, Graf, Ustich, and the other investigators were entitled to rely on the opinions of the NORTAF forensic investigators, even if those opinions turned out to be wrong.

41:15; R. 339, Wasowicz Field Notes, NB 171-747 at NB 746. This information primarily came from Paul's youth pastor, who had told investigators earlier that morning about a written "Family Agreement"[27] and about a recent altercation between Paul and his father. *See* NDSOF ¶ 68; Exh. 46, May 16, 2011 Pretrial Hr'g Tr. 40:23-41:15, 104:24-105:11; R. 286-1, Exh. 49, Koh Family Agreement; R. 285-6, Exh. 47, Garner Aff.; R. 285-7, Exh. 47A, Garner Aff. Exh. A (sealed). Graf and Ustich also learned that Paul had previously been found wandering the neighborhood in the middle of the night after an argument with his father. Exh. 45, May 16, 2001 Pretrial Hr'g Tr. 100-101; Exh. 36, Graf Dep. Tr. 88:6:-89:6.

Finally, Graf and Ustich learned about some apparent inconsistencies in the Kohs' stories. Graf found the evidence of cleanup in the master bathroom suspicious, because it contradicted Mrs. Koh's version of events—during her interview, she stated that neither she nor her husband washed up in the bathroom after finding Paul's body. *See* Exh. 121, Eunsook Koh Interview Tr. at 12; *see also* Exh. 36, Graf Dep. Tr. 99:15-101:2. The detectives also learned that Mrs. Koh had maintained in her interview that she had not moved Paul's body, which was inconsistent with Mr. Koh's statement that they had turned the body over. Exh. 36, Graf Dep. Tr. 41:16-42:7; Exh. 44, Hyung Seok Koh Interview Tr. 23-24. Finally, Graf and Ustich learned that a neighbor had heard a scream from the Kohs' house.

---

[27]One of the "expectations" that Paul had to abide by under the Koh Family Agreement related to Paul's drug usage: "I understand that there is NO tolerance in regards to smoking and drugs in the house. A random drug test will be conducted by my parents." R. 286-1, Exh. 49, Koh Family Agreement. Investigators learned from Paul's friend Neil Schnitzler the morning after Paul died that Paul had smoked marijuana the night before. NDSOF ¶ 71; R. 286-4, Exh. 51, Mazurkiewicz Aff.; R. 286-5, Exh. 51A, Mazurkiewicz Aff. Exh. A.

Exh. 46, May 16, 2011 Pretrial Hr'g Tr. 42:15-19. Mr. Koh had told Graf that he was a light sleeper, so Graf was skeptical that Mr. Koh could have slept through Paul's death. *See id*; *see also* Exh. 44, Hyung Seok Koh Interview Tr. 87.

Taking all of this evidence into account, a jury *must* conclude that there was probable cause to arrest Mr. Koh after the debriefing sessions. To be sure, this is a very close call, particularly when viewed through the lens of summary judgment. But probable cause is too low a bar for Mr. Koh to overcome after the debriefing session. *See Kaley v. United States*, 134 S. Ct. 1090, 1103 (2014) ("Probable cause … is not a high bar."). Probable cause requires nothing more than a "fair probability" on which "reasonable and prudent" people could act. *Kaley*, 134 S. Ct. at 1103. Although the Kohs point out that the officers also had evidence that pointed towards Mr. Koh's innocence—that is, evidence suggesting that Paul might have committed suicide—the existence of some contrary evidence does not defeat probable cause. *See District of Columbia v. Wesby*, 138 S. Ct. 577, 588 (2018) ("probable cause does not require officers to rule out a suspect's innocent explanation for suspicious facts"). The inference of the suspect's guilt need not be the most likely scenario, or even more likely true than not, for a reasonable officer to have probable cause to arrest. *See Gerstein v. Pugh,* 420 U.S. 103, 121 (1975) (contrasting probable cause with the preponderance of evidence and reasonable doubt standards). Nor does it matter that none of the facts Graf and Ustich learned, viewed in isolation, would be enough for probable cause. *See Wesby*, 138 S. Ct. at 588. Probable cause is a holistic, commonsense inquiry, and officers are allowed to

draw reasonable inferences based on their experience and judgment. *United States v. Williams*, 627 F.3d 247, 251 (7th Cir. 2010); *United States v. Bullock*, 632 F.3d 1004, 1022 (7th Cir. 2011). In this case, the officers were entitled to rely on Graf and Ustich's evidence-based suspicions about Mr. Koh's manner and the inconsistencies in the Kohs' stories. Considering these suspicions in combination with substantial physical and motive evidence, the Northbrook officers indisputably had enough information at that point to justify Mr. Koh's detention.

At the very least, qualified immunity would protect the individual defendants against the false arrest claim after the debriefing sessions. Graf and Ustich had "arguable probable cause" for purposes of applying the qualified immunity doctrine. *Abbott v. Sangamon Cty., Ill.*, 705 F.3d 706, 714-15 (7th Cir 2013). In other words, it would have been reasonable—even if mistaken—for an officer to believe that there was probable cause to arrest Mr. Koh based on the information divulged at the debriefing sessions. *See Abbot*, 705 F.3d at 714-15 ("[Q]ualified immunity in [the probable cause] context protects officers who reasonably but mistakenly believe that probable cause exists[.]" (citation omitted)); *see also Fox*, 600 F.3d at 834 (rejecting qualified immunity argument where the officers' theory of the case was "*absolutely unreasonable*"). As the Supreme Court emphasized in *District of Columbia v. Wesby*, existing precedent must place the lawfulness of the particular arrest "beyond debate" in order to defeat qualified immunity. *Wesby*, 138 S. Ct. at 590. In this case, the officers' decision to hold Mr. Koh after their debriefing sessions was at least

arguably supported by probable cause. Qualified immunity therefore mandates dismissal of Mr. Koh's false arrest claim from after the debriefings and onward.

### b. Mrs. Koh

The probable cause inquiry is different for Mrs. Koh, mostly because the Northbrook Defendants unambiguously concede that there was no probable cause to hold her until at least the time of Mr. Koh's inculpatory statements at the end of his second interview. Northbrook Defs.' Mot. Summ. J. at 15 ("[I]t was not until Mr. Koh abandoned the Kohs' initial story, and then appeared to admit that he killed Paul, that probable cause was present."). But, as will be explained below, a reasonable jury could find that Mr. Koh's confession was coerced, and, more importantly, coerced in a way that made the reliability of his statements questionable. *See Hurt v. Wise*, 880 F.3d 831, 841 (7th Cir. 2018) (noting the importance of coercion to the question of a confession's reliability). A reasonable jury could find that Mr. Koh's confession was too unreliable to play a role in the probable cause analysis for Mrs. Koh. So in light of the Defendants' concession, Mrs. Koh's false arrest claim survives from the time of her initial detention until her release from the police station the next day. To be sure, the Defendants might be able to prove at trial that probable cause existed to detain Mrs. Koh at some earlier point in time. But as things stand, the Northbrook Defendants' motion for summary judgment is denied as to Mrs. Koh's false arrest claim.

### c. Officer Kim

Although the Kohs' false arrest claims survive against the Northbrook Defendants, any false arrest claim against Officer Kim must fail. Kim was not on the scene when the Kohs were arrested, and there no evidence that he knew or should have known that they had been arrested without probable cause. Without that knowledge, Kim could not have conspired to further the false arrest. *See Scherer v. Balkema*, 840 F.2d 437, 442 (7th Cir. 1988) (noting that, for a § 1983 conspiracy claim, a plaintiff must establish "an express or implied agreement among defendants to deprive plaintiff of his or her constitutional rights"). Nor can Kim be liable for failure to intervene if he did not know that a false arrest had occurred. *See Gill v. City of Milwaukee*, 85 F.3d 335, 342 (7th Cir. 2017) ("[T]he detectives would not have known a constitutional violation was committed, and therefore, cannot be liable for failure to intervene."). The Wheeling Defendants' motion for summary judgement is granted on the false arrest claim.[28]

### C. Involuntary Confession

Next, the Defendants move for summary judgment on Mr. Koh's coerced confession claim. Mr. Koh advances two versions of the coerced confession claim, one based on the Fifth Amendment right to be free of compelled self-incrimination,

---

[28]As discussed in Part III.A above, the Northbrook Defendants have not made clear which of them should be off the hook for which conspiracy and failure to intervene claims, so summary judgment is not granted to any of them on this claim. The Court does have significant questions about whether any of the Defendants except Meents, Johnson, Eisen, and possibly Celia could be liable for the initial false arrest, and about when the responsibility of those initial arresting officers must cut off. There are also individual defendants who do not seem to have been involved in the false arrest and detention in any way. But again, Northbrook has not made these arguments.

the other a substantive due process claim based on "conscience-shocking" police conduct. The substantive due process claim is readily rejected. As the Seventh Circuit recently noted, the bar for "conscience-shocking" conduct is extraordinarily high. *Hurt v. Wise*, 880 F.3d 831, 844 (7th Cir. 2018). What's more, "[w]hen there is an alleged violation of a specific constitutional provision, that provision should guide the court's analysis." *Id.* (citing *City of Sacramento v. Lewis*, 523 U.S. 833, 842 (1998)). In this case the *specific* alleged constitutional violation—the Fifth Amendment claim—precludes reliance on the more *general* substantive due process claim.

Moving on, the use of a coerced confession in a criminal proceeding violates the Fifth Amendment's guarantee against compelled self-incrimination. *Miller v. Fenton*, 474 U.S. 104, 109-10 (1985); *Sornberger*, 434 F.3d at 1023-1027. A confession does not run afoul of the Fifth Amendment if, based on the totality of the circumstances, the confession was "free and voluntary," and "not [ ] extracted by any sort of threat or violence or obtained by any direct or implied promises however slight nor by the exertion of any improper influence." *Howell v. United States*, 442 F.2d 265, 272 (7th Cir. 1971) (citing *Malloy v. Hogan*, 378 U.S. 1, 7 (1964)); *see also Arizona v. Fulminante*, 499 U.S. 279, 285-86 (1991). This standard requires the Court to determine, after examining the totality of the circumstances, whether "[the suspect's] will was overborne in such a way as to render his confession the product of coercion." *Fulminante,* 499 U.S. at 288; *see also Hicks v. Hepp*, 871 F.3d 513, 527 (7th Cir. 2017) (citing *Schneckloth v. Bustamonte*, 412 U.S. 218, 227 (1973)). The

issue of coercion is determined from the perspective of a reasonable person in the position of the suspect. *Hicks*, 871 F.3d at 527. The characteristics of the suspect, the conditions of the interrogation, and the conduct of the interrogator are all part of the totality of the circumstances inquiry. *United States v. Brooks*, 125 F.3d 484, 492 (7th Cir. 1997). Relevant considerations include the suspect's age, intelligence and mental state; the length of the detention; the nature of the interrogations; whether the suspect received *Miranda* warnings; whether physical coercion occurred; and the deprivation of food or sleep. *Id.* The voluntariness of a confession must be analyzed based on the totality of the circumstances. *Hicks*, 871 F.3d at 527.

With those standards in mind, the Court turns to the circumstances surrounding Mr. Koh's confession. Officers Graf and Ustich interviewed Mr. Koh for a combined total of about 2½ hours the morning after Paul died. *See* NDSOF ¶¶ 52, 78; Exh. 42, Video of Hyung Seok Koh Interview 1; Exh. 55, Video of Hyung Seok Koh Interview 2; Exh. 57, Video of Hyung Seok Koh Interview 3. Mr. Koh had not taken his medications for blood pressure, diabetes, and hyperammonemia since the day before (despite having asked Detective Graf for them), *see* PSOF ¶ 20; Pls.' Resp. WDSOF ¶ 32; Exh. 85, Mar. 16, 2010 Pretrial Hr'g Tr. 14:3-15:12; *but see* WDSOF ¶ 32; Exh. 39, Kim Dep. Tr. 131:4-22, nor had he recently eaten[29] or slept, PSOF ¶ 29; Exh. 17, Hyung Seok Koh Dep. Tr. 354:22-355:8. By the start of the second interview, Mr. Koh had been held at the police station for almost eight hours, unable to call anyone and isolated from anyone other than his wife (who was

_____

[29]It is undisputed, however, that before Mr. Koh's *second* interview, Detective Graf offered him food, coffee, and water. NDSOF ¶ 80; R. 285-3, Exh. 44, Hyung Seok Koh Interview Tr. 58.

also under arrest) and the police. PSOF ¶¶ 7, 10-12, 24; Northbrook Defs.' Resp. PSOF ¶ 11; NDSOF ¶ 37; Exh. 79, Nov. 13, 2009 Pretrial Hr'g Tr. 59:3-9 (sealed); Exh. 82, Mar. 22, 2010 Pretrial Hr'g Tr. 17:20-18:8 (sealed); Exh. 48, Hwang Dep. Tr. 102:17-103:7 (sealed). Throughout the interviews, Mr. Koh displayed signs of mental and physical exhaustion: he sat hunched over in his chair, occasionally hitting himself on the head and chest.[30] Exh. 55, Video of Hyung Seok Koh Interview 2 44:03, 55:20-1:09:53; Exh. 57, Video of Hyung Seok Koh Interview 3 00:03:15-00:03:20, 00:10:50-00:10:52, 00:12:18-00:12:20; *see also* PSOF ¶ 32.

Mr. Koh also had difficulty understanding Detective Graf's questions. Many of Mr. Koh's answers were altogether nonsensical, showing (or so a reasonable jury could find) that he did not understand what was going on. For example, Mr. Koh responded to Graf's question about what kind of person Paul was by narrating what happened yesterday morning. Exh. 44, Hyung Seok Koh Interview Tr. 3-4. At another point in the interview, Koh answered a question about whether he saw a weapon by telling Graf about the tools he kept for his vending machine business. *Id.* at 36. During one tense moment, Graf asked Mr. Koh "Would God want Paul to [ ] have his father sitting here and telling us a story that's not true?"—a question that should obviously have been answered "no"—but Mr. Koh said "yeah." *Id.* at 123. As the interview went on, Mr. Koh largely defaulted to giving one word or unintelligible answers, or responding that he did not know or could not remember,

---

[30]Mr. Koh's attorney also observed that upon entering the interview room, he found Mr. Koh disoriented, disheveled, and tired. PSOF ¶ 43; R. 308-41, Exh. 148, Shim Dep. Tr. 69:4-16.

*see, e.g.*, *Id.* at 108, 110-114, 116-119, 124, 126-135, 138-143.[31] The language barrier was obvious.[32] Graf exacerbated the problem by abruptly switching back and forth between topics, which further confused Mr. Koh. *See, e.g., id.* at 5-6, 68-70, 132-135, 135-137. Officer Kim, for his part, provided little translation assistance to Mr. Koh throughout the entirety of the interviews. Officer Kim's lack of assistance even prompted Mr. Koh to plead with Detective Graf, "I need this interpreter over here." *Id.* at 103.

What's more, the Kohs assert that what language assistance Officer Kim did provide made the circumstances even more coercive. For example, when translating the *Miranda* warnings into Korean, "Officer Kim did not advise Mr. Koh that his statements may be used against him, or that Mr. Koh had a right to an attorney if he could not afford one." PSOF ¶¶ 103-104; *see also* Pls.' Resp. WDSOF ¶ 36. And in fact, the Kohs argue, Officer Kim actually "advised Mr. Koh that he did *not* need a lawyer."[33] PSOF ¶ 105 (emphasis added). Likewise, Kim mistranslated a Korean idiom—"*gachi jookja*"—that Mr. Koh used when talking about his relationship with

---

[31]For example: "Q. Tell us what happened. / A. I can't I can't remember that one." "Q. Did he come after you? Did he have a knife, did he have a knife, did he have a knife and come after you? / A. No." "Q. Hyungseok, who had the knife? / A. I don't know." Exh. 44, Koh Interview Tr. at 132-33.

[32]Nevertheless, Detective Graf accused Mr. Koh of lying about his inability to understand questions posed to him throughout the interview. *See* R. 285-3, Exh. 44, Hyung Seok Koh Interview Tr. 106, 117-18, 132; *see also* PSOF ¶ 36; Northbrook Defs.' Resp. PSOF ¶ 36.

[33]The Wheeling Defendants assert that "there is no Section 1983 cause of action available to Mr. Koh for any actual failure to inform Mr. Koh of his *Miranda* rights." R. 330, Wheeling Defs.' Reply Br. at 4. But Mr. Koh is not asserting that Officer Kim violated his constitutional rights on the basis that Officer Kim failed to properly translate the *Miranda* warnings. Rather, he is asserting that Officer Kim's mistranslation of *Miranda* is a relevant consideration in determining whether his confession was voluntary, which it is. *See Brooks*, 125 F.3d at 492.

Paul. PSOF ¶¶ 115-118. Though Kim provided Graf a literal translation of the phrase—literally, "let's die together"—Kim did not explain that the phrase was in fact an idiom, not to be taken literally (like the English phrase "you're killing me"). *Id.* ¶¶ 117-118. *See also* Exh. 44, Hyung Seok Koh Interview Tr. at 62-63; R. 276-3, Exh. 106, Yoon Dep. Tr. 48:6-49:12, 54:12-57:8. Towards the end of the interview, Officer Kim even joined in the interrogation by asking his own questions in English. Exh. 57, Video of Hyung Seok Koh Interview 3 00:18:28-00:19:27.

Finally, there were instances where Officer Kim would translate (or mistranslate) some, but not all, of Mr. Koh's statements, or interject in Korean with questions of his own. *See, e.g.*, Exh. 42, Video of Hyung Seok Koh Interview 1 00:00:21-00:02:24; Exh. 57, Video of Hyung Seok Koh Interview 3 00:10:21-00:10:25, 00:12:24-00:12:36, 00:18:28-00:18:40. For example, during a key exchange, Graf tried to get Mr. Koh to admit that he had stabbed Paul in self-defense. At the same time, Kim started asking Mr. Koh questions in Korean, partially but not exactly translating Graf's words. *See* R. 308-73, Exh. 180, Yoon Report at 5; Exh. 57, Video of Hyung Seok Koh Interview 3 00:12:00-000:12:42. At the crucial moment, Graf and Kim asked overlapping questions: Graf asked in English whether Mr. Koh was angry, and before Mr. Koh could answer, Kim asked in Korean whether Mr. Koh acted in self-defense. Exh. 180, Yoon Report at 5. Mr. Koh said "I think so," leading Kim proclaim that "He said it was in defense"—even though Kim had not actually translated Graf's question about whether Mr. Koh was angry, so it was not clear

which question Mr. Koh was answering. *See Id*. at 5; Exh. 44, Hyung Seok Koh Interview Tr. 136; Exh. 180, Yoon Report at 5; *see also* PSOF ¶ 119.

In addition to considering Mr. Koh's characteristics and the conditions of the interrogation, the interrogators' conduct is also relevant to the voluntariness inquiry. As soon as the second interview began, Graf continually accused Mr. Koh of lying and directed Mr. Koh to be "totally honest" in order "to get closure for [Paul]." *See* NDSOF ¶ 81; Pls.' Resp. NDSOF ¶ 81; Exh. 44, Hyung Seok Koh Interview Tr. 59-60; *id*. 97, 101 (Detective Graf accusing Mr. Koh of lying because "there [was] a lot of stuff … not adding up. … There had to be, there had to be a struggle, okay"). Graf also introduced new storylines in the second interview, which he pressured Mr. Koh to adopt. *See, e.g.*, Exh. 44, Hyung Seok Koh Interview Tr. 97, 101-107 (pressing Mr. Koh to admit that he was angry Paul had gone out with his friends the night before and stayed up waiting for Paul to come home); *id*. 108 (Graf stating that he knew Mr. Koh had called Paul the night before and stayed up waiting for Paul to come home); *id*. 135 (Graf presents Mr. Koh with the story line that he had killed his son in self-defense). Graf implied that all of the evidence—both physical evidence and Mrs. Koh's statements during her interview—implicated Mr. Koh as Paul's killer, *see* Exh. 44, Hyung Seok Koh Interview Tr. 120 ("Listen to me, we know what happened. … We know, okay. And we want you to tell us what happened. We need it with your words. … Okay, cause we know and … other people have told us what happened. We've talked to your wife, we know what happened, okay."); *id*. 125 ("You know what happened last night, okay. And we, we know what

happened last night, Hyungseok, we know. We're … gathering all the evidence at the station, okay."); *id.* 127 ("And only you can do that because everybody else is telling us stuff right now so let's get to it."); *id.* ("We know more than you think we know okay.").

It is important too that Detective Graf used coercive mental and physical tactics throughout the interviews. He raised his voice, yelled at Mr. Koh, approached Mr. Koh, and occasionally touched Mr. Koh on his arms and legs. PSOF ¶ 33; Northbrook Defs.' Resp. PSOF ¶ 33; NDSOF ¶¶ 85, 92; Pls.' Resp. NDSOF ¶ 92; Exh. 44, Hyung Seok Koh Interview Tr. 103; Exh. 55, Video of Hyung Seok Koh Interview 2 00:55:20-01:09:53. (It is also worth noting that Officer Kim's gun was visible throughout the entirety Mr. Koh's interviews. NDSOF ¶ 97; WDSOF ¶ 9.) Detective Graf implicitly threatened that the interview would not end until Mr. Koh confessed, telling him that they could be there "for days and days and days" in order to get "the whole truth." Exh. 44, Hyung Seok Koh Interview Tr. 117; *see also* PSOF ¶ 37; Northbrook Defs.' Resp. PSOF ¶ 37. When Mr. Koh resisted the officer's version of events, Detective Graf would say things like, "And you're not telling the truth. You're not telling me the truth. God wants this to be right for Paul. And Paul wants you to do this." Exh. 44, Hyung Seok Koh Interview Tr. 123; *id.* 126-127; *see also* PSOF ¶ 34; Northbrook Defs.' Resp. PSOF ¶ 34. Graf absolutely refused to accept any of Mr. Koh's denials, asking questions over and over until Mr. Koh finally agreed to Graf's story. *See, e.g.*, Exh. 44, Hyung Seok Koh Interview Tr. 34-35, 39-40, 102-103, 109-118, 124 ("Q: Tell us the truth. Tell us the

truth. / A: My memory is -- / Q: No, your memory is good … You just don't … you don't want to--"), 127-128 ("Q: But did you get in the car and drive to go look for him? … / A. I don't know. / Q: Hyungseok, you're, you're telling stories now. You're not telling me the truth. / A: No, I, I-- … / Q: No, you're not. You would know if you went to the car and looked for him."), 132-145 ("A: Maybe. / Q: Not maybe. What happened?"). Detective Graf also ramped up the coercive tactics as soon as he learned that Mr. Koh's attorney was at the police station.[34] PSOF ¶¶ 42-43; Exh. 44, Hyung Seok Koh Interview Tr. 144 ("Hyung Seok, come on. Right now, let's be done, hurry up, fast!").

Based on all of this evidence, a reasonable jury could infer that Mr. Koh's "will was overborne so as to render his confession the product of coercion." *Fulminante,* 499 U.S. at 288. The combined effect of Mr. Koh's vulnerabilities, the language barrier, the coercive atmosphere in the interrogation room, Detective Graf's interrogation tactics, and Officer Kim's deficient performance as translator is enough for a jury to find that Mr. Koh's confession was involuntary. Indeed, courts have recognized that circumstances like those under which Mr. Koh confessed may render a confession involuntary. *See Haynes v. Washington*, 373 U.S. 503, 504, 514-15 (1963) (confession involuntary where the suspect was not given Miranda warnings, was held incommunicado for 16 hours, and was told he could not call his wife until he signed a confession); *Carrion v. Butler*, 835 F.3d 764, 776 (7th Cir.

---

[34]It is true that "the law permits the police to pressure and cajole, conceal material facts, and actively mislead—all up to limits … ." *United States v. Rutledge*, 900 F.2d 1127, 1131 (7th Cir. 1990). But here, Detective Graf's tactics—which included badgering Mr. Koh, pressuring him to confess, lying to him, and manipulating him—exceeded those limits, especially given all the other circumstances surrounding the confession, as discussed above.

2016) (observing that "evidence that Detective Delgadillo, in acting as translator, manipulated or mistranslated the prosecutor's questions or Mr. Carrion's answers is relevant to the extent that it demonstrates coercive conduct"); *Aleman v. Vill. of Hanover Park*, 662 F.3d 897, 906 (7th Cir. 2011) (reversing dismissal of involuntary confession claim where the defendant "forced on [the suspect] a premise that led inexorably to the conclusion that he must have been responsible for Joshua's death; the lie if believed foreclosed any other conclusion"); *Andersen v. Thieret*, 903 F.2d 526, 530 (7th Cir. 1990) (reasoning that "[f]ood, sleep, and water deprivation and a mentally coercive interrogation would also have caused the state courts to conclude that [a] confession was involuntary" (citations omitted)); *United States v. Short*, 790 F.2d 464, 469 (6th Cir. 1986) (finding that "[t]here is a serious question whether Short's second confession was knowing and intelligent": "Short's English was broken and her understanding of English deficient. … [S]he was separated from her children and subjected to an interrogation in English, even though one of the agents spoke some German"); *United States v. Preston*, 751 F.3d 1008, 1027-28 (9th Cir. 2014) (repetitive questioning, threats to continue interrogation indefinitely, pressure to adopt certain responses, use of two incriminating alternative questions, and false promises to an intellectually disabled suspect rendered a confession involuntary); *cf. Nazarova v. I.N.S.*, 171 F.3d 478, 484 (7th Cir. 1999) ("A non-English-speaking alien has a due process right to an interpreter at her deportation hearing because, absent an interpreter, a non-English speaker's ability to participate in the hearing and her due process right to a meaningful opportunity to

be heard are essentially meaningless.").[35] Viewing all of the evidence and all reasonable inferences in the Kohs' favor, there is a genuine issue of material fact as to whether the circumstances surrounding Mr. Koh's interviews, including the interrogation tactics employed by the Defendants, led to an involuntary confession.[36]

These circumstances also make clear that the interrogators are not entitled to qualified immunity. A reasonable officer would have known that verbally and physically intimidating a suspect, as well as manipulating him, lying to him, and coaching him on the details of the confession, all while knowing he was not fluent in English and was operating without food, medications, or sleep, violates the Fifth Amendment. And a reasonable officer assigned to interpret for that suspect would

---

[35]*See also, e.g., Grayson v. City of Aurora*, 157 F. Supp. 3d 725, 741-42 (N.D. Ill. 2016) (denying summary judgment on plaintiff's involuntary confession claim where plaintiff was "'starving,'" "kept from sleeping," did not "understand statements the same way an average person would," and had "a mental breakdown at one point"; the interrogation room was "hot and uncomfortable"; and the officers "lied to [the plaintiff] about evidence implicating him, manipulated him … and fed him details of the crime"); *Hill v. City of Chi.*, 2009 WL 174994, at *8 (N.D. Ill. Jan. 26, 2009) (concluding that "coercing a confession by abusive language and physical contact, along with coaching the suspect as to the details of the confession, clearly violates the suspect's constitutional right against self-incrimination"); *United States v. Campos*, 201 F.Supp.3d 1083, 1089-90 (N.D. Cal. 2016) (finding a confession involuntary where "confusion reigned" during the interview due to overlapping questioning in two languages and incomplete translations; and where officers continually interrupted and rejected the suspect's denials and falsely insisted that irrefutable evidence established his guilt).

[36]There is also enough evidence for a jury to find against both Kim and Ustich on Mr. Koh's conspiracy claim, as well as sufficient evidence for a jury to find that Kim and Ustich failed to intervene while Detective Graf coerced Mr. Koh into confessing. (Given that Detective Graf was the lead interrogator, a failure to intervene claim against him does not make sense.) So even if Kim and Ustich are not directly liable for participating in Mr. Koh's interrogation—though each did ask Mr. Koh their own questions, *see* Exh. 42, Video of Hyung Seok Koh Interview 1 00:44:50-00:55:01; Exh. 57, Video of Hyung Seok Koh Interview 3 at 00:18:28-00:19:27—they are liable for either conspiracy or failure to intervene.

have recognized that manipulating his deficient understanding of English, mistranslating the *Miranda* warnings, and altogether refusing to provide translation assistance, likewise violates the Constitution.

The Seventh Circuit's recent opinion in *Hurt v. Wise* is helpful here. In *Hurt*, the Seventh Circuit held that interrogating officers were not entitled to qualified immunity when they extracted a confession using tactics strikingly similar to Graf's. *Hurt*, 880 F.3d at 848. Like Graf, the interrogators in *Hurt* threatened to extend the plaintiffs' interrogations until they gave the "right" answer (where "right" meant "inculpatory"). 880 F.3d at 847-48. Also like Graf, the officers in *Hurt* "basically drafted the entire confession" by feeding the plaintiffs "every critical fact" and refusing to accept their denials until they finally agreed to the version proposed by the interrogators. *Id*. And, like Graf, the officers applied interrogation tactics designed to increase psychological pressure to confess, such as minimizing moral guilt to prime the plaintiffs for a confession, and telling one plaintiff that her co-defendant had already implicated her. *Id*. at 848.

The defendants attempt to distinguish *Hurt* on the grounds that the interrogators in *Hurt* "made obviously prohibited threats of lengthy prison sentences and untimely death, and that a suspect's entire family would be imprisoned if she did not confess." R. 380, Defs.' Resp. to Pl.'s Supp. Authority at 3, discussing *Hurt*, 880 F.3d at 848. But the cases are not so different, because threats were also made to Mr. Koh. *Hurt* noted the interrogator's threat that the pain of the coercive interrogation would continue until the suspect confessed. *Hurt*, 880 F.3d at

848 (quoting the investigator as saying that "none of the pain was 'going to go away until you tell me the truth.'"). Similarly, Graf told Koh (who by that point was visibly distressed and confused) that if he did not tell "the truth," his interrogation could continue for "days and days and days." Exh. 44, Hyung Seok Koh Interview Tr. at 117. Given Graf's refusal to take "I don't know" for an answer up to that point, Mr. Koh would have understood "the truth" to mean "what Graf wanted to hear." *Cf. Hurt*, 880 F.3d 831 ("[The interrogator] made it clear to [the suspect] that he and [his partner] were the ones who would decide if [the suspect] told the 'right' story."). Graf also made a comment about Mr. Koh's race, asking "Are you Korean or Filipino or Chinese" in a way that Mr. Koh found inappropriate and threatening. Exh. 17, Hyung Seok Koh Dep. Tr. 425:10-12. Finally, a jury might even find Graf's repeated physical touches and his close proximity to Mr. Koh to be an implied threat of physical violence. *See, e.g.*, Exh. 44, Hyung Seok Koh Interview Tr. 103; Exh. 55, Video of Hyung Seok Koh Interview 2 00:55:20-01:09:53.

But even assuming that Mr. Koh was not threatened with physical violence, the facts of this case are arguably *worse* than the facts of *Hurt*. Unlike the plaintiffs in *Hurt*, Mr. Koh had obvious difficulties understanding English—a vulnerability that, taking the facts in the light most favorable to the Kohs, Graf and Kim exploited. A reasonable jury could conclude that Graf *knew* that he was pressuring Mr. Koh to agree with statements that he did not fully understand.[37] A reasonable

_____

[37]Mr. Koh's confusion was obvious at crucial points in the interview. For example, when Graf had ostensibly gotten Mr. Koh to admit that he killed Paul in self-defense, follow-up questions made it clear that Mr. Koh might have been talking about a completely different incident. Apparently, a few weeks before Paul's death, Paul had swung a golf club

jury could likewise conclude that Graf knowingly exploited Mr. Koh's mental and physical vulnerabilities. Mr. Koh had not taken his daily medications, and the Kohs' expert testified that the absence of these medications could cause confusion. *See* R. 290-2, Exh. 94, Galatzer-Levy July 27, 2011 Pretrial Testimony at 36:22-38:6; *see also* Exh. 17, Hyung Seok Koh Dep. Tr. 359:3-9 (Mr. Koh's testimony that without his medications, he experiences fatigue, shakiness, and confusion). According to Mr. Koh, as Graf was escorting Mr. Koh to a court hearing, Graf again threatened to extend the coercive interrogation if Mr. Koh did not play along: "If you say in the presence of the judge that you are either sick or dizzy, then we will take a week or even two to [ ] investigate you, so don't do that." Exh. 17, Hyung Seok Koh Dep. Tr. 425:13-17. It would be reasonable to infer from this comment that Graf knew that Mr. Koh was mentally and physically vulnerable at the time of the interrogation and that he exploited those vulnerabilities with aggressive tactics. In sum, there is evidence that Mr. Koh was even more vulnerable to coercion than even the young plaintiffs in *Hurt*, and that Graf's coercive tactics were correspondingly less reasonable. *See United States v. Sablotny*, 21 F.3d 747, 752 (7th Cir. 1994) ("If mental impairment of whatever kind should have reasonably been apparent to the interrogators, special care should have been exercised, and a lesser quantum of coercion would render the confession involuntary."); *Dassey v. Dittman*, 877 F.3d 297, 304 (7th Cir. 2017) ("The interaction between the suspect's vulnerabilities and

---

at Mr. Koh, and this might have been what Mr. Koh was talking about during the self-defense back-and-forth. Exh. 44, Hyung Seok Koh Interview Tr. 136-37 ("Q: Tell me why you did it, Hyungseok. / A: Weeks, weeks ago. / Q: Weeks ago? / A: He golf-- / Q: He took a golf club? / A: (inaudible) / Q: He hit you with a golf club? / A: Yeah.").

the police tactics may signal coercion even in the absence of physical coercion or threats."). These facts and circumstances show that Detective Graf was intent on coercing a confession out of Mr. Koh. Officer Kim is on the hook too: his shared knowledge of those facts and circumstances undermines his qualified immunity defense as well. Neither Detective Graf nor Officer Kim is entitled to qualified immunity, so Mr. Koh's involuntary confession claim must go to trial.[38]

### D. Evidence Fabrication

Next up is another due process claim, this time based on the Northbrook Defendants' alleged fabrication of evidence.[39] The Due Process Clause of the

---

[38]The Northbrook Defendants make two additional arguments that they assert warrant applying qualified immunity. First, they point to the fact that the state court judge in Mr. Koh's criminal case already determined that Mr. Koh's statements were voluntary. *See* Northbrook Defs.' Br. at 22-24. Second, they argue that the state court judge's decision to admit the confession is an "independent, superseding cause of any alleged violation of Mr. Koh's [constitutional] rights … ." *Id.* at 24-25. The first argument fails. It is unclear whether the state court judge considered the same evidence at the suppression hearing that is currently before this Court on the Kohs' involuntary confession claim. And even if the state court judge had considered the same evidence, the evidentiary picture would have been different due to the procedural posture of this case. On a motion for summary judgment, the Court is *required* to credit the non-moving party's evidence and make all reasonable inferences in their favor. The state court judge, on the other hand, was free to make credibility judgments, weigh the evidence, and find facts, and did so. *See, e.g.,* R. 291-2, Exh. 97, J. Howard Oral Ruling on Mot. Suppress at 3:12-13 (describing the tenor of Mr. Koh's interview as "low-key and very cordial"), 3:19-24 (finding that Mr. Koh had "a very good command of the English language"), 4:21-24 (finding the Kohs' expert witness unpersuasive). The second argument fails too—"qualified immunity is a doctrine designed to respond to legal uncertainty, but causation (a factual matter) has nothing to do with *legal* uncertainty." *Dominguez v. Hendley*, 545 F.3d 585, 589 (7th Cir. 2008) (emphasis in original).

[39]In the Second Amended Complaint, the Kohs alleged that "[a]t the conclusion of the interrogation, the Defendant Officers fabricated a statement and falsely attributed it to Plaintiff, and then communicated the same to members of the Cook County State's Attorney's Office orally and in writing. Defendant Graf also testified falsely on this subject before the Grand Jury." Second Am. Compl. ¶ 40. The Northbrook Defendants did not specifically move for summary judgment on the Kohs' fabrication of evidence claim, and indeed maintain that those allegations are insufficient to advance such a claim. *See* Northbrook Defs.' Mot. Summ. J.; Northbrook Defs.' Br.; Northbrook Defs.' Reply Br. at 4-5.

Fourteenth Amendment forbids the state from depriving a person of her liberty on the basis of manufactured evidence. *Whitlock v. Brueggemann*, 682 F.3d 567, 580 (7th Cir. 2012); *Hurt*, 880 F.3d at 843 (*citing Avery v. City of Milwaukee*, 847 F.3d 433, 439 (7th Cir. 2017); *Alexander v. McKinney*, 692 F.3d 553, 557 (7th Cir. 2012)). False police reports can give rise to an evidence fabrication claim, as can procurement of false or fabricated witness testimony. *See Hurt*, 880 F.3d at 843-44; *Petty v. City of Chi.*, 754 F.3d 416, 422 (7th Cir. 2014). Mr. Koh has three different evidence fabrication theories. First, he argues that Graf and Kim prepared false police reports, which were then used as a basis for charging and detaining Mr. Koh. Pls.' Resp. Br. at 51-52. Second, he asserts that Graf invented incriminating statements and falsely attributed them to Paul Koh's youth pastor, Joon Hwang. *Id.* at 52. Third, he alleges that Graf induced Paul's friend Neil Schnitzler to give false testimony. *Id.* at 52-53.

Mr. Koh's first theory falls short. The Seventh Circuit has drawn a distinction between coerced testimony (which might be true, even if coerced) and false or fabricated testimony, "which is known to be untrue by the witness and whoever cajoled or coerced the witness to give it." *Fields v. Wharrie*, 740 F.3d 1107, 1110 (7th Cir. 2014). In this case, there is ample evidence that Graf and Kim *coerced* Mr. Koh's confession, but there is not enough evidence for a reasonable jury

---

But those allegations are enough to plausibly allege a fabrication-of-evidence claim and to place the Defendants on notice that the Kohs were making that claim. What's more, discovery in this case would have been no different with or without these specific fabrication-of-evidence allegations. So, the claim is in.

to find that Graf and Kim *knew* that the coerced confession was false.[40] Koh argues that Graf and Kim lied in their police reports recounting Mr. Koh's interrogation. *See* Pls.' Resp. Br. at 51-52. But this is not the case; the things Graf and Kim related in their reports were true, as a literal matter. Mr. Koh *did* eventually adopt the details proposed by Graf and recounted in the police reports, and he *did* make a hand gesture demonstrating cutting someone's throat in response to Graf's questions about how he killed Paul. *See* Video of Hyung Seok Koh Interview 3 18:40-20:09. Similarly, Kim did give Mr. Koh Miranda warnings (though with some translation errors), and Mr. Koh did say "kachi jookja,"[41] which literally translates to "Let's die together." *See* Exh. 106, Yoon Dep. 56:11-57:8; 57:13-58:16. It is true that these reports could have been more detailed, and that if they had been more detailed they would have presented a fairer picture of the interrogation. But the Constitution does not guarantee perfectly fair police reports (or perfectly accurate translations). To be sure, there must be some point where omissions become egregious enough to render a police report effectively false.[42] But in this case, the

---

[40]If Mr. Koh is arguing that the confession's falsity was obvious because of the coercive nature of the interrogation, that line of argument is foreclosed by Seventh Circuit precedent. In *Petty v. City of Chicago*, the plaintiff alleged that police officers coerced a witness into giving false evidence by holding the witness in a locked room without food, water, or bathroom access for over 13 hours, and badgering and pressuring the witness until he incriminated the plaintiff. 754 F.3d at 417-18, 423. The Seventh Circuit held that even this extreme coercion was not enough to demonstrate that the witness's testimony was fabricated evidence. *Id.* at 423. *Petty* makes it clear that a claim that officers fabricated false statements cannot rest on the coercive nature of an interrogation alone. So the fact that Graf and Kim reported a coerced confession is not, on its own, enough to make out an evidence fabrication claim.

[41]This phrase is sometimes rendered as "gachi jookja," *see, e.g.*, Yoon Dep. Tr. 48:6-49:12, 54:12-57:8, but the meaning is the same.

[42]For example, in *Hurt*, a suspect told police that he had dumped a body in the river, then stopped at a convenience store to buy snacks. 800 F.3d at 837. A police officer

omissions in Graf's and Kim's police reports were not so misleading as to give rise to an inference that Graf and Kim were deliberately falsifying evidence in order to mislead the prosecutors.[43] Indeed, Graf's report explicitly states that its account of Koh's statements is "summary, not verbatim," and notes that the interrogation could be viewed in full on videotape. R. 308-46, Exh. 153, Graf Post-Interrogation Police Report. At the very least, qualified immunity would protect Graf and Kim on this facts.

Mr. Koh's next argument is that Graf fabricated a statement from Paul Koh's youth pastor, Joon Hwang. *See* Pls.' Resp. Br. at 51-52. Hwang was interviewed by two non-defendant police officers on the morning of April 16, 2009. Exh. 47, Garner Aff. ¶ 5. According to the officers' report of the interview, Hwang stated that Mrs. Koh told him that "maybe Paul was afraid that his father would not respect his

---

interviewed the convenience store clerk who was working that night, and prepared a police report stating that a store clerk had identified two of the suspects in a photo array. *Id.* at 838. The report neglected to mention "the most important details"—namely, that the clerk had told the officer that she did *not* remember the suspects coming into the store on the night in question, and that she might have recognized their faces from watching the news. *Id.* On these facts, the Seventh Circuit held that the plaintiffs had a valid evidence fabrication claim against the police officer who prepared the report. *Id.* at 844. That officer's report, although literally true, was so misleading as to be effectively false. *See also Jones v. City of Chi.*, 856 F.2d 985, 993 (7th Cir. 1998) (finding a constitutional violation where a jury could find that "the defendants systematically concealed from the prosecutors, and misrepresented to them, facts highly material to—that is, facts likely to influence—the decision whether to prosecute [the plaintiff] and whether (that decision having been made) to continue prosecuting him").

[43]That makes this case different from *Jones*, where a forensic examiner's omission of relevant evidence was clearly designed to mislead prosecutors. In *Jones*, a police laboratory technician discovered physical evidence that would have exonerated the defendant, but omitted this information from her lab report. *Jones*, 856 F.2d at 991. On these facts, "[t]he jury was entitled to conclude that [the technician] … had for whatever reason decided to help the officers … who were determined to put away [the defendant] regardless of the evidence." *Id.* at 993. In contrast, Graf and Kim's actions are not so inexplicable that a jury could reasonably conclude that they were trying to obfuscate the truth and further a false prosecution.

privacy, *or perhaps feared his father*." Exh. 47, NORTAF Interview Report at 2 (emphasis added). Graf then told ASA Albanese, who was conducting the felony review of the case, that Hwang said that Paul Koh feared his father.[44] PSOF ¶ 67; *see also* Exh. 157, Felony Review Folder (reporting that Paul "made an outcry to a youth minister [ ] that he was scared of his father"). Hwang now denies that he ever told police that Paul was afraid of Mr. Koh, *see* Exh. 48, Hwang Dep. Tr. 173:5-74:23 (sealed). But even assuming (as the Court must) that Hwang is telling the truth, Mr. Koh's claim fails. The two officers who interviewed Hwang are not defendants in this case, and there is no evidence at all that Graf or any other defendant knew that the interviewing officers' account of Hwang's interview was false. So none of the Defendants is on the hook for the alleged falsehoods about Hwang's testimony.

Mr. Koh's last theory is that Graf fabricated testimony by encouraging Paul Koh's friend Neil Schnitzler to make false statements that incriminated Mr. Koh. *See* Pls.' Resp. Br. at 52-53. In the course of the investigation into Paul's death, Schnitzler gave three different statements to the police, each with slightly different details.[45] See PSOF ¶¶ 68-69. Most importantly, in Schnitzler's third statement, Schnitzler told Graf that he had accidentally called the Kohs' home on the night of Paul's death (intending to call Paul's cell), and told whoever picked up the phone "I

---

[44]The Northbrook defendants dispute this, *see* Northbrook Defs.' Resp. PSOF ¶ 67, but the dispute does not matter. The Kohs' argument fails even if the Court accepts their version of events.

[45]Schnitzler's first statement to the police was late morning on the day of Paul's death, April 16, 2009. *See* NDSOF Exh. 75, Schnitzler Dep. Tr. 186:6-187:5. Schnitzler's next statement was given on May 2, 2009, after he was arrested for possession of marijuana. *See id.* at 199:20-200:3. Schnitzler's last statement was made during a phone call with Detective Graf on May 27, 2009. *See id.* at 216:10-20.

got the stuff, meet back at my house." R. 287-17, Exh. 75, Schnitzler Dep. Tr. 219:13-20. This testimony was important because it supported the police officers' theory that Paul had been out doing drugs on the night of his death, and that Mr. Koh knew about it and became angry at Paul. *See* PSOF ¶ 70.

Unfortunately for the Kohs, there is no evidence at all that Graf or any other officer falsified Schnitzler's testimony. Schnitzler affirms that he made this statement, and his story is backed up by the Kohs' home phone records, which showed a call from Schnitzler's number on the night in question. *See* Exh. 75, Schnitzler Dep. Tr. 219:13; 218:8-9; *see also* PSOF ¶ 69. The Kohs assert that Graf got Schnitzler to lie in exchange for lenience in Schnitzler's criminal drug case. *See* PSOF ¶¶ 69-70; Pls.' Resp. Br. at 52-53. But there is no actual *evidence* to back up this assertion, only unsupported innuendo. *See Delapaz v. Richardson*, 634 F.3d 895, 901 (7th Cir. 2011) ("conjecture alone cannot defeat a summary judgment motion") (citation omitted). None of Mr. Koh's theories of evidence fabrication hold up, so summary judgment is granted on the evidence fabrication claim.

### E. Malicious Prosecution and Pretrial Detention

The Kohs believe that the Defendants maliciously prosecuted Mr. Koh, and that Mr. Koh was detained without probable cause in the time leading up to his criminal trial in violation of the Fourth Amendment. The Fourth Amendment claim stems from the Supreme Court's recent decision in *Manuel v. City of Joliet*, which held that the Fourth Amendment prohibits detention without probable cause even

after a defendant has received legal process.[46] *See* 137 S. Ct. 911, 918-19 (2017). The malicious prosecution claim is based on Illinois tort law. To prevail on a malicious prosecution claim under Illinois law, a plaintiff must establish: "(1) the commencement or continuation of an original criminal or civil judicial proceeding by the defendant; (2) the termination of the proceeding in favor of the plaintiff; (3) the absence of probable cause of such proceeding; (4) malice; and (5) damages." *Sang Ken Kim v. City of Chi.*, 858 N.E.2d 569, 574 (Ill. App. Ct. 2006); accord *Cairel v. Alderden*, 821 F.3d 823, 834 (7th Cir. 2016) (applying Illinois law).

Both the malicious prosecution claim and the extended Fourth Amendment claim are stymied by the existence of probable cause. As discussed above, a reasonable factfinder would *have* to find that there was probable cause to detain Mr. Koh before the start of his second police interview. *See* Section III.B.2.a, *above*. No information later emerged to destroy probable cause. Indeed, some later-revealed facts actually *reinforced* the theory that Mr. Koh killed Paul. Interviews with Paul's friends, for example, confirmed that Paul and Mr. Koh fought frequently, and that Paul seemed to be afraid of Mr. Koh. *See* R. 308-13, Exh. 120. Mazurkiewicz Dep. Tr. 37:15-18; 65:22-66:1; R. 308-15, Exh. 122, Petersen Dep. Tr. 67:16-23; Exh. 75, Schnitzler Dep. Tr. 195:10-18, 213:18-23. Emerging physical evidence also suggested that Mr. Koh might be guilty. The Cook County Medical Examiner who performed Paul's autopsy concluded that Paul's death was a

---

[46]Defendants argue that the Kohs did not properly plead or pursue a Fourth Amendment claim stemming from Mr. Koh's extended pretrial detention; the Kohs disagree. *See* R. 362, Defs' Joint Mot. Summ. J at 4-5; R. 363, Pl. Resp. Defs.' Joint Mot. Summ. J. at 1. The Court need not resolve this dispute because the claim fails on the merits.

homicide, and found injuries that could be defensive wounds on Paul's hands. NDSOF ¶ 106; Pls.' Resp. NDSOF ¶ 106; R. 286-7, Exh. 52D, Helma Aff. Exh. D. Blood spatters were also found on Mr. Koh's boxer shorts. R. 308-5, Exh. 112, Trial Tr. 334:5-9.

It is true that some evidence also emerged to support the competing version that Paul (who by all accounts was suffering from serious mental health issues) committed suicide. The same friends who told police about Paul's conflict with his father also noted that Paul seemed sad, depressed, and anxious. Exh. 120, Mazurkiewicz Dep. Tr. 35:17-36:14, 64:13-14. Interviews with the Kohs' family members confirmed that Paul was depressed and revealed that Paul had made comments suggesting that he was suicidal. R. 308-35, Exh. 142, NORTAF Report of Steven Cho Interview; Exh. 47, NORTAF Report of Joon Hwang Interview (reporting that Paul told Hwang, "I don't want to live sometimes."); Exh. 83, May 11, 2010 Pretrial Hr'g Tr. 152:8-10, 152:24-153:2.[47] The Kohs' experts also argue that the physical evidence was more consistent with suicide than with murder. *See* R. 291-3, Exh. 98, Dec. 11, 2012 Trial Tr. of Dr. Laposata Testimony 69:6-72:11; R. 308-31, Exh. 138, Moses Dep. Tr. 99:19-25. But it is worth reiterating that probable cause is a low bar. The inference of the suspect's guilt does not need to be more probable than competing alternatives; a fair probability of guilt is enough. *Kaley*, 134 S. Ct. 1103. On the undisputed facts, a reasonable jury would have to find that probable cause existed to believe that Mr. Koh killed Paul from the time of Mr.

---

[47]Some of this information might have been available even before Mr. Koh's second interview, but it is not clear how long it took for it to filter through to Graf, Wernick, and the other relevant defendants.

Koh's second interview all the way through his acquittal. Summary judgment is therefore granted to all the Defendants on Mr. Koh's state-law malicious prosecution and Fourth Amendment pretrial detention claims.

## F. Municipal Liability

In addition to their claims against the individual defendants, the Kohs seek to hold the Village of Northbrook liable for violating their constitutional rights. Municipal liability is permitted under Section 1983 "if the unconstitutional act complained of is caused by: (1) an official policy adopted and promulgated by its officers; (2) a governmental practice or custom that, although not officially authorized, is widespread and well settled; or (3) an official with final policy-making authority." *Thomas v. Cook Cty. Sheriff's Dep't*, 604 F.3d 293, 303 (7th Cir. 2009); *Monell v. N.Y. City Dept. of Social Servs.*, 436 U.S. 658, 690 (1978). The Kohs premise their *Monell* claims on the first and third grounds for municipal liability— namely, that a Northbrook Police Department General Order and Chief Wernick *himself* were the moving forces behind their alleged constitutional violations. *See* Pls.' Resp. Br. at 53-59. The Court addresses each basis for *Monell* liability in turn.

### 1. General Order 15.14

Section 15.14, Paragraph 4, of the NPD General Orders outlines department protocols for managing and communicating with witnesses at crime scenes:

Unusual Occurrences, Major Crimes Response Protocol:
4. Witnesses
    a. Always use tact when dealing with citizens/witnesses at crime scenes
      i. Some may be potential witnesses with valuable information
      ii. Secure and Separate all witnesses
        a) Get names, addresses and telephone numbers

b) Arrange transportation to the station
*c) Do not release them until they have been interviewed.*

R. 292-3, Exh. 102, NPD General Order 15.14 ¶ 4 (emphasis added); *see also* NDSOF ¶ 124. According to the Kohs, Northbrook officers acted pursuant to this policy when they falsely arrested them the morning of Paul's death Pls.' Resp. Br. at 54-55. The Northbrook Defendants argue that no reasonable jury could find that Section 15.14 precipitated the Kohs' allegedly false arrest, and that the Order is only a general "guideline[] and [is] not to be interpreted in a manner inconsistent with the law." Northbrook Defs.' Br. at 34-35.

The express policy theory of municipal liability, as the name of the theory suggests, applies where a policy explicitly "violates the constitution when enforced." *Hahn v. Walsh*, 762 F.3d 617, 636 (7th Cir. 2014). The plaintiff must be able to point to "language in the … policy that is constitutionally suspect, [or] he must provide enough evidence of custom and practice to permit an inference that the [municipality] has chosen an impermissible way of operating." *Calhoun v. Ramsey*, 408 F.3d 375, 381 (7th Cir. 2005). Liability may attach even where just "one application of the policy result[s] in a constitutional violation," *Calhoun*, 408 F.3d at 379; *see also City of Oklahoma City v. Tuttle,* 471 U.S. 808, 822 (1985); *Hahn*, 762 F.3d at 636-37.

There is ample evidence for a jury to reasonably infer that the Northbrook Defendants acted pursuant to an unconstitutional policy—Section 15.14—when they falsely arrested the Kohs the morning of Paul's death. Just looking at the

language of the Order is enough to raise eyebrows. Section 15.14 orders officers to "[s]ecure," "[s]eparate," "arrange [for] transport[]," and hold all witnesses at the police station "until they have been interviewed." Exh. 102, NPD General Order 15.14. Tellingly, there is no prefatory language in Section 15.14 that tempers its application. It would be one thing if Section 15.14 contained a qualifier requiring officers to obtain the witnesses' consent, for example. But there is no language to this effect. That Section 15.14 on its face gives officers seemingly boundless authority to seize, transport, and detain a witness without their consent—and without stopping to consider the existence of reasonable suspicion or probable cause—is evidence that the order explicitly violates the Fourth Amendment.

And there is enough evidence that the officers acted pursuant to Section 15.14 when they secured and separated the Kohs at their house before driving them to the station and holding them there for hours on end. Both Commander Eisen and Officer Johnson were aware of Section 15.14 in April 2009;[48] they have also admitted that they were aware of and followed NPD policies when they interacted with the Kohs the morning after Paul died. *See* R. 283-1, Exh. 13, Eisen Aff. ¶ 9 ("As of April 16, 2009, I was aware of Section 15.14 … ."); R. 292-5; Exh. 104, Johnson Aff. ¶ 9 (same); R. 308-23, Exh. 130, Eisen and Johnson's Resp. to Pls.' March 6, 2015 Requests to Admit, Nos. 1-2 ("Subject to and without waiving … objections, [the Defendants] admit [that they] acted pursuant to the policies of the Northbrook

---

[48]Indeed, every officer is given a copy of the NPD's General Orders; supervisors review those orders with officers; and officers must attest to the fact that they have read and understand those orders. *See* R. 308-8, Exh. 115, Caruso Dep. Tr. 25:17-24; R. 284-1, Exh. 25, Wernick Dep. Tr. 169:5-23.

Police Department during [their] interactions with [the Kohs] on April 16, 2009."); *see also* NDSOF ¶ 125; Pls.' Resp. NDSOF ¶ 125. And even though the Northbrook Defendants claim that the NPD's General Orders were mere "guidelines," Northbrook Defs.' Br. at 34-35, Chief Wernick testified otherwise, *see* R. 284-1, Exh. 25, Wernick Dep. Tr. 168:17-21 ("Q: What does a general order mean in the Northbrook Police Department? / A: General order, how we are supposed to operate."). A reasonable jury could infer based on this evidence that the Northbrook officers who responded to Mr. Koh's 911 call and oversaw the Kohs' transport to, and detention at, the police station not only arrested the Kohs, but did so pursuant to Section 15.14. The problem, of course, is that doing so without probable cause violated the Fourth Amendment.[49] The Northbrook Defendants' motion for summary judgment on this *Monell* claim is denied.

### 2. Chief Wernick

The Kohs' second theory of municipal liability is that Chief Wernick—an official with final policy-making authority—directed officers to violate the Kohs'

---

[49]Chief Wernick has even testified that it was perfectly lawful to detain and investigate the Kohs just because they were the only two people in the house when Paul died. *See* R. 284-1, Exh. 25, Wernick Dep. Tr. 23:11-24:19 ("Q: So, anybody who is present in the home where a homicide takes place can be arrested for a felony; is that correct? … / A: If there are only two people in the house, well, we're going to bring them both in where a homicide occurred."); *id.* 24:24-28:11 ("Q: What did Mrs. Koh do that you believe was enough to have her arrested for a felony / A: She was present when a homicide occurred. … Q: And based on your understanding of the Illinois statutes, that was enough for an arrest; is that correct? … / A: We brought her in with her husband, and we had her in the station until we could figure out what happened."). This course of action is precisely what Section 15.14 instructs Northbrook officers to do, but it does not square with the Fourth Amendment in this case, absent probable cause that the Kohs committed a crime.

constitutional rights, or at the very least, ratified their misconduct.[50] Pls.' Resp. Br. at 56-58. The Northbrook Defendants move for summary judgment on this theory of municipal liability as well, asserting that there is no evidence from which a jury could infer that Chief Wernick directly caused any alleged constitutional violation. Northbrook Defs.' Br. at 35-36.

To proceed on a final policymaker theory of municipal liability, the Kohs must establish, among other things, that there is at least a genuine issue of fact as to whether Chief Wernick caused any of their alleged constitutional injuries. *See King v. Kramer*, 763 F.3d 635, 649 (7th Cir. 2014); *Estate of Sims ex rel. Sims v. Cty. of Bureau,* 506 F.3d 509, 515 (7th Cir. 2007). To be sure, Chief Wernick "need not [have] participate[d] directly in the deprivation [of civil rights]," in order for liability to attach. *Backes v. Vill. of Peoria Heights, Ill.,* 662 F.3d 866, 869-70 (7th Cir. 2011) (quotations and citations omitted). But there must be enough evidence from which a jury could infer that Chief Wernick "kn[e]w about the [mis]conduct and facilitate[d] it, approve[d] it, condone[d] it, or turn[ed] a blind eye for fear of what [he] might see." *Id.* at 870 (quotations and citations omitted).

Even assuming that Chief Wernick was Northbrook's final policymaker—an issue which the parties dispute, *see* Pls.' Resp. Br. at 56-57, Northbrook Defs.' Reply Br. at 35 n. 36—a reasonable jury could not find that Chief Wernick *caused* the

---

[50]The Second Amended Complaint states that in addition to "ratif[ying] and authoriz[ing] the[ir] unlawful detentions … as well as the coercive interrogation of [Mr. Koh]," Chief Wernick also "ratified and authorized … strip searches of [the Kohs]." *See* Second Am. Compl. ¶ 65. But the Kohs do not address the strip search issue in their response brief, *see* Pls.' Resp. Br., so the Court will treat that portion of their *Monell* claim as withdrawn.

Kohs' alleged constitutional violations. The Kohs cannot point to any evidence that Chief Wernick ordered their false arrest or that he directed Officers Graf, Ustich, and Kim to coerce a confession out of Mr. Koh. That Chief Wernick was one of the officers who responded to Mr. Koh's 911 call; investigated Paul's death; attended briefings on the investigation; viewed the videotape of Mr. Koh's interrogation; and oversaw the investigation as both the executive director of NORTAF and Northbrook's Chief of Police, *see* Pls.' Resp. Br. at 57-58, is not enough. *See Jackson v. City of Chi.*, 645 F. Supp. 926, 928 (N.D. Ill. 1986) ("[A] single incident of constitutional deprivation resulting from a direct command by a municipal policymaker will satisfy the *Monell* 'policy' requirement if the enforcement of that command *directly caused* the constitutional violation." (emphasis added) (citing *Pembaur v. City of Cincinnati*, 475 U.S. 469 (1986)). So, summary judgment on this *Monell* claim is granted.

## G. Loss of Consortium

Last up is Mrs. Koh's state-law loss of consortium claim, which is premised on her loss of her husband's companionship during his years-long pretrial detention. Under Illinois law, when one spouse is tortiously injured, the other spouse may recover from the tortfeasor for the resulting loss of support, society, and companionship. *Pease v. Ace Hardware Home Ctr. of Round Lake No. 252c.*, 498 N.E.2d 343, 349 (Ill. App. 1986). At this point, Mr. Koh's state-law tort claim for malicious prosecution has been dismissed, and all that remains are his constitutional claims.

Neither party has briefed whether a state-law loss of consortium claim can arise out of a constitutional claim.[51] *See* Pls.' Resp. Br. at 70 (arguing that the loss of consortium claim should survive if the underlying claims do, but not specifying the underlying claims). At least one court of appeals has held (albeit in unpublished decisions) that a state-law loss of consortium claim can arise from violation of a spouse's constitutional rights. *Gross v. City of Dearborn Heights*, 625 Fed. Appx. 747, 754 (6th Cir. 2015) (remanding husband's loss-of-consortium claim because wife's § 1983 excessive force claim survived); *Boyer v. Lacey*, 665 Fed. Appx. 476, 485 (6th Cir. 2016); *see also Kinzer v. Metropolitan Govt. of Nashville*, 451 F.Supp.2d 931, 934-947 (M.D. Tenn. 2006). The Seventh Circuit implied in dicta that a state-law consortium claim can be joined to a spouse's constitutional claim. *See Niehus v. Liberio*, 973 F.2d 526, 530, 534 (7th Cir. 1992) ("We add that the authority newly conferred by Congress to join a state-law claim for consortium with the spouse's constitutional claim, and thus bring both in federal court, will enable persons similarly situated to the Niehuses to obtain full compensation in a single proceeding."). The Court will not decide the issue without the benefit of full briefing. The burden is on the Defendants to show entitlement to judgment as a matter of law, and they have not done so. The loss of consortium claim survives for now.

---

[51]As opposed to the theory that a spouse has an independent *constitutional* consortium claim arising out of violations of her spouse's rights. *See Russ v. Watts,* 414 F.3d 783, 790 (7th Cir. 2005); *Niehus v. Liberio*, 973 F.2d 526, 534 (7th Cir. 1992).

## IV. Conclusion

For the reasons discussed, the following claims survive and may go to trial:

- The Kohs' Fourth Amendment false arrest claims against the Northbrook Defendants (Count One), although Mr. Koh's claim ends when officers had probable cause before his second interview.

- Mr. Koh's Fifth Amendment coerced confession claim (Count Two).

- Conspiracy and Failure to Intervene (Counts Three and Five), except as described in the Opinion, and with the warning that, at trial, some Defendants almost surely will not be subject to these claims.

- Municipal liability against Northbrook (Count Four) for false arrest.

- Mrs. Koh's loss of consortium claim (Count Eight).

- Respondeat superior and indemnification against Northbrook and Wheeling (Counts Nine and Ten) remain intact insofar as the underlying claims do.

Summary judgment is granted to Defendants on the remaining claims:

- Mr. Koh's state-law malicious prosecution claim (Count Six).

- Mr. Koh's substantive due process claim based on his coerced confession (Count Two).

- Mr. Koh's due process evidence fabrication claim (Count Six).

- Mr. Koh's Fourth Amendment claim based on his pretrial detention.

ENTERED:


_____s/Edmond E. Chang_____
Honorable Edmond E. Chang
United States District Judge

DATE:  March 30, 2018