UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| HYUNG SEOK KOH and EUNSOOK KOH, | ) ) ) | |
| Plaintiffs, | ) ) | No. 11 C 02605 |
| v. | ) ) | Judge Edmond E. Chang |
| VILLAGE OF NORTHBROOK, *et al.*, | ) ) | |
| Defendants. | ) | |

**MEMORANDUM OPINION AND ORDER**

Hyung Seok Koh and Eunsook Koh brought this civil-rights lawsuit against the Village of Northbrook, as well as Northbrook police officers, detectives, and its Chief of Police. The other targets of the lawsuit are the Village of Wheeling and Wheeling police officer Sung Phil Kim. The lawsuit arose out of the investigation of the death of the Kohs' son, Paul Koh. R. 133, Second Am. Compl.[1] After almost ten years of litigation (including an interlocutory trip to the Seventh Circuit), the Kohs entered into a settlement agreement with Northbrook and its officers (for convenience's sake, the Opinion will refer to those defendants collectively as "Northbrook"). But no settlement has been reached with Wheeling and the Wheeling officer. The Kohs and Northbrook ask this Court to find that their settlement was made in good faith. R. 523, Mot. Good Faith. The key consequence of a good-faith finding: if

---

[1]This Court has subject matter jurisdiction under 28 U.S.C. § 1331 over the § 1983 claims and supplemental jurisdiction pursuant 28 U.S.C. § 1367 over the state law claims. Citations to the record filings are indicated by "R." followed by the docket number and, when necessary, a page or paragraph number.

Wheeling is later found liable at trial, Wheeling would be blocked from seeking contribution from Northbrook. Put another way, granting the motion would extinguish Wheeling's contribution claim against Northbrook. For the reasons explained in this Opinion, the motion is denied: the proposed settlement was not made in good faith.

## I. Background

## A. Factual History

As noted earlier, the Kohs' claims against Northbrook and Wheeling arise from the investigation into the death of the Kohs' son in 2009. The Court assumes familiarity with the detailed factual recitation in the summary judgment opinion, R. 383, but will repeat here the facts most relevant to the settlement-approval motion. Also, it makes sense generally to set forth the facts in the light most favorable to the Kohs, because the question for the settlement-approval motion is what the approximate allocation of *liability* is between Northbrook and Wheeling.

In the pre-dawn hours of April 16, 2009, Mrs. Koh discovered her 22-year old son Paul lying in a pool of blood in the entryway to their house. R. 280, NDSOF ¶ 1; R. 315, PSOF ¶ 2; R. 288-2, Exh. 82, Mar. 22, 2010 Pretrial Hr'g Tr. 42:9-43:14 (sealed). Her screams awoke her husband, Hyung Seok Koh, who dialed 911. PSOF ¶¶ 2-3; NDSOF ¶¶ 1-2; R. 280-2, Exh. 1, 911 Call Tr. 1-3. When Northbrook police officers Eisen, Johnson, Meents, and Celia arrived at the Kohs' house, they found Mr. Koh with a phone in his hand screaming for help and Mrs. Koh crying and hunched over their son's body. NDSOF ¶ 3, 4; PSOF ¶ 4; Exh. 6, NPD Call Detail Report

(sealed); R. 280-5, Ex. 4, Celia Dep. Tr. 35:6-38:7. Paul had suffered major stab wounds to his throat and chest. NDSOF ¶ 5, 29; Celia Dep. Tr. 36:23-37:7.

After the officers' arrival, Mr. Koh headed toward the family car, but Officer Meents corralled him to the front yard, while Meents and Celia instructed Mrs. Koh to come along as well. R. 280-6, Exh. 5, July 15, 2010 Pretrial Hr'g Tr. 12:6-13:17; Exh. 4, Celia Dep. Tr. 42:21-43:12. In the front yard, the Kohs were pushed to the ground, and Officers Johnson and Meents watched over them for around 15 minutes. NDSOF ¶¶ 8, 11; PSOF ¶ 5; Exh. 5, July 15, 2010 Pretrial Hr'g Tr. 15:19-21; NDSOF Exh. 7, Meents Dep. Tr. 71:1-19. The Kohs' various requests to see their son, collect Mr. Koh's medications and cellphone, and go to the hospital were all denied by the officers. NDSOF ¶¶ 8, 12-13, 15; R. 283-6, Exh. 17, Hyung Seok Koh Dep. Tr. 354:4-355:8; Exh. 11, May 11, 2010 Pretrial Hr'g Tr. 76:8-20; Exh. 5, Meents Dep. Tr. 132:2-9.

At the direction of Commander Eisen, the Kohs were taken to Johnson's squad car where they were "pushed" and "sort of shoved" into the vehicle. R. 380-4, Exh. 3, Eisen Dep. Tr. 56:6-9; R. 282, Exh. 9, Johnson Dep. 67:22-68:7; Exh. 5, Meents Dep. Tr. 89:8-16; R. 311, Pls.' Resp. NDSOF ¶ 16; Exh. 17, Hyung Seok Koh Dep. Tr. 363:16-364:17. Johnson drove the Kohs to the Northbrook Police Department; no officer had asked the Kohs whether they wished to go there. NDSOF ¶ 22; R. 282, Exh. 9, Johnson Dep. Tr. 76:19-21; PSOF ¶ 6; Exh. 5, July 15, 2010 Pretrial Hr'g Tr. 41:18-42:12; Exh. 82, Mar. 22, 2010 Pretrial Hr'g Tr. 64:8-65:14 (sealed).

At the Northbrook police station, officers escorted the Kohs to a conference room. NDSOF ¶ 44; Exh. 9, Johnson Dep. Tr. 89:1-19. Mr. Koh's request to sit in the station chapel instead was denied, as was his request to make a phone call. PSOF ¶¶ 7, 11; NDSOF ¶ 37; R. 287-21, Exh. 79, Nov. 13, 2009 Pretrial Hr'g Tr. 59:3-9 (sealed). Eventually, Johnson contacted the Kohs' pastor, who arrived at 6:00 a.m. PSOF ¶ 10; Exh. 82, Mar. 22, 2010 Pretrial Hr'g Tr. 17:20- 18:8 (sealed). But the pastor was not allowed to see the Kohs. *Id.* Nor, for the matter, were the other friends and family who arrived at the station. PSOF ¶¶ 12, 24; R. 286, Exh. 48, Hwang Dep. Tr. 102:17-103:7 (sealed); R. 288-3, Exh. 83, May 11, 2010 Pretrial Hr'g Tr. 147:12-149:19; Exh. 79, Nov. 13, 2009 Pretrial Hr'g Tr. 91:13-95:17 (sealed).

Instead, while the Kohs waited, Commander Eisen initiated a search for a Korean-speaking police officer to help translate for the Kohs, who had difficulty communicating in English. PSOF ¶ 16; Exh. 3, Eisen Dep. Tr. 151:7-155:3. Officer Kim of the Wheeling Police Department answered the request and came to the Northbrook police station to assist with translation. NDSOF ¶ 45; WDSOF ¶ 8; R. 284-17, Exh. 39, Kim Dep. Tr. 80:10-81:9.

At around 7:30 a.m., Northbrook detectives Graf and Ustich started to interview Mr. Koh, with Officer Kim providing Korean-language interpretation. NDSOF ¶ 52; R. 285-1, Exh. 42, Video of Hyung Seok Koh Interview 1. Before the interview, Mr. Koh again requested his medications, but again they were not provided. PSOF ¶ 20; R. 289-1, Exh. 85, Mar. 16, 2010 Pretrial Hr'g Tr. 14:3-15:12. Graf administered English-language *Miranda* warnings; Kim at least partially translated the warnings

into Korean. NDSOF ¶ 54; R. 285-3, Exh. 44, Hyung Seok Koh Interview Tr. 1-3; PSOF ¶ 102- 105; WDSOF ¶ 36; R. 309, Pls.' Resp. WDSOF ¶ 36; R. 323, Wheeling Defs.' Resp. PSOF ¶¶ 102-105. Mr. Koh then signed the English-language *Miranda* form. Exh. 42, Video of Hyung Seok Koh Interview 1 at 00:02:13-00:02:36; NDSOF ¶ 54; R. 285-4, Exh. 45, *Miranda* Waiver Form; Exh. 44, Hyung Seok Koh Interview Tr. 1-3. For almost one hour, Graf then questioned Mr. Koh about Paul's death, and Graf eventually suggested that Mr. Koh might have harmed Paul. DSOF ¶ 52; Exh. 42, Video of Hyung Seok Koh Interview 1; Exh. 44, Hyung Seok Koh Interview Tr. 3-4, 36-37. When this first interview ended, the detectives next questioned Mrs. Koh; she provided a version of events mostly corroborating Mr. Koh's. NDSOF ¶ 73; R. 286-13, Exh. 54, Video of Eunsook Koh Interview; PSOF ¶ 111; Wheeling Defs.' Resp. PSOF ¶ 111. Officer Kim assisted with Mrs. Koh's interview, too. *Id.*

Following the initial interviews of the Kohs, Detectives Graf and Ustich met with supervisors to discuss how to proceed. PSOF ¶ 26; R. 284-14, Exh. 36, Graf Dep. Tr. 91:4-93:24; Exh. 28, Wasowicz Dep. Tr. 30:13-32:12. During that discussion, Graf and Ustich conveyed their suspicions about Mr. Koh given his answers in the first interview, various pieces of crime-scene evidence that suggested a possible struggle, and the pre-existing tensions between father and son. NDSOF Exh. 40, Ustich Dep. Tr. 85:21-86:4, 95:6-96:1; R. 285-5, Exh. 46, May 16, 2011, Pretrial Hr'g. Tr. 39:21-42:19.

At 11:30 a.m., Graf and Ustich, again joined by Kim, interrogated Mr. Koh in a second interview. NDSOF ¶ 78; Video of Hyung Seok Koh Interview 2. Mr. Koh had

not slept, eaten recently, or taken his medications, but did not accept the food and drinks offered to him. NDSOF ¶ 80; Exh. 44, Hyung Seok Koh Interview Tr. 58-59; PSOF ¶ 29; Exh. 17, Hyung Seok Koh Dep. Tr. 354:22-355:8. The tenor of the second interview was much more aggressive than the first, with Graf raising his voice, yelling at Mr. Koh, and touching Mr. Koh's arms and legs. PSOF ¶ 33; Northbrook Defs.' Resp. PSOF ¶ 33; NDSOF ¶ 92; Pls.' Resp. NDSOF ¶ 92; Exh. 55, Video of Hyung Seok Koh Interview 2 00:55:20-01:09:53. Kim provided only minimal translation assistance, and Mr. Koh appeared visibly distressed, hunched in his chair and occasionally hitting himself in the head or chest. *See generally* Exh. 55, Video of Hyung Seok Koh Interview 2; Exh. 57, Video of Hyung Seok Koh Interview 3.

Mr. Koh eventually agreed to a story—the details of which were suggested by Graf—that he had gotten into an argument with Paul that had culminated with Mr. Koh stabbing his son and slitting his son's throat in self-defense. Exh. 44, Hyung Seok Koh Interview Tr. 111-144; *see also* NDSOF ¶¶ 89-90; Pls.' Resp. NDSOF ¶¶ 89-90. Minutes before this interview would have concluded, Officer Dunham knocked on the door to the interview room and Graf stepped out to speak to him. Dunham informed Graf that Mr. Koh's lawyer had arrived at the station and would be brought to the room. PSOF ¶ 42; Exh. 24, Dunham Dep. Tr. 66:21-68:18. Graf returned to the room and resumed questioning Mr. Koh but stepped up the pressure on him to confess "right now" and "fast," until Mr. Koh's lawyer arrived and terminated the interview. PSOF ¶ 43; Exh. 44, Hyung Seok Koh Interview Tr. 144; Exh. 57, Video of Hyung Seok Koh Interview 3 at 21:08-21:36.

## B. State Court Prosecution

The next morning, Assistant State's Attorney Bob Heilengoetter approved first-degree felony murder charges against Mr. Koh, and on May 13, 2009, a grand jury returned an indictment against Mr. Koh for first-degree murder. NDSOF ¶ 109; R. 287-9, Exh. 67, Felony Compl.; PSOF ¶ 73. Mrs. Koh was not charged and was released after one night in jail. NDSOF ¶ 111. Mr. Koh, though, waited nearly four years in Cook County Jail for his December 2012 trial. R. 316, Pls.' Resp. Br. at 22; see PSOF ¶¶ 73-74. When the trial finally arrived, a jury acquitted Mr. Koh of all charges. PSOF ¶ 74; NDSOF ¶ 122.

## C. Procedural History

In 2011, the Kohs filed a civil rights-lawsuit against the Villages of Northbrook and Wheeling and their respective police officers. R. 1. The Second Amended Complaint, which is now the operative version, advances the following claims: in Count One, the Kohs allege that the Defendants arrested them without probable cause (or, in Officer Kim's case, extended Mr. Koh's unlawful detention) in violation of the Fourth Amendment. R. 133, Second Am. Compl. ¶¶ 48-52. In Count Two, the Kohs allege that the Defendants violated Mr. Koh's right against self-incrimination and his right to due process under the Fifth and Fourteenth Amendments. *Id.* ¶¶ 53-56. Count Three alleges that the Defendants failed to intervene to prevent these constitutional violations, *id.* ¶¶ 57-60; Count Four targets the Village of Northbrook, alleging that the Northbrook Defendants were acting pursuant to an unconstitutional municipal policy and practice, *id.* ¶¶ 61-65; and Count Five alleges that the Defendants

7

conspired to violate the Kohs' constitutional rights, *id.* ¶¶ 66-70. Finally, in the wake of the Supreme Court's decision in *Manuel v. City of Joliet*, 137 S. Ct. 911 (2017), the Kohs contend that Mr. Koh's pretrial detention violated the Fourth Amendment. R. 357, Pls.' Supp. Br. at 1-3.

The Kohs also bring a few state law claims. Count Six is a malicious prosecution claim, which alleges that the Defendants fabricated evidence, withheld exculpatory information, and subjected Mr. Koh to criminal proceedings without probable cause. Second Am. Compl. ¶¶ 71-75. Count Seven is (or was[2]) an intentional infliction of emotional distress claim, *id.* ¶¶ 76-80, and Count Eight alleges loss of consortium on behalf of Mrs. Koh, *id.* ¶¶ 81-84. Finally, Counts Nine and Ten allege *respondeat superior* and indemnification against the Villages of Northbrook and Wheeling. *Id.* ¶¶ 85-93. The Kohs also seek attorneys' fees and costs on the § 1983 claims under 42 U.S.C. § 1988.

The Wheeling Defendants moved to dismiss the Second Amended Complaint. R. 141. The Court dismissed all of *Mrs. Koh*'s (but not Mr. Koh's) claims against the Wheeling Defendants, except for the loss-of-consortium claim. R. 150. After discovery, both sets of Defendants moved for summary judgment on March 1, 2016. R. 274, 278. In granting these motions in part and denying them in part, the Court held that genuine disputes of material fact existed on part of the Fourth Amendment claims (Count 1); Mr. Koh's Fifth Amendment coercion claim (Count 2); the failure to intervene claim (Count 3); the *Monell* claim against Northbrook (Count 4); the conspiracy

---

[2]The Court already dismissed the Kohs' intentional infliction of emotional distress claim as untimely filed. *See* R. 82, Mot. to Dismiss Order at 13-16.

claims (Count 4); Mrs. Koh's loss-of-consortium claim (Count 8); and the *respondeat superior* (Count 9) and indemnification (Count 10) claims. R. 383, Summ. J. Op. at 63.

As the trial date loomed (then scheduled for April 2020, though ultimately vacated due to the pandemic), the Kohs and the Northbrook Defendants reached a verbal settlement in February 2020. The terms of the settlement were later memorialized in a written settlement agreement dated May 18, 2020. R. 523-1. By the Settlement Agreement's terms, Northbrook (through its insurer) agrees to pay the Kohs and their attorneys a total of $3,950,000 to settle all claims against the Northbrook Defendants. *Id.* ¶ 2.1. More important than the grand total—at least for purposes of this motion—the money is to be allocated among the claims as follows:

> $100,000 for Mr. Koh's Fourth Amendment claims;
>
> $100,000 for Mrs. Koh's Fourth Amendment claims;
>
> $450,000 for attorney's fees and costs expended in pursuit of claims against the Northbrook Defendants (and which did not advance the claims against the Wheeling Defendants); and
>
> $3,300,000 for Mrs. Koh's claims for loss of consortium damages against the Northbrook Defendants.

*Id.* ¶ 2.3.

Pursuant to a motion filed by the Kohs and the Northbrook Defendants, the Court dismissed the individual Northbrook officers from the case with prejudice. R. 505, 508. Northbrook was also dismissed but *without* prejudice, pending resolution of

this motion, R. 523, seeking a good-faith finding and approval of the settlement. R. 508.

### III. Analysis

### A. The Contribution Act

The statute that governs here is the Illinois Joint Tortfeasor Contribution Act. Generally speaking, the Act creates a statutory right of contribution where "2 or more persons are subject to liability in tort arising out of the same injury" and where one of the tortfeasors "has paid more than his pro rata share of the common liability," 740 ILCS 100/2(a), 2(b). The overall purpose of the Act is to prevent the saddling of one tortfeasor with the unfair burden of paying more than his "pro rata share." *Id.* To put that purpose into action, the Act gives the unfairly burdened tortfeasor the right to sue the others for contribution. But it is easy to see how the right to contribution can end up undermining another generally salutary goal: the promotion of settlement agreements. A tortfeasor considering whether to settle a case would think twice about doing that if the tortfeasor remains vulnerable to a contribution suit from a co-defendant.

Recognizing this, the Act provides that a tortfeasor who has settled with the plaintiff in "good faith" is "discharged from all liability for any contribution to any other tortfeasor." 740 ILCS 100/2(c), (d). Put another way, the Act extinguishes the right of contribution if the tortfeasor and the plaintiff have entered into a good-faith settlement. The settling tortfeasor and the plaintiff may ask a court to make a finding of a good-faith settlement in order to confirm the end of the remaining defendant's

right to contribution. *Fox v. Barnes*, 2013 WL 2111816, at *6-9 (N.D. Ill. May 15, 2013).

As the first step in evaluating a settlement, the settling parties carry "the initial burden of making a preliminary showing of good faith," which can be proven by "the existence of a legally valid settlement agreement." *Johnson v. United Airlines*, 784 N.E.2d 812, 820 (Ill. 2003). "[P]roof of consideration … [has been] held to be *prima facie* evidence of validity" and therefore creates a "presumption" of good faith. *Id*. at 819. After that preliminary showing is made, "the burden shifts to [the non-settling party] to prove the absence of good faith by a preponderance of the evidence." *Piercy v. Whiteside Cty., Illinois*, 2016 WL 1719802, at *4 (N.D. Ill. Apr. 29, 2016) (citing *Johnson*, 784 N.E.2d at 820).

To evaluate whether a settlement was negotiated in good faith, trial courts primarily consider four factors: (1) "whether the amount paid by the settling tortfeasor was within the reasonable range of the settlor's fair share"; (2) "whether there was a close personal relationship between the settling parties"; (3) whether the plaintiff sued the settlor"; and (4) "whether a calculated effort was made to conceal information about the circumstances surrounding the settlement agreement." *Wreglesworth v. Arctco, Inc.*, 740 N.E.2d 444, 449 (Ill. App. Ct. 2000). No one factor is dispositive on its own. *Id*. But even if those factors tip in favor of good faith, a court may nonetheless find a settlement falls short of good faith if the parties engaged in "wrongful conduct, collusion, or fraud" or if the agreement "conflicts with the terms of the Act or is inconsistent with the policies underlying the Act." *Johnson*, 784 N.E.2d at

821; *see also In re Guardianship of Babb*, 642 N.E.2d 1195, 1203 (Ill. 1994); *Dubina v. Mesirow Realty Development, Inc.*, 756 N.E.2d 836, 840 (Ill. 2001). Remember that the policies promoted by the Contribution Act are the "encouragement of settlements" and "the equitable apportionment of damages among tortfeasors." *Bulson v. Helmold,* 2018 WL 5729752, at *2 (N.D. Ill. Nov. 2, 2018). Ultimately, the trial court must exercise sound discretion and consider "the totality of the circumstances." *Johnson*, 784 N.E.2d at 821.

## IV. Analysis

Applying those principles here, there is a *preliminary* showing of good faith, because the Settlement Agreement provides for consideration on both sides: the Northbrook Defendants agree to pay the Kohs and their lawyers (the law firm Loevy & Loevy) $3,950,000 in return for a general release and discharge from the Kohs of any and all claims for damages that the Kohs may have against the Northbrook Defendants. R. 523-1, Settlement Agr. ¶¶ 1.2, 1.4, 2.1, 2.3, 3.0.

It is also true that some of the four factors set forth in *Wreglesworth*, 740 N.E.2d at 449, point in favor of a good-faith finding. *First*, broadly speaking, the settlement amounts are within a reasonable range for the claims to which the amounts are assigned[3]—though, as discussed below, *not* every claim has an assigned

---

[3]The settling parties provide comparators for the settlement amounts: (1) as a comparator for Mrs. Koh's $3.3 million for four years of lost consortium, a spouse received $2.7 million compensation for 8 months loss of consortium in *Fox v. Hayes*, 600 F.3d 819, 845-46 (7th Cir. 2010); (2) as comparators for the $100,000 each for the Kohs on the Fourth Amendment wrongful detention of around one day, a plaintiff received $125,000 for just over 24 hours in jail in *Adams v. City of Chicago*, 2014 WL 2621115, at *9 (N.D. Ill. June 10, 2014), and another received $100,000 for a six-hour false arrest detention in *Egan v. City of Chicago*, 2012 WL 6963983 (N.D. Ill. Oct. 12, 2012); and (3) as comparators for the $450,000 award to

settlement amount. *Second*, there is no personal relationship between the settling parties. They are separately represented by counsel and vigorously opposed each other in the litigation. *Third*, of course the Kohs did sue the Northbrook Defendants. And *fourth*, there was no unusual concealment of the Settlement Agreement, which is attached to the motion. R. 523-1. The Wheeling Defendants were not parties to the settlement negotiations between the Kohs and the Northbrook Defendants, but there is nothing unusual about keeping settlement negotiations close to the vest.

But the proposed good-faith finding is fatally undermined by the allocation of *zero* of the $3.95 million settlement toward Mr. Koh's Fifth Amendment claim for the coerced confession. The result of that zero allocation leaves the Wheeling Defendants on the hook—all by themselves—for the *entirety* of any damages that a jury might award on this claim at trial. And given the nearly four years that Mr. Koh spent in pretrial detention, if the jury finds liability on the coerced-confession claim, then the damages award could run into the millions of dollars.

The settling parties argue, however, that those risks are based on a whole lot of "ifs" and "coulds," and those are the risks that the settling parties have decided to eliminate while the Wheeling Defendants insist on trial. The Kohs point out that the Illinois Appellate Court "has recognized the importance of allowing settling parties to apportion their settlements to their advantage." *Lard v. AM/FM Ohio, Inc.*, 901 N.E.2d 1006, 1018 (Ill. App. Ct. 2009). And "[i]f the position of a non-settling

---

Loevy & Loevy, that amount is well below the fees granted for similar claims in *Fields v. City of Chicago*, 2018 WL 253716, at *11 (N.D. Ill. Jan. 1, 2018) ($1.9 million in wrongful conviction case), and in *Jiminez v. City of Chicago*, 2012 WL 5512266, at *7 (N.D. Ill. Nov. 14, 2012) ($1.7 million in wrongful conviction case).

defendant[s] is worsened by the terms of a settlement, this is the consequence of a refusal to settle." *Muro v. Abel Freight Lines, Inc.*, 669 N.E.2d 1217, 1219 (Ill. App. Ct. 1996). From this perspective, according to the settling parties, "inequality in the ultimate cost does not signalize bad faith." *Smith v. Texaco, Inc.*, 597 N.E.2d 750, 755 (Ill. App. Ct. 1992) (quotation omitted).

But that argument goes too far: settling parties do not have boundless discretion. The Illinois Supreme Court has emphasized that courts "must strike a balance between [the] two policy considerations" of promoting settlement *and* ensuring equitable apportionment. *Johnson*, 784 N.E.2d at 821; *see also Bulson*, 2018 WL 5729752, at *2. No doubt that, in order to promote settlement, a settling defendant of course should reap a benefit for being willing to pay up before a liability determination has been made at trial. And one aspect of that benefit is substantial leeway in allocating the settlement monies to their benefit to minimize any potential set-offs in the future. *Lard*, 901 N.E.2d at 1018. But a court would hardly be "balancing" the policy considerations underlying the Contribution Act—as *Johnson* requires—if the court allowed settlement promotion to completely eclipse the Act's competing interest in equitable apportionment. For this reason, a "settlement [that] shifts a disproportionally large and inequitable portion of the settling defendant's liability onto the shoulders of another" "cannot be construed as a good-faith settlement." *Associated Aviation Underwriters, Inc. v. Aon Corp.*, 800 N.E.2d 424, 435 (Ill. App. Ct. 2003); *see also Piercy*, 2016 WL 1719802 at *4.

14

Here, even with the substantial leeway given to settling parties, the Settlement Agreement's allocation of zero dollars toward Mr. Koh's coerced-confession claim—putting the Wheeling Defendants on the hook for 100 percent of any damages on that claim—is grossly disproportionate and inequitable in allocating responsibility on that claim. Even a quick glance at the record, as described in the summary judgment Opinion, makes clear that the Northbrook Defendants bear much more responsibility than the Wheeling Defendants for any liability on this claim. Northbrook Detective Graf was the lead investigator during the two interviews of Mr. Koh that led to the allegedly coerced confession, R. 383, at 7-9, 11-14: Graf asked the vast majority of the questions; he employed "coercive mental and physical tactics throughout the interviews," including "rais[ing] his voice, yell[ing] at Mr. Koh, approach[ing] Mr. Koh, and occasionally touch[ing] Mr. Koh on his arms and legs," *id.* at 41; he accused Mr. Koh of lying, pressed him to be "totally honest," and urged him to adopt "new storylines," *id.* at 40; he refused to accept any of Mr. Koh's denials, *id.* at 41; he insisted that Mr. Koh's deceased son "Paul wants you to do this," *id.*, that is, to confess; and he "implicitly threatened that the interview would not end until Mr. Koh confessed," suggesting that despite Mr. Koh's lack of sleep, medication, food, or drink, they could be there for "days and days and days," *id.* And importantly, when Mr. Koh's attorney arrived at the station, it was Graf, not Wheeling Officer Kim, who received notice that the attorney was there and who responded not by cutting off the interview but by "ramp[ing] up the coercive tactics" and saying "Hyung Seok, come on. Right now, let's be done, hurry up, fast!" *id.* at 42.

In contrast, although Officer Kim did contribute to the coercive nature of the interview, Kim did much less than Graf. Kim mistranslated certain points, such as the description of the right to an attorney (instead advising Mr. Koh that Koh did not need an attorney), and joined in the interrogation in a way that led Mr. Koh to sound more self-incriminating that he actually was. *Id.* at 38-40. Kim's role in obtaining the allegedly coerced confession was significantly less than Graf's repeated and multiple interrogation tactics and conduct.

So it is impossible to say, even with the wide bounds given to settling parties, that the Northbrook Defendants' range of reasonable exposure to the coerced-confession claim is zero. As the settling parties themselves concede, "courts [] require that the settlement be *within the reasonable range of the settlor's fair share*." R. 533 at 6 (emphasis added). And this settlement is not in that reasonable range. The bottom line is that the Settlement Agreement's allocation is apparently designed to deny the Wheeling Defendants any set-off on the coerced-confession claim. *See Piercy*, 2016 WL 1719802, at *5 (rejecting a good-faith finding where settlement agreement artificially separated the non-settling defendants' liability in an attempt to deny them any setoff).

And lest another reason is needed for skepticism, the Settlement Agreement's allocation of damages is impossible to reconcile with simple logic. The $3,300,000 that is dedicated to Mrs. Koh for loss of consortium presumably covers the nearly four years that she spent separated from Mr. Koh during his pretrial detention. By definition, success on the consortium claim is premised on the success of the coerced-

confession claim. So, on what theory of liability could the Northbrook Defendants believe that they might owe Mrs. Koh millions of dollars in lost consortium but not a penny to Mr. Koh for the years in pretrial detention that must be the cause of the lost consortium? There is no logic to that allocation. Remember that a finding of good faith would mean that the Wheeling Defendants' right to contribution on the coerced-confession claim is outright extinguished. On the facts of this case, that is so grossly unfair that the Court must reject a finding of good faith.[4] The motion is denied.

Perhaps anticipating the Wheeling Defendants' objection, the Settlement Agreement actually embeds a backup provision that reconfigures the settlement allocation "[t]o the extent any amount of the settlement payment allocated by this [agreement] is deemed unenforceable." R. 523-1, Settlement Agr. ¶ 2.3. Under this provision, any "portion deemed unenforceable shall be allocated in equal portions to Mr. Koh's compensatory damages, to Mrs. Koh's compensatory damages, and to 42 U.S.C. 1988 fees and costs incurred by the Plaintiffs and their attorneys, Loevy & Loevy, solely in pursuit of claims against the Northbrook defendants." *Id.*

Neither the settling parties nor the Wheeling Defendants explicitly discussed whether this backup allocation satisfies the good-faith standard. Perhaps the absence of discussion reflects the Wheeling Defendants' implicit concession that the backup

---

[4]With that said, the Court points out that the rejection of the proposed finding of good faith is *not* quite the equivalent of finding that the Kohs and the Northbrook Defendants acted out of nefarious, bad-faith motives that would warrant some sort of punishment. There is a relative dearth of case law in this area, and given the breadth of judicial discretion on this issue, it is understandable why the settling parties gave it a try. But that does not change the Court's conclusion that the proposed allocation does not satisfy the good-faith standard required by the Contribution Act.

allocation is reasonable. It certainly strikes the Court as much more reasonable to allocate the $3,300,000 in equal shares, especially given the broad leeway given to settling parties. Indeed, the Court was inclined to simply say so in this Opinion. But because neither side has explicitly addressed the issue, the Court invites the settling parties to formally move for a finding of good faith as to the backup allocation by November 23, 2020. The Kohs and the Northbrook Defendants first must confer with the Wheeling Defendants; perhaps the motion will be unopposed. To track this issue, the Court resets the tracking status hearing of November 20, 2020, to November 27, 2020, at 8:30 a.m. (but to track the case only, no appearance is required and the case will not be called).

## V. Conclusion

Because the proposed allocation in the Settlement Agreement fails the good-faith standard set by the Contribution Act, the settling parties' joint motion for a finding of good faith is denied. The motion on the backup allocation is due by November 23, 2020.

ENTERED:

s/Edmond E. Chang
Honorable Edmond E. Chang
United States District Judge

DATE: November 12, 2020

18